**AMENDED AND RESTATED BYLAWS**
**OF**
**GARDEN OAKS HOMEOWNERS ASSOCIATION, INC.**
**(F/K/A GARDEN OAK MAINTENANCE ASSOCIATION, INC.)**

**ARTICLE 1**
**OFFICES**

1.01     Name. The name of the Association is the Garden Oaks Homeowners Association, Inc. ("Association") which was formerly known as the Garden Oaks Maintenance Association, Inc. pursuant to the Articles of Amendment.

1.02     Principal Office. The principal office of the Association is located in Harris County, Texas. The Association may have other offices, either within or without the State of Texas, as the Board of Directors (collectively, the "Board" and individually, "Director") may determine or as the affairs of the Association may require from time to time.

1.03     Registered Office and Registered Agent. The Association will have and continuously maintain in the State of Texas a registered office and a registered agent whose address is identical with the registered office, as required by the Texas Business Organizations Code. The registered office may, but need not, be identical with the principal office of the Association in the State of Texas. The address of the registered office may be changed from time to time by the Board of Directors.

1.04     Definitions. The capitalized terms used in these Bylaws have the same meaning as set forth in the Amended and Restated Declaration of Covenants, Conditions and Restrictions for Garden Oaks, Section One, recorded in the Official Public Records of Harris County, Texas, under Clerk's File No. _____, Amended and Restated Declaration of Covenants, Conditions and Restrictions for Garden Oaks, Section Two, recorded in the Official Public Records of Harris County, Texas, under Clerk's File No. _____, Amended and Restated Declaration of Covenants, Conditions and Restrictions for Garden Oaks, Section Three, recorded in the Official Public Records of Harris County, Texas, under Clerk's File No. _____ , Amended and Restated Declaration of Covenants, Conditions and Restrictions for Garden Oaks, Section Five, recorded in the Official Public Records of Harris County, Texas, under Clerk's File No. _____, (collectively referred to herein as the "Amended and Restated Declaration, as amended, renewed, or extended from time to time), unless otherwise specified herein.

1.05     Property. The property affected by these Bylaws is the property described on the first recorded plat for Garden Oaks, recorded under the following for each section: Volume 14, Page 5 for Section One, Volume 15, Page 46 for Section Two, Volume 15, Page 71 for Section Three, and Volume 19, Page 19 for Section Five, in the Map Records of Harris County, Texas, and any other property which is subsequently annexed and made subject to the authority of the Association ("Subdivision").

## ARTICLE 2
## MEMBERS

2.01    Membership. There will be one class of Members. All record owners (an "Owner" or "Owners") of any separately-owned Lot (a "Lot", as defined below) within Garden Oaks Sections 1, 2, 3, and 5 (collectively, the "Subdivision" and individually, the "Section") in Harris County, Texas, shall become members ("Members") of the Association.

2.02    Voting Rights and Procedures. Each Lot in Garden Oaks Sections 1, 2, 3, and 5 will have one (1) vote in the Association on matters requiring a vote of the Members, regardless of the number of Owners of the Lot.

Each Lot is entitled to one (1) vote, regardless of the number of Owners of a Lot. Multiple Owners of any single Lot must vote in agreement (under any method they devise among themselves) but, in no case will such multiple Owners cast portions of votes.  The vote attributable to any single Lot must be voted in the same manner (i.e. all Owners of the Lot for, or all Owners of the Lot against a particular issue) but, in no event can there be more than one vote cast per Lot.

A Lot is entitled to two (2) votes only if all of the following conditions are satisfied: (i) applicable City of Houston subdivision ordinances would permit subdivision of the Lot by re-platting, (ii) each resulting Lot would satisfy the frontage requirements imposed herein, (iii) no Structure that is located on one resulting Lot would encroach onto the adjacent Lot or violate setback lines after subdivision (e.g., a building may not be located on the original Lot such that the lot line created by the subdivision would, with respect to existing Structures, result in an encroachment or violation of setback lines), and (iv) each resulting Lot may be conveyed to a separate Owner as a fee simple tract of land.

No Owner will have a right to vote unless (i) the Owner is shown on the membership rolls of the Association, or (ii) the recorded deed evidencing ownership of the Lot has been delivered to the Association.

Votes may be cast by written proxy if the original proxy is delivered to the Board at or before the time of voting. Proxies may not be effective for a period exceeding eleven months. Owners may be represented at a meeting for voting purposes by an attorney-in-fact pursuant to a power of attorney satisfying the requirements of Texas law if the following are delivered to the Board at or before the time of voting: a copy of the power of attorney; a written statement by the attorney-in-fact that the power of attorney is valid, continuing, and has not been revoked; and the current address, phone number, and contact person, if an entity, in order to contact the Owner.

2.03    Transfer of Membership. Membership in the Association is automatically transferred with ownership of a Lot.

2.04    Address of Members. Members shall be deemed to have received notices sent to the street address of the Lot owned by a Member (or any one Lot if more than one Lot is owned), unless another address has been provided in writing to the Association by delivery to its principal office or to the then-Secretary by certified mail, return receipt requested.

## ARTICLE 3
## MEETINGS OF MEMBERS

3.01    Annual Meeting of Members.  Annual meeting of the Members will be held each year at a time, place, and date designated by the Board, for the purpose of electing Directors and for the transaction of other business as may come before the meeting.

Within ninety (90) days of the confirmation of the bankruptcy plan (or the effective date of the Amended and Restated Declaration), the Interim Board shall hold an annual meeting for the purposes of electing a new Board.

3.02    Special Meetings of Members. Special meetings of the Members may be called by the President, the Board, or Members representing not less than one-tenth (1/10) of the Lots then entitled to vote on the issue for which the special meeting is called.  Whenever a special meeting is called by the Members, the Members may be required by the Board to deposit with the Association the amount necessary to pay the expenses of the Association in calling and holding the special meeting.

3.03    Place of Meeting of Members. Any place in Harris County, Texas, may be designated as the place for any annual meeting or special meeting of the Members.

3.04    Notice of Meetings of Members. Written or printed notice stating the place, day, and hour of each annual and special meeting of Members will be delivered, either personally by delivery to the Lot (whether or not the Member resides on the Lot or is at home at the time of delivery) or by mail, to each Member entitled to vote at the meeting, not less than ten (10) , nor more than sixty (60), days before the date of the meeting, by or at the direction of the President, the Secretary, the Directors, or the Members calling the meeting.  Written notice under this section may be sent by electronic mail to any Member who has registered his/her email address with the Association and opted to receive notice in this manner.  Additional notice of any meeting and notice of informational meetings may be given by any means determined by the President, the Secretary, or the Directors to be reasonable and appropriate, such as by publication in the Garden Oaks Gazette or by signs posted in the neighborhood. In ease of a special meeting or when required by statute or these Bylaws, the notice must state the purpose or purposes for which the meeting is called. If mailed, the notice will be deemed to be delivered when deposited in the United States Mail, addressed to the Member at the address that appears in the records of the Association, with postage prepaid.

3.05    Quorum. Except as otherwise provided in these Bylaws or in the Amended and Restated Declaration, the presence, in person or by proxy, absentee ballot, or electronic ballot, of Members representing ten percent (10%) of the total votes allocated to Owners in the Subdivision will constitute a quorum for the conduct of business at a meeting. If a quorum is

not present at any meeting of Members, Members representing a majority of the Lots present at the meeting may adjourn and reconvene the meeting at a later time or date.

3.06     Manner of Acting. The act of Members representing a majority of the Lots attending in person or by proxy, absentee ballot, or electronic ballot, and entitled to vote at a meeting at which a quorum is present will be the act of the Members, unless the act of a greater number is required by law or another provision of these Bylaws.

3.07     Proxies. At any meeting of Members, the Member(s) representing a Lot entitled to vote may vote by proxy executed in writing by the Member or by his or her duly-authorized attorney-in-fact. No proxy will be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

3.08     Voting by Written Ballot. When Directors or officers are to be elected, the election may be conducted by written ballot in the manner determined by the Board.

3.09     Robert's Rules of Order. If questions of procedure or Association are not specifically addressed by these Bylaws, the then-current edition of Robert's Rules of Order, or its successor publication, if any, will control.

## ARTICLE 4
## BOARD OF DIRECTORS

4.01     General Powers. The affairs of the Association will be managed by the Board of Directors.  Currently, the Association consists of the same Directors from the Garden Oaks Maintenance Organization, Inc. (the "Interim Board").  At the first annual meeting for the Association, twelve (12) Directors will be elected for the Association.

At the first annual meeting of the Association to be held within ninety (90) days of the confirmation of the bankruptcy plan (or the effective date of the Amended and Restated Declaration, twelve (12) Directors will be elected in order to replace the Interim Board.  For the first annual meeting of the Association, the Association must solicit candidates as provided in Section 4.02.  Four (4) Directors will serve a term of one (1) year, four (4) Directors will serve a term of two (2) years, and four (4) Directors will serve a term of three (3) years until a successor is elected.  Unless otherwise established by the Board, the twelve (12) candidates receiving the highest numbers of votes will be the new Board, with the four candidates receiving the highest numbers of votes serving the three-year terms, the four candidates receiving the next highest numbers of votes serving the two-year terms, and the four candidates receiving the next highest numbers of votes serving the one-year term.  In an election where two (2) or more candidates receive the same number of votes resulting in a tie, the winner of the election will be chosen by lot (i.e., the names of the candidates who are running for a director position and have received the same number of votes will be written on separate pieces of paper by the presiding officer of the meeting, the pieces of paper will be folded by the presiding officer and placed in a container provided by the then-serving Board; the presiding officer will ask for a volunteer Member from the audience of Owners to pick any one piece of paper from the container and the person whose

name is picked will be declared the winner of such election).   At the expiration of the terms of the initial twelve (12) Directors to be elected at the first annual meeting of the Association, Directors will each thereafter be elected to serve a term for three (3) years.  Each director will continue to hold office until his/her successor or elected.

4.02    Number, Tenure, and Qualifications. The Association will have twelve (12) Directors.   All Directors must be Members and at least eleven (11) Directors must reside in the Subdivision. After the first annual meeting at which the initial Directors are elected, Directors will each be elected for three-year terms.

At least ten (10) days before the Association disseminates absentee ballots or other ballots to the Members for purposes of voting in a Board member election, the Association must provide notice to the Members soliciting candidates interested in running for a position on the Board.  The notice must contain instructions for an eligible candidate to notify the Board of the candidate's request to be placed on the ballot and the deadline to submit the candidate's request.  The deadline may not be earlier than the 10th day after the date the Board provides the notice.  The absentee ballot or other ballot must include the name of each eligible candidate from whom the Board received a request to be placed on the ballot.

The notice required by this provision must be:
1.    mailed to each Member; *or*
2.    provided by:
     (a)  posting the notice in a conspicuous manner reasonably designed to provide notice to the Members:
          (i)  on public or privately-owned property within the Subdivision in a conspicuous manner, with the Owner's consent; or
          (ii) on any Internet website maintained by the Association or other Internet media; *and*
     (b)  sending by e-mail to each Member who has registered an e-mail address with the Association.

4.03    Annual Board Meetings. An annual meeting of the Board will be held immediately after, and at the same place as, the annual meeting of Members.

4.04    Special Board Meetings. Special meetings of the Board may be called by or at the request of the President or any two Directors.

4.05    Regular Board Meetings. Regular meetings of the Board will be held not less than nine (9) times each calendar year, at the time and place designated by the Board from time to time.

4.06    Board Meetings.  A Board meeting means a deliberation between a quorum of the voting Directors or between a quorum of the voting Directors and another person, during which Association business is considered and the Board takes formal action.  A Board meeting does not include the gathering of a quorum of the Board at a social function unrelated to the business of the Association or the attendance by a quorum of the Board at a regional, state, or

national convention, ceremonial event, or press conference, if formal action is not taken and any discussion of Association business is incidental to the social function, convention, ceremonial event, or press conference.

Regular and special Board meetings must be open to the Members, subject to the right of the Board to adjourn a Board meeting and reconvene in closed executive session.

Regarding all Board meetings that are open to the Members, Members other than Directors may not participate in any discussion or deliberation unless permission to speak is requested on his or her behalf by a Director.  In such case, the President may limit the time any Member may speak.

An open meeting may be held by electronic or telephonic means provided that (i) each Director may hear and be heard by every other Director, (ii) all Members in attendance at the meeting may hear all Directors (except if adjourned to executive session), and (iii) all Members are allowed to listen using any electronic or telephonic communication method used or expected to be used by a Director to participate.

Action Outside of a Meeting, Generally:
1.   The Board may take action outside of a meeting, including voting by electronic and telephonic means, without prior notice to Members if each Director is given a reasonable opportunity to express the Director's opinion to all other Directors and to vote.   Any action taken without notice to the Members must be summarized orally, including estimation of expenditures approved at the meeting, and documented in the minutes of the next regular/special Board meeting.

Action Outside of a Meeting Prohibited:
2.   Notwithstanding subsection 1, above, the Board may not consider or vote on any of the following issues except in an open meeting for which prior notice was given to Members:
   a.  Initiation of enforcement actions, excluding temporary restraining orders or violations involving a threat to health or safety;
   b.  Increases in Assessments;
   c.  Appeals from a denial of architectural approval;
   d.  A suspension of a right of a particular Member before the Member has an opportunity to attend a Board meeting to present the Member's position, including any defense, on the issue;
   e.  Lending or borrowing money;
   f.  The adoption or amendment of a Dedicatory Instrument;
   g.  The approval of an annual budget or the approval of an amendment of an annual budget that increases the budget by more than ten percent (10%);
   h.  The sale or purchase of real property;
   i.  The filling of a vacancy on the Board;
   j.  The construction of capital improvements other than the repair, replacement, or enhancement of existing capital improvements; or
   k.  The election of an officer.

4.07    Community Meetings. One or more of the Directors, as determined by the Board, may also be designated to:

a.      attend the meetings of the Garden Oaks Civic Club, Inc.; and

b.      call and preside over informational meetings for the purpose of communications among and between the Members and the Directors, with notice for these meetings to be provided by any means determined by the President, the Secretary, or the Directors to be reasonable and appropriate, such as by publication in the Garden Oaks Gazette or by signs posted in the neighborhood.

4.08    Notice to the Members and Directors of the date, hour, place and general subject of regular or special open Board meetings, including instructions for Members to access any communication method utilized for the Board meeting, as well as a general description of any matter to be brought up for deliberation in executive session, will be:

1.      mailed to each Member and Director not later than the 10th day or earlier than the 60th day before the date of the meeting; or

2.      provided at least 72 hours before the start of the meeting by:
   a.      posting in a conspicuous manner reasonably designed to provide notice to the Members and Directors:
      i.      in a place located on any public or Member's property with their consent, or other property within the subdivision; *or*
      ii.     on any internet website maintained by the Association or other internet media; *and*
   b.      sending notice by e-mail to each Member and Director who has registered an email address with the Association.

It is the Member's and Director's duty to keep an updated e-mail address registered with the Association.

If the Board recesses to continue the meeting the following regular business day, the Board is not required to post notice of the continued meeting if the recess is taken in good faith and not to circumvent this provision.  If the meeting is continued to the next business day, and the Board again continues the meeting to another day, the Board will give notice of continuation in at least one of the manners described above, within two (2) hours after adjourning the meeting being continued

4.09    Quorum. At all meetings of the Board, a majority of the Directors will constitute a quorum for the transaction of business, and the votes of a majority of the Directors present at a meeting at which a quorum is present will constitute the decision of the Board.  If any meeting of the Board cannot be held because a quorum is not present, a majority of the Directors who are present at such meeting may adjourn the meeting subject to the notice requirements set forth herein.  At the reconvened meeting, if a quorum is present, any business that might have been transacted at the meeting originally called may be transacted without further notice.

4.10    Vacancies. In the event of a vacancy, the Association will hold an election and send notice to the Members as required by Section 4.02 of any Board vacancy so that Members may stand for election to the position. The Director who is elected in this manner will serve for the remainder of the unexpired term. If no Member chooses to stand for election, the special election will be canceled, and the position will remain vacant until the election of Directors at the next annual meeting.

4.11    Removal. Any Director elected by the Members may be removed, with or without cause, by the vote of Members holding a majority of the total votes of a quorum of Members.  Any Director whose removal is sought will be given notice prior to any meeting called for that purpose.  Upon removal of a Director, a successor will then and there be elected by the Members entitled to elect the Director so removed to fill the vacancy for the remainder of the term of such Director.  A Director is considered to have been immediately removed from the Board if the Director misses three (3) consecutive, regular Board meetings.  In such case, a vote of at least eighty percent (80%) of the remaining Directors may vote to excuse one or more of the absences, allowing the Director to remain on the Board.

4.12    Resignation. A Director will be deemed to have resigned immediately if the Director no longer owns property in the Subdivision.

4.13    Conflict of Interest. The Association may enter into an enforceable contract with a current Director, a person related to a current Director within the third degree by consanguinity or affinity, as determined under Chapter 573, Government Code, a company in which a current Director has a financial interest in at least 51 percent of profits, or a company in which a person related to a current Director within the third degree by consanguinity or affinity, as determined under Chapter 573, Government Code, has a financial interest in at least 51 percent of profits only if the following conditions are satisfied:
    (1)  the Director, relative, or company bids on the proposed contract and the association has received at least two other bids for the contract from persons not associated with the board member, relative, or company, if reasonably available in the community;
    (2)  the Director:
        (A)  is not given access to the other bids;
        (B)  does not participate in any board discussion regarding the contract; and
        (C)  does not vote on the award of the contract;
    (3)  the material facts regarding the relationship or interest with respect to the proposed contract are disclosed to or known by the Board and the Board, in good faith and with ordinary care, authorizes the contract by an affirmative vote of the majority of the Board members who do not have an interest governed by this subsection; and
    (4)  the Board certifies that the other requirements of this subsection have been satisfied by a resolution approved by an affirmative vote of the majority of the Directors who do not have an interest governed by this subsection.

4.14    Compensation. Directors will not receive any compensation for their services, but, by resolution of the Board, may be reimbursed for reasonable expenses.

4.15     Executive Session.  The Board may close a portion of its meetings for the purpose of discussing actions involving personnel, pending or threatened litigation, contract negotiations, enforcement actions, confidential communications with the Association's attorney, matters involving the invasion of privacy of individual Members, or matters that are to remain confidential by request of the affected parties and agreement of the Board.  Following an executive session, any decision made in the executive session must be summarized orally and placed in the minutes, in general terms, without breaching the privacy of individual Members, violating any privilege, or disclosing information that was to remain confidential at the request of the affected parties.  The oral summary must include a general explanation of expenditures approved in executive session.

4.16     Powers.  The Board will be responsible for the affairs of the Association and will have all of the powers necessary for the administration of the Association's affairs.

The Board may delegate to one (1) or more of its Directors the authority to act on behalf of the Board on all matters relating to the duties of the managing agent or manager, if any, that might arise between meetings of the Board.

In addition to the authority created in these Bylaws, Texas law or by any resolution of the Board that may hereafter be adopted, the Board will have the power to establish policies relating to, and for performing or causing to be performed, the following, in way of explanation, but not limitation:

(a)     preparing and adopting of annual budgets;

(b)     making Assessments, establishing the means and methods of collecting such Assessments;

(c)     collecting the Assessments, depositing the proceeds thereof in a bank depository that it approves, and using the proceeds to operate the Association; provided, any reserve funds may be deposited, in the Directors' best business judgment, in depositories other than banks;

(d)     providing for the operation, care, upkeep and maintenance of the Subdivision, including entering into a contract to provide for such operation, care, upkeep and maintenance;

(e)     making or contracting for the making of repairs, additions, and improvements to or alterations of the Subdivision in accordance with the other provisions of the Amended and Restated Declaration and these Bylaws after damage or destruction by fire or other casualty;

(f)     designating, hiring, and dismissing the personnel necessary for the operation of the Association and the maintenance, operation, repair, and replacement of the Subdivision and, where appropriate, providing for the compensation of such personnel and for the purchase of equipment, supplies, and materials to be used by such personnel in the performance of their duties;

(g)     making and amending rules and regulations and promulgating, implementing and collecting fees related to enforcement of the rules and regulations, the Amended and Restated Declaration, and all Dedicatory Instruments (as that term is defined in the Texas Property Code) for the Subdivision;

(h)     opening of bank accounts on behalf of the Association and designating the signatories required;

(i)     enforcing by legal means the provisions of the Dedicatory Instruments and bringing any proceedings that may be instituted on behalf of or against the Owners concerning the Association;

(j)     obtaining and carrying insurance against casualties and liabilities with policy limits, coverage and deductibles as deemed reasonable by the Board and paying the premium cost thereof;

(k)     paying the cost of all services rendered to the Association or its Members and not chargeable directly to specific Owners;

(l)     keeping books with detailed accounts of the receipts and expenditures affecting the Association and its administration, specifying the maintenance and repair expenses and any other expenses incurred;

(m)     maintaining a membership register reflecting, in alphabetical order, the names, property addresses and mailing addresses of all Members;

(n)     making available upon request to any prospective purchaser, any Owner, any first Mortgagee, and the holders, insurers, and guarantors of a first Mortgage on any property, for any proper purpose during normal business hours by advance appointment, copies of the Amended and Restated Declaration, the Certificate of Formation, the Bylaws, rules governing such property and all other books, records, and financial statements of the Association for a reasonable charge; and making copies thereof available for a reasonable charge;

(o)     permitting utility suppliers to use portions of the Subdivision reasonably necessary to the ongoing development or operation of the Subdivision;

(p)     compromise, participate in mediation, submit to arbitration, release with or without consideration, extend time for payment, and otherwise adjust any claims in favor of or against the Association;

(q)     commence or defend any litigation in the Association's name with respect to the Association or any Association property; and

(r)     regulate the use, maintenance, repair, replacement, modification, and appearance of the Subdivision.

4.17    Management. The Board may employ for the Association a professional management agent or agents at a compensation established by the Board to perform such duties and services as the Board shall authorize. No controlling owner, representative, officer, director, or partner of the management agent or agent shall be a property owner in the Subdivision.

4.18    Accounts and Reports.  The following management standards of performance will be followed unless the Board by resolution specifically determines otherwise:

(a)     Accrual or cash accounting, as defined by generally accepted accounting principles, will be employed.

(b)     Accounting and controls should conform to generally accepted accounting principles.

(c)     Cash accounts of the Association will not be commingled with any other accounts.

(d)     No remuneration without full disclosure and prior agreement of the Board, or as contained in a written management contract, will be accepted by the managing agent from vendors, independent contractors, or others providing goods or services to the

Association, whether in the form of commissions, finder's fees, service fees, prizes, gifts, or otherwise.

(e)     Any financial or other interest that any Director, or the managing agent may have in any firm providing goods or services to the Association will be disclosed promptly to the Board.

(f)     An annual report consisting of at least the following will be prepared as soon as practicable after the close of the fiscal year and made available to all Members at the next annual meeting of Members: (1) a balance sheet; (2) an operating (income) statement; and (3) a statement of changes in financial position for the fiscal year.  The annual report referred to above may be prepared on an audited or reviewed basis, as determined by the Board, by an independent, certified public accountant.

4.19     Borrowing.  The Board has the power to borrow money for any proper purpose with the approval of a majority (50% plus one) of the Members of the Association at a meeting at which quorum is present in person, or by proxy, absentee ballot, or electronic ballot.  The Board, on behalf of the Association, may pledge the Association's Assessments and assign the Association's assets as collateral for any loan obtained by the Board on behalf of the Association.

## ARTICLE 5
## OFFICERS

5.01     Officers. The officers of the Association will be the President, one Vice President, a Secretary, and a Treasurer, each of whom must be a Director. The Board may create other offices and elect or appoint other officers as it deems desirable (who may or may not be required to be Directors), these officers to have the authority and perform the duties prescribed from time to time by the Board. One person may hold more than one office, except for the offices of President, Secretary, and Treasurer.

5.02     Election and Term of Office. The officers of the Association will be elected annually by the Board at the Board's annual meeting. If the election of officers is not held at the Board's annual meeting, the election will be held as soon thereafter as practicable. Each officer will hold office until his or her successor has been duly elected and qualified.

5.03     Removal. Any officer elected or appointed by the Board may be removed by a 75% affirmative vote of the remaining Directors if the Board determines that the officer has not acted in the best interests of the Association.

5.04     Vacancies. A vacancy in any office may be filled by the Board for the unexpired portion of the term of the officer.

5.05     President. The President will be the principal executive officer of the Association and will in general supervise and control all of the business and affairs of the Association. The President will preside at all meetings of the Members and of the Board. The President may sign, with the Secretary or any other officer of the Association authorized by the Board, all deeds, mortgages, bonds, contracts, or other instruments that the Board has authorized to be executed, except in cases where the signing and execution has been expressly delegated by the Board,

another provision of these Bylaws, or statute to some other officer or agent of the Association. In general, the President will perform all duties incident to the office of President and other duties be prescribed by the Board from time to time.

5.06     Vice President. In the absence of the President or in the event of his or her inability or refusal to act, the Vice President will perform the duties of the President, and when so acting shall have all the powers of and be subject to all the restrictions on the President. The Vice President will perform other duties as from time to time may be assigned to the office of Vice President by the President or the Board.

5.07     Treasurer. The Treasurer will have charge and custody of and be responsible for all funds and securities of the Association; receive and give receipts for moneys due and payable to the Association from any source whatsoever, and deposit these funds in the name of the Association in the banks, trust companies, or other depositories selected in accordance with Article 7 of these Bylaws; and in general perform all the duties incident to the office of Treasurer and other duties as from time to time may be assigned to the office by the President or the Board. If required by the Board, the Treasurer will give a bond for the faithful discharge of his or her duties in the amount and with a surety or sureties as the Board requires.

5.08     Secretary. The Secretary will keep the minutes of the meetings of the Members and the Board in one or more books provided for that purpose; give all notices in accordance with provisions of these Bylaws or as required by law; be custodian of the corporate records and the seal of the Association (if one is adopted) and affix the seal of the Association to all documents that must be delivered under seal; keep a register of the mailing address of each Member as furnished to the Secretary by each Member; and, in general, perform all duties incident to the office of Secretary and other duties as from time to time may be assigned to the office of Secretary by the President or by the Board.

5.09     Compensation. Officers will not receive any compensation for their services, but, by resolution of the Board, may be reimbursed for reasonable expenses.

# ARTICLE 6
# COMMITTEES

6.01     Committees of Directors. The Board may, by resolution adopted by a majority of the Directors in office, designate and appoint one or more committees and their members, which committees, to the extent provided in each resolution, will have and exercise the authority of the Board in the management of the Association. The Board may not, however, delegate to any committee the Board's authority to amend, alter, or repeal the Bylaws; elect, appoint, or remove any member of any committee or any Director or officer of the Association; amend the Articles of Incorporation; adopt a plan of merger or consolidation with another corporation; authorize the sale, lease, exchange, or mortgage of all or substantially all of the property and assets of the Association; authorize the voluntary dissolution of the Association or revoke proceedings for dissolution; adopt a plan for the distribution of the assets of the Association; or amend, alter, or repeal any resolution of the Board that by its terms provides that it may not be amended, altered, or repealed by the committee. The designation and

appointment of, and the delegation of authority to, a committee will not operate to relieve the Board, or any individual Director, of any responsibility imposed on it by law.

6.02    Architectural Review Committee. The Board has the authority to act as the Architectural Review Committee, in accordance with the Amended and Restated Declaration, with the power to approve or deny applications for proposed original construction or modification of a building, Dwelling, Structure, or improvement within the Subdivision as being in compliance with the Amended and Restated Declaration. The Board may, by resolution adopted by a majority of the Directors in office, designate and appoint a subcommittee that will have the authority of the Board with regard to architectural review, composed of not less than three Directors and other Committee Members (as defined in Section 6.03) who need not be Directors.

6.03    Other Committees. Other committees not having and exercising the authority of the Board in the management of the Association may be designated by resolution adopted by a majority of the Directors present at a meeting at which a quorum is present. Except as otherwise provided in the resolution, the President will appoint committee members from the Members ("Committee Member(s)"). A Committee Member may be removed by the person or persons authorized to appoint the Committee Member whenever, in their judgment, the best interests of the Association will be served by removal.

6.04    Term of Office. Each Committee Member will continue to serve until the next annual meeting of the Board and until his or her successor is appointed; the committee is dissolved; the Committee Member is removed or resigns from the committee; or the Committee Member ceases to qualify as a Committee Member.

6.05    Chair. One Committee Member of each committee will be appointed chair by the person or persons authorized to appoint the Committee Members.

6.06    Vacancies. Vacancies in the membership of any committee may be filled by appointments made in the same manner as the original appointments.

6.07    Quorum. Unless otherwise provided in the Board resolution designating and appointing a committee, a majority of the whole committee will constitute a quorum, and the act of a majority of the Committee Members present at a meeting at which a quorum is present will be the act of the committee.

6.08    Rules. Each committee may adopt rules for its own governance not inconsistent with either these Bylaws or rules adopted by the Board.

6.09    Compensation. Neither Committee Members nor chairs will receive any compensation for their services, but, by resolution of the Board, may be reimbursed for reasonable expenses.

6.10    Ex-Officio Member. The President will be an ex-officio member of all committees.

**ARTICLE 7**

## CONTRACTS, CHECKS, DEPOSITS, AND FUNDS

7.01    Contracts. The Board may authorize any officer or agent of the Association, in addition to the officers authorized by these Bylaws, to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Association. Delegated authority may be general or confined to specific instances.

7.02    Checks and Drafts. All checks, drafts, or orders for the payment of money, notes, or other evidences of indebtedness issued in the name of the Association must be signed by the officer(s) or agent(s) of the Association established by Board resolution from time to time. In the absence of a delegation of authority by the Board, these instruments will be signed by any two officers of the Board.

7.03    Deposits. All funds of the Association will be deposited to the credit of the Association in the banks, trust companies, or other depositaries selected by the Board.

7.04    Gifts to the Association. The Board is authorized to accept, on behalf of the Association, a contribution, gift, bequest, or devise for the general purposes or for any special purpose of the Association. The Board is not obligated, however, to accept, and is authorized to reject, any gift tendered or offered to the Association.

7.05    Surplus Funds. As practicable, the Board will strive to maintain a balance of no more than two (2) years-worth of operating funds (or other amount as determined by the Board from time to time) ("Reserve") in readily available funds as a reserve for the Association's operation, administrative, legal, enforcement, and other appropriate expenses. Funds in the Association's treasury in excess of the Association's current operational budget and the Reserve may be allocated by the Board for the support of neighborhood activities and programs to benefit the Subdivision generally, including, but not limited to, those sponsored by the Garden Oaks Civic Club, Inc., a Texas nonprofit corporation organized to promote the common good and general welfare of the residents of Garden Oaks Sections 1, 2, 3, 4, and 5. Members may deliver proposals to the Board for use of these funds at least sixty (60) days before each annual meeting of Members. The Board's proposed annual budget for these activities, and any additions proposed to be made to the budget for these purposes between annual meetings of Members, will be publicized by any means determined by the President, the Secretary, or the Directors to be reasonable and appropriate, such as by publication in the Garden Oaks Gazette or by signs posted in the neighborhood, at least thirty (30) days before the annual meeting of the Members. The proposed budget will be brought to a vote at the annual meeting or a special meeting of Members and must be approved by Members representing a majority of the Lots present at the meeting and entitled to vote. If the proposed budget or any budget amendment for these activities is not approved, the money will remain unallocated in the Association's treasury until the subsequent proposals are brought before the next annual or special meeting of Members. No distribution of funds for these purposes may be made if there are otherwise insufficient funds for the proper operation of the Association.

## ARTICLE 8
## BOOKS AND RECORDS

8.01     The Association will keep correct and complete books and records of account and minutes of the proceedings of its Members, the Board, and committees having any of the authority of the Board. The books and records will be kept at the registered or principal office, including a record of the names and addresses of Members entitled to vote. The books and records of the Association may be inspected by any Member or his or her agent or attorney-in-fact for any proper purpose, at any reasonable time, and upon reasonable notice. The Association may levy a reasonable charge for copies that it provides of the books and records.

## ARTICLE 9
## POWERS OF THE ASSOCIATION

9.01     The Association will have all the powers of a non-profit corporation chartered in the state of Texas pursuant to the Texas Business Organizations Code, a property owners association pursuant to Section 204.010 of the Texas Property Code, and Chapter 209 of the Texas Property Code (as amended or any successor statutes).  The Association will have the power to collect Assessments and enforce the Amended and Restated Declaration as provided therein.

## ARTICLE 10
## ENFORCEMENT OF THE RESTRICTIONS

10.01    Authority of the Association. The Association is authorized by the Amended and Restated Declaration to enforce the Amended and Restated Declaration with respect to the Lots within the Subdivision.

10.02    Enforcement of the Restrictions. The Board may adopt written procedures for the investigation, handling, and enforcement of actual and threatened violations of the Restrictions, including procedures for notice to an Owner of an alleged violation and for the reporting of alleged violations. These procedures may be made generally available by any means determined by the President, the Secretary, or the Directors to be reasonable and appropriate, such as individual notice to the Members or publication in the Garden Oaks Gazette.

## ARTICLE 11
## GARDEN OAKS GAZETTE

11.01    The Association is authorized to arrange with the Garden Oaks Gazette for publication of articles concerning the Association's current activities and issues affecting the Subdivision, lists of Directors and officers, and notices to Members and Owners.

## ARTICLE 12
## INDEMNIFICATION OF DIRECTORS AND OFFICERS

12.01    To the maximum extent allowed by law, the Association will indemnify each Director and officer of the Association from liability relating to actions taken in good faith in his or her officio] capacity for the Association. The Members intend that no Director or officer have personal liability for any action taken in good faith in his or her capacity as a Director or officer, except to the extent that the Director or officer has breached the standards of conduct set forth in the Texas Business Organizations Code or other applicable law that is the basis for

indemnification or exculpation of Directors or officers. The Association will, if reasonably available and economically feasible, and if funds are available for this purpose, purchase Directors' and officers' liability insurance for the benefit of the Directors and officers.

## ARTICLE 13
## AMENDMENTS TO BYLAWS

13.01   These Bylaws may be amended only by the affirmative vote of a majority (50% plus one) of a quorum of Members present in person, or by proxy, absentee ballot or electronic ballot, at a meeting called for that purpose.

## ARTICLE 14
## SEVERABILITY

14.01   Any term or provision of these Bylaws that is held to be illegal or unenforceable will be interpreted so as to be valid to the extent possible and will not render the remaining terms or provisions invalid.

## <u>CERTIFICATION</u>

I, the undersigned, do hereby certify:

That I am the Secretary of Garden Oaks Homeowners Association Inc., a Texas non-profit corporation;

That the foregoing Amended and Restated Bylaws constitute the original Amended and Restated Bylaws of said Association, as duly adopted at a meeting of the Board of Directors where a quorum was present held on the _____ day of _____, 20__.

IN WITNESS WHEREOF, I have hereunto subscribed my name on this the _____ day of _____, 20__.

By: _____

Print Name: _____

Secretary

STATE OF TEXAS                    §

                                             §

COUNTY OF HARRIS            §

BEFORE ME, on this day personally appeared _____, the Secretary of Garden Oaks Homeowners Association, Inc. known by me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that s/he executed the same for the purposes herein expressed, in the capacity herein stated, and as the act and deed of said corporation.

Given under my hand and seal of office, this _____ day of _____, 20__.

_____

Notary Public – State of Texas

**AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS
FOR
GARDEN OAKS, SECTION ONE**

STATE OF TEXAS      §
                    §
COUNTY OF HARRIS    §


This Amended and Restated Declaration of Covenants, Conditions and Restrictions for Garden Oaks, Section One ("Amended and Restated Declaration") is approved and facilitated pursuant to the authority of the bankruptcy court and further approved by the affirmative vote of Owners in Garden Oaks, Section One to become effective upon recording in the Official Real Property Records of Harris County, Texas.


**W I T N E S S E T H**

WHEREAS, Garden Oaks, Section One is a subdivision in Harris County, Texas according to the map or plat recorded under Volume 14, Page 5 of the Map Records of Harris County, Texas and is encumbered by the Restrictions Applying to Garden Oaks Section One recorded under Film Code No. 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 in the Official Public Records of Harris County, Texas ("Restrictions"); and

WHEREAS, the Restrictions were amended pursuant to Chapter 204 of the Texas Property Code by that Petition to Amend Restrictions to Create a Property Owners Association and Certificate of Compliance with Texas Property Code, Chapter 204 Garden Oaks, Section One recorded under File No. V953649 on July 22, 2002 in the Official Public Records of Harris County, Texas ("Amendment"); and

WHEREAS, the Amendment created a mandatory Transfer Assessment payable to the Garden Oaks Maintenance Organization, Inc., a Texas nonprofit corporation (the "Organization"), being a mandatory association; and

WHEREAS, the Organization filed for Chapter 11 bankruptcy protection under Case No. 18-60018, in the Bankruptcy Court for the Southern District of Texas; and

WHEREAS, the Bankruptcy Court approved the Organization's Chapter 11 Plan by order dated _____; and

WHEREAS, the Bankruptcy Court had the authority to approve and facilitate the adoption of this Amended and Restated Declaration upon obtaining the affirmative vote of the Owners in Garden Oaks, Section One in accordance with the Bankruptcy Code and Rules, which will become effective upon recording in the Official Real Property Records of Harris County, Texas; and

WHEREAS, the Bankruptcy Court, in confirming the Chapter 11 Plan, and approving and adopting this Amended and Restated Declaration has retained exclusive jurisdiction as to any and all issues related to the confirmation of the Chapter 11 Plan and the approval and adoption of this Amended and Restated Declaration; and

WHEREAS, the Owners in Garden Oaks, Section One desire to supersede, amend, restate, and wholly replace the Restrictions and Amendment for Garden Oaks, Section One in their entirety and replace them with this Amended and Restated Declaration; and

WHEREAS, the Owners of Garden Oaks, Section One desire to protect and maintain the park-like character by careful and thoughtful planning, including protective restrictions, which include architectural review of plans, a maintenance fund, and many other beneficial restrictions, based on its original environment, natural beauty, permanent improvements, comfort, drainage, and parks and playgrounds; and

NOW THEREFORE, the Owners in Garden Oaks, Section One, hereby amend, alter, and change the Restrictions and Amendment for Garden Oaks, Section One by replacing them in their entirety with this Amended and Restated Declaration which shall include the following reservations, restrictions and covenants, and Garden Oaks, Section One shall be improved, sold, used and enjoyed in accordance with, including the conditions, covenants, easements, reservations, and restrictions hereinafter set forth, all of which are hereby adopted for, and placed upon Garden Oaks, Section One and shall run with Garden Oaks, Section One and be binding on all parties, now and at any time hereinafter, having or claiming any right, title or interest in Garden Oaks, Section One or any part thereof, their heirs, executors, administrators, successors and assigns, regardless of the source of, or the manner in which any such right, title or interest is or may be acquired, and shall inure to the benefit of each owner of any part of Garden Oaks, Section One to wit:

## ARTICLE I. DEFINITIONS

(a)    "Architectural Review Committee" or "ARC" shall mean the architectural review committee established by the Organization to review plans submitted to the Organization for architectural review.

(b)    "Attic" means the space between the ceiling beams of the top story and the Roof rafters.  An Attic whether finished or unfinished is not a story.

(c)    "Board" shall mean the Board of Directors of the Organization.

(d)    "Corner Lot" is one that abuts on more than one Street.  Any Lot, except a corner, is deemed to front on the Street upon which it abuts.  A Corner Lot shall be deemed to front on the Street on which it has its smaller dimension, or if dimensions on more than one Street are approximately the same, Organization reserves the right to designate which Street the Lot shall face.

(e)    "Dwelling" means a main residential structure constructed on a Lot intended for single-family residential purposes.

(f)    "Duplex" means a main residential structure constructed on a Lot intended for one or two family residential purposes and owned by one or more Owners with an undivided interest.

(g)    "Garage" means a building or part of a building used to house motor vehicles.

(h)   "Irregular Shaped Lot" means any Lot with a frontage width which differs by greater than thirty-five percent (35%) from the rear width of the Lot.   The Board shall have the discretion to determine whether any other Lot can be considered an Irregular Shaped Lot.

(i)   "Lot" means a parcel of property within the Plat of the subdivision recorded in the real property records of Harris County, Texas, and encumbered by this Amended and Restated Declaration, and restricted to single-family residential purposes.   For purposes of this Amended and Restated Declaration, a Lot may consist of a platted Lot, less than a platted Lot, more than a platted Lot, or portions of two or more platted Lots.

(j)   "Organization" shall mean and refer to the Garden Oaks Maintenance Organization, Inc.

(k)   "Outbuilding" shall mean and refer to structures such as (by way of example and not limitation) storage buildings, sheds, greenhouses, gazebos and other Roofed Structures.

(l)   "Owner" means an owner of any portion of the Subdivision. Persons or entities holding title only as a lienholder shall not be an Owner for purposes of this Amended and Restated Declaration.

(m)   "Roof" means a non-porous cover for a structure such as (by way of example and not limitation) Lexan barriers or shingles but not a shade trellis, ivy or other open or porous material that may also be used as a cover.

(n)   "Short Lot" means a Lot whose depth does not allow for an Outbuilding.

(o)   "Street" as used herein shall include any street, drive, boulevard, road, lane, avenue, or place as shown on the recorded plat as a thoroughfare.

(p)   "Structure" means any building (including a Dwelling) or improvement, placed, maintained or constructed on a Lot, whether or not affixed to the land, and any addition to, or modification of any existing building, or improvement.

(q)   "Subdivision" means Garden Oaks, Section One.

## ARTICLE II. RESTRICTIONS

(a)   Except as herein noted, no Lots shall be used for anything other than single-family residential purposes. As used herein, the term "single-family residential purposes" refers to the architectural design of a Dwelling. Said Lot may contain up to a total of two (2) domiciles to include (i) a Duplex, or (ii) a single-family Dwelling and Garage apartment. Specifically prohibited, without limitation, is the use of a Lot for an apartment (excluding Garage apartments with ARC plan approval), multi-family Dwelling for more than two (2) families, or for any business, professional or other commercial activity of any type, unless such business, professional or commercial activity is unobtrusive and merely incidental to the primary use of the Lot and the Dwelling for residential purposes.   An Owner may not have a Garage apartment on a Lot on which a Duplex is constructed.   An Owner may

not subdivide a Duplex or the Lot on which a Duplex is constructed.

(b)  No trade or business may be conducted in or from any Dwelling, Structure or Lot except such use where (i) the existence or operation of the business activity is not apparent or detectable by sight, sound or smell from outside the Dwelling, Structure or Lot; (ii) the business activity conforms to all zoning requirements and other restrictive covenants applicable to the Subdivision; (iii) the business activity does not involve visitation to the Dwelling, Structure or Lot by clients, customers, workers, employees, suppliers or other business invitees or door-to-door solicitation of residents of the Subdivision; and (iv) the business activity is consistent with the residential character of the Subdivision and does not constitute a nuisance, or a hazardous or offensive use, or threaten the security or safety of other residents of the Subdivision, as may be determined in the sound discretion of the Board.  The uses set out in this section shall be referred to singularly or collectively as an "Incidental Business Use."  At no time may an Incidental Business Use cause increased parking or traffic within the Subdivision such that egress or ingress is impeded.  Any increased parking or traffic within the Subdivision as a result of an Incidental Business Use that impedes egress or ingress shall be deemed to be a deed restriction violation. Examples of expressly prohibited uses include, but are not limited to, a bed and breakfast, boarding house, vacation rental daily/weekly rentals of the entire Dwelling, Structure or Lot, or portions of the Dwelling, Structure or Lot, a day-care facility, home day-care facility, church, nursery, pre-school, beauty parlor, or barber shop or other similar facility.  No lease or rental of a Dwelling, Structure, or Lot shall be for less than thirty (30) consecutive and guaranteed days.

(c) The Organization, for itself, its successors and assigns, makes the following reservations for business purposes in the Subdivision:

BLOCK ONE (1), Lots One (1) Two (2) and Three (3);
BLOCK TWO (2), Lots One (1) Two (2), and Three (3);
BLOCK FIVE (5), Lots Thirty-four (34), Thirty-five (35) and Thirty-six (36);
BLOCK SIX (6), Lots One (1) to Three (3), inclusive, and lots Thirty-six (36) to Forty-two (42), inclusive;
BLOCK TWELVE (12), lots Six (6) and Seven (7);
BLOCK THIRTEEN (13), Lots Fifteen (15) and Sixteen (16)
BLOCK FOURTEEN (14), lots Twelve (12) and Thirteen (13) and
BLOCK FIFTEEN (15), lots One (1) and Two (2), which may be used for business purposes and when so used the restrictions applying to single-family residential purposes do not apply.

(d)  Except as herein noted, no signs, billboards, posters, or advertising devices of any character shall be erected in this Subdivision without the written consent of the Organization, and such consent shall be revocable at any time.  The Board has the authority to adopt a policy or guidelines regarding signs.

## ARTICLE III. ARCHITECTURAL RESTRICTIONS

No Dwelling, Outbuilding, or improvements of any character shall be erected or modified, or the erection thereof begun, or changes made in the exterior thereof after construction, on any Lot, Dwelling or Outbuilding in Garden Oaks, Section One, until plans and specifications have been submitted

to and approved in writing by the Architectural Review Committee of the Organization. Such submission is to include exterior design, survey and site plan, and such approval by the Organization is to be based on the following general requirements, stipulations and restrictions, together with any other requirements, stipulations, and restrictions that the Organization may deem advisable.   In the event the ARC fails to approve such plans and specifications within thirty (30) days after receipt thereof, they shall be deemed to be disapproved.

(a) No Dwelling shall be erected on any Lot or homesite of less frontage than seventy-five (75) feet and no Lot shall be subdivided to be less than ten thousand (10,000) square feet.   No Lot shall be subdivided to create a Lot with frontage of less than seventy-five (75) feet.   No Lot shall be subdivided in a manner which will result in an Irregular Shaped Lot or Short Lot.

(b) No Duplex shall be constructed to accommodate more than two (2) families.   Except as herein provided, all Lots in the Subdivision shall be known and described as single-family residential Lots, and all Lots shall have one (1) detached single-family Dwelling.   A detached Garage may not be converted to a livable space without ARC plan approval. All permissible Dwellings and Outbuildings, including the Garage, on a Lot, shall be erected and maintained in compliance with all setback limitations provided herein.

(c) No Dwelling shall be moved onto any Lot without ARC plan approval.

(d) No trailer, tent, shack, or other temporary Outbuilding erected or moved on to the Lot shall at any time be used as habitable space, nor shall any residence of a temporary character be permitted.

No trailer, trailer house, or movable Structure of any kind or type, or temporary building shall be erected or maintained on any Lot except during actual construction of the Dwelling being erected thereon, and then such trailer house or temporary building must be on the Lot on which construction is in progress and not on adjoining Lots, Streets or easements, and at completion of construction, the temporary building must be removed immediately.

(e) No Garage apartment may be used for rental purposes for a period of less than thirty (30) guaranteed and consecutive days.

(f) All Dwellings shall be constructed on the Lot so as to front the Street upon which such Lot faces.

(g) Where Corner Lots are of equal or nearly equal dimensions on two Streets, or they are Irregular Shaped Lots, the Organization reserves the right to designate the direction in which such improvements shall face, and such decision shall be made with the thought in mind of the best general appearance to that immediate section.   If a Corner Lot is subdivided resulting in a Lot with a rear setback which is adjacent to the side setback of the adjacent Lot, the resulting rear setback shall maintain the dimensions of the original side setback.

(h) The building lines of any Dwelling to be erected on any Lot shall be as follows:
    1.    The front building line shall not be nearer than fifty (50) feet to the front property line, including the gallery,

terrace or porch exclusive of steps used to access the ground floor.

2. The rear building line shall not be nearer than the rear easement.

3. No fence, wall, nor any pergola or other detached Structure shall be erected or maintained on any part of any Lot forward of the front building line of said Lot except that the Organization may grant a variance for Lots along the boundary of the Subdivision as to Lot lines shared with non-Subdivision property.

4. No detached Garage, barn, or other Outbuilding of any kind shall be erected on any Lot nearer than one hundred (100) feet to the front property line, unless it is in the rear of the Dwelling and in compliance with the setbacks described in subsection (5).

5. The side building lines shall not be nearer than fifteen (15) feet to either side property line in the area from the front building line (50-foot line) to the Outbuilding build line (100-foot line); or nearer than ten (10) feet to either side property line in the area from the Outbuilding build line (100-foot line) to the rear building line.

6. The right is reserved by the Organization to change these restrictions in the case of unusual or Irregular Shaped Lots, Short lots, or Lots unusual in size, where same is considered desirable for the advantage and best appearance of the immediate community.

(i) No Outbuildings shall exceed in height or number of stories (not including Attics), beyond the highest ridgeline, the Dwelling to which they are appurtenant.

(j) No building material of any kind or character shall be placed or stored upon the Lot until the Owner is ready to commence construction, and then such material shall be placed within the property lines of the Lot or parcel of land upon which the improvements are to be erected, and shall not be placed in the Street or between the pavement and property line.

(k) No stumps, trees, underbrush or any refuse of any kind nor scrap material from the improvements being erected an any Lot shall be placed on any adjoining Lots, Streets, or easements. All such material, if not disposed of immediately, must remain on the Lot on which construction work is in progress, and at the completion of such improvements, such materials must be immediately removed from the property.

(l) Any property on which a condition exists on the date this Amended and Restated Declaration is recorded in the Official Public Records of Harris County, Texas that is a violation of this Amended and Restated Declaration shall be grandfathered until and unless the condition on the property is replaced. Repairing the condition shall not require compliance so long as it simply restores the violation to the condition as it existed on the effective date of this Amended and Restated Declaration. The repair shall not enhance or extend any portion of the violation. The Board shall use sound discretion to determine whether any such repair is to such a degree which requires compliance with this Amended and Restated Declaration.

## ARTICLE IV. VARIANCES

The Board, or its duly authorized representative, may authorize variances from compliance with any of the architectural provisions of this Amended and Restated Declaration, unless specifically prohibited, including restrictions upon height, size, placement of Structures, or similar restrictions, when circumstances such as topography, natural obstruction, hardship, aesthetic, or environmental considerations may require.  The Board, or its duly authorized representative, shall conduct a hearing with the Lot Owner seeking such variance and any Lot Owners adjacent or contiguous to such Lot, in order to consider any objections, concerns or comments regarding such variance, except that the decision to grant a variance is to be determined solely by the Board.  Such variances must be evidenced in writing, must be approved by at least eighty percent (80%) of the Board, and shall become effective upon execution.  The variance must be signed by a member of the Board and recorded in the Official Public Records of Harris County, Texas. If such variances are granted, no violation of the covenants, conditions, or restrictions contained in this Amended and Restated Declaration shall be deemed to have occurred with respect to the matter for which the variance was granted.  The granting of such a variance shall not operate to waive any of the terms and provisions of this Amended and Restated Declaration for any purpose except as to the particular provision hereof covered by the variance, nor shall it affect in any way the Owner's obligation to comply with all applicable governmental laws and regulations.

No granting of a variance shall be relied on by an Owner, or any other person or entity (whether privy or party to the subject variance or not), as a precedent in requesting or assuming variance as to any other matter of potential or actual enforcement of any provision of this Amended and Restated Declaration.  Action of the Board in granting or denying a variance is a decision based expressly on one unique set of circumstances and need not be duplicated for any other request by any party or the same party for any reason whatsoever.

## ARTICLE V. TERM AND MODIFICATION OF RESTRICTIONS

(a) The provisions of this Amended and Restated Declaration will remain in full force and effect until January 1, 2038, and are extended automatically for successive ten (10)year periods; provided, however that the provisions of this Amended and Restated Declaration may be terminated on January 1, 2038, or on the commencement of any successive ten (10) year period by filing for record in the Official Public Records of Real Property of Harris County, Texas, an instrument in writing signed by Owners representing not less than eighty percent (80%) of the Lots in the Subdivision.

(b) Approval by the Owners of a majority (fifty percent (50%) plus one (1)) of the Lots shall be required to amend or modify this Amended and Restated Declaration.  Upon approval of the Owners, as set out above of said amended declaration (as evidenced by the President's or Vice-President's signature certifying such approval) the amended declaration shall be recorded in the Official Public Records of Harris County, Texas, whereupon to the extent of any conflict with this Amended and Restated Declaration and any amendment thereto, the more restrictive provision shall control.  For purposes of this Section, the approval of multiple Owners of a Lot may be reflected by the signature of any one Owner of such Lot.

Notwithstanding anything contained herein to the contrary, the Organization shall be entitled to use any combination of the following methods to obtain approval of the Owners for an amendment to this Amended and Restated Declaration:

  i. by written ballot, or electronic ballot as same may be established by the Board, that states the substance of the amendment and specifies the date by which a written or electronic ballot must be received to be counted;

  ii. at a meeting of the Members of the Organization, if written notice of the meeting stating the purpose of the meeting is delivered to the Owners of the Lots; such notice may be hand-delivered to the Owners, sent via regular mail to the Owner's last known mailing address, as reflected in the Organization's records, or via email to the Owner's email address as reflected in the Organization's records;

  iii. by door-to-door circulation of a petition by the Organization or a person authorized by the Organization; and/or by any other method permitted under this Amended and Restated Declaration or applicable law.

## ARTICLE VI. RIGHT TO ENFORCE

The restrictions herein set forth shall be binding upon the Organization, its successors and assigns, and all parties claiming by, through or under it or them, and all subsequent Owners of property in said Subdivision, each of whom shall be obligated and bound to observe such restrictions, covenants, and conditions, provided, however, that no such person or corporation shall be liable except in respect to breaches committed during its, his or their ownership of said property. The violation of any such restriction, covenant or condition shall not operate to invalidate any mortgage, deed of trust, or other lien acquired and held in good faith against said property, or any part thereof, but such liens may be enforced as against any and all property covered thereby, subject nevertheless to the restrictions, covenants, and conditions herein mentioned. The Organization shall have the right to enforce observance and performance of such restrictions, covenants and conditions, and in order to prevent a breach, or to enforce the observance or performance of same, shall have the right in addition to all other legal remedies, to an injunction either prohibitive or mandatory. The Owner of any Lot or Lots affected shall have the right either to prevent a breach of any such restriction, covenant, or condition or to enforce performance of same.

## ARTICLE VII. ASSESSMENTS

(a) Creation of Assessments

The Owners of any Lot, by virtue of ownership of property within the Subdivision, covenant and agree to pay to the Organization an annual assessment ("Assessment") and any applicable late fees, interest and costs as more particularly set forth in this Amended and Restated Declaration.

Each such Assessment, together with attorney's fees, late fees, interest and costs, shall be the personal obligation of the person or entity

who was the Owner of the land at the time when the Assessment became due.  No diminution or abatement of Assessments or set-off shall be claimed or allowed by reason of any alleged failure of the Organization or Board to take some action or perform some function required to be taken or performed by the Organization or the Board under this Amended and Restated Declaration, or for inconvenience or discomfort arising from the making of repairs or improvements which are the responsibility of the Organization.  The obligation to pay Assessments is a separate covenant on the part of each Owner of a Lot.

(b)   Annual Assessments

i.    Purpose. Assessments levied by the Organization shall be used for any legal purpose for the benefit of the Subdivision as determined by the Board and, in particular, may, by way of example and not limitation or obligation, include operational expenses of the Organization, enforcement of deed restrictions, payment of insurance premiums, costs of collection and litigation, administrative expenses, beautification, providing security, and any other services as may be in the Subdivision's and Owners' interest and all buildings, services, improvements and facilities deemed necessary or desirable by the Board in connection with the administration, management, control or operation of the Subdivision.  The Board may, in its sound discretion, give one or more of the purposes set forth herein preference over other purposes, and it is agreed that all expenses incurred and expenditures and decisions made by the Board in good faith shall be binding and conclusive on all Owners.

ii.   Creation. Payment of the Assessment shall be the obligation of each Owner, subject to the provisions below, and shall be binding and enforceable as provided in this Amended and Restated Declaration.

iii.  Rate. The initial Assessment established by the Organization shall not exceed EIGHTY DOLLARS AND NO/100 ($80.00) per Lot.  An Owner who formally re-plats two or more Lots into one Lot with the approval of the City of Houston Planning and Development Department shall owe one Assessment. Similarly, an Owner who subdivides a Lot shall pay one Assessment per Lot created by the subdivision of the Lot.

iv.   Commencement. The initial Assessment for a Lot shall commence as soon as practical but in no event later than January 1, 2020.  Assessments shall be due in advance on January 1st for the coming year and shall be delinquent if not paid in full as of January 31st of each year.

v.    Proration. An Owner's initial Assessment shall be made for the balance of the calendar year as determined on a pro-rata basis and shall become due and payable on the commencement date described above.  The Assessment for any year after the first year shall be due and payable on the first day of January.  Any Owner who purchases a Lot or Lots after the first day of January in any year shall be personally responsible for a pro-rated Assessment amount for that year.

vi.   Levying of the Assessment. The Board shall determine the sufficiency or insufficiency of the then-current Assessment to reasonably meet the expenses for providing services and capital improvements in the Subdivision and may, at its sole discretion and without a vote by the Members, increase the Assessment in an amount up to three percent (3%) annually.  The Assessment may only be increased by more than three percent (3%) annually if such increase is approved by Owners of a majority of the Lots present, in person or by proxy, electronic ballot, or absentee ballot, at a meeting called for said purpose at which a quorum is present in person or by proxy, electronic ballot, or absentee ballot.  The Assessment shall not be adjusted more than once in a calendar year nor shall any increase be construed to take effect retroactively, unless otherwise approved by Owners of a majority of the Lots subject to such Assessments present in person or by proxy, electronic ballot or absentee ballot at a meeting called for said purpose at which a quorum is present in person or by proxy, electronic ballot, or absentee ballot.

vii. Over-65 Exemption.  Any Owner who is sixty-five (65) years old or older on the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas and has also received an over-65 homestead exemption on the Lot owned by the Owner in the Subdivision from the Harris County Appraisal District may apply to be exempted from payment of the Assessment for so long as the Owner continues to own the Lot ("Over-65 Exemption").  This Over-65 Exemption shall not apply to: (1) any current Owners who become sixty-five (65) years old during the ownership of their Lot after the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas; and (2) any new Owners who purchase a Lot in the Subdivision who are or may become sixty-five (65) years old or older after the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas. An Owner must apply for and receive approval in writing from the Organization for the Over-65 Exemption.

(c)     Enforcement

The Organization may bring an action in law against the Owner personally obligated to pay the Assessment, late fees, interest, and costs, including attorneys' fees, incurred by the Organization in collecting same and obtain a personal judgment against the Owner.  No lien is created herein to secure the payment of the Assessment.

## ARTICLE VIII. EASEMENTS

It is agreed that all sales of Lots and dedication of Streets in said Subdivision shall be subject to easements over and across such portions of each Lot, as hereinafter designated, as may be deemed appropriate or necessary for the purpose of installing, using, repairing and maintaining public utilities, water, sewer lines, electric lighting and telephone poles, pipe lines, and drainage ditches or structures, and/or any equipment necessary for the performance of any public or quasi-public utility service and function, with the right of access thereto for the purpose of further construction, maintenance and repairs.  Such right of access to include the right, without liability on the part of any one or all of the owners or operators of such utilities, to remove any or all obstructions on said easement right-of-way, caused by trees, brush, shrubs, either on or overhanging such right-of-way, as in their opinion may interfere with the installation or operation of their circuits, lines, pipes, or drainage ditches or structures.  Such easements shall be for the general benefit of the Subdivision and the property Owners thereof and are hereby reserved and created in favor of any and all utility companies entering into and upon said property for the purposes aforesaid, with the permission of the Organization, its successors or assigns, and shall extend to only the following portions of said Subdivision:

In BLOCK ONE (1), there is an easement ten (10) feet in width off the rear of each Lot.

In BLOCK TWO (2) there is an easement five (5) feet in width off the rear of each Lot.

In BLOCK THREE (3), there is an easement five (5) feet in width off the rear of each Lot.

In BLOCK FOUR (4), there is an easement five (5) feet in width off the rear of each Lot.

In BLOCK FIVE (5) there is an easement five (5) feet in width off the rear of each Lot.

In BLOCK SIX (6) there is an easement ten (10) feet in width off the rear of all Lots from One (1) to Thirty-four (34), inclusive, an easement ten (10) feet in width off the north side of Lot Thirty-five (35); an easement five (5) feet in width off the west side of Lot Thirty-five (35), (Lot Thirty-five (35) is dedicated as a public park); an easement five (5) feet in width off the rear of all Lots from Thirty-six (36) to Forty-one (41), inclusive, an easement five (5) feet in width off the west side of Lot Twenty-seven (27); and an easement five (5) feet in width off the east side of Lot Twenty-eight (28).

In BLOCK SEVEN (7), there is an easement five (5) feet in width off the rear of all Lots; and easement five (5) feet in width off the west side of Lot Seventeen (17); an easement three (3) feet in width off the northeast side of Lot Twenty (20); an easement three (3) feet in width off the southwest side of Lot Twenty-one (21); an easement sixteen (16) feet in width off the east side of Lot Nine (9); an easement sixteen (16) feet in width off the east side of Lot Thirty (30); an easement three (3) feet in width off the east side of Lot Twenty-four (24), for a distance of twenty (20) feet toward the front from the rear property line, and an easement three (3) feet in width off the west side of Lot Twenty-five (25), for a distance of twenty (20) feet toward the front from the rear property line.

In BLOCK EIGHT (8) there is an easement five (5) feet in width off the rear of all Lots; an easement five (5) feet in width off the west side of Lot Seventeen (17); and easement five (5) feet in width off the west side of Lot Twenty-two (22); and easement three (3) feet in width off the north side of Lot Nineteen (19); an easement three (3) feet in width off the south side of Lot Twenty (20); and easement sixteen (16) feet in width off the east side of Lot Nine (9); an easement sixteen (16) feet in width off the east side of Lot Thirty (30); and easement three (3) feet in width off the east side of Lot Twenty-five (25), for a distance of twenty (20) feet toward the front from the rear property line; and an easement three (3) feet in width off the west side of Lot Twenty-six (26), for a distance of twenty (20) feet toward the front from the rear property line.

In BLOCK NINE (9) there is an easement five (5) feet in width off the rear of all Lots; and easement five (5) feet in width off the west side of Lot Sixteen (16); an easement five (5) feet in width off the west side of Lot Twenty-one (21); and easement three (3) feet in width off the north side of Lot Eighteen (18); an easement three (3) feet in width off the south side of Lot Nineteen (19); an easement sixteen (16) feet in width off the east side of Lot Twenty-nine (29); an easement sixteen (16) feet in width off the east side of Lot Nine (9); and easement three (3) feet in width off the east side of Lot Twenty-one (21), for a distance of twenty (20) feet toward the front from the rear property line; an easement three (3) feet in width off the west side of Lot Twenty-two (22), for a distance of twenty (20) feet toward the front from the rear property line; and easement three (3) feet in width off the east side of Lot Twenty-five (25), for a distance of twenty (20) feet

toward the front from the rear property line; and an easement three (3) feet in width off the west side of Lot Twenty-six (26) for a distance of twenty (20) feet toward the front from the rear property line.

In BLOCK TEN (10), there is an easement five (5) feet in width off the rear of all Lots except Lot Fifteen (15); and an easement three (3) feet in width off the west side of Lot Fourteen (14); and easement three (3) feet in width off the east side of Lot Fifteen (15); and easement three (3) feet in width off the northeast side of Lot Fifteen (15); an easement three (3) feet in width off the southwest side of Lot Sixteen (16); and easement sixteen (16) feet in width off the east side of Lot Ten (10); and an easement sixteen (16) feet in width off the east side of Lot Twenty-two (22);

In BLOCK ELEVEN (11) there is an easement ten (10) feet in width off the rear of all Lots; and an easement sixteen (16) feet in width off the east side of Lot Ten (10).

In BLOCK TWELVE (12) there is an easement ten (10) feet in width off the rear of all Lots from One (1) to Five (5) inclusive; an easement ten (10) feet wide off the south side of Lot Six (6); an easement five (5) feet in width off the west side of Lot Five (5); and an easement five (5) feet in width off the rear of Lots Six (6) and Seven (7).

In BLOCK THIRTEEN (13), there is an easement five (5) feet in width off the rear of all Lots, except Lot Fourteen (14); an easement five (5) feet in width off the west side of Lot Fourteen (14); an easement three (3) feet in width off the north side of Lot Two (2); an easement three (3) feet in width off the south side of Lot Three (3); an easement three (3) feet in width off the north side of Lot Eight (8); and an easement three (3) feet in width off the south side of Lot Nine (9).

In BLOCK FOURTEEN (14), there is an easement five (5) feet in width off the rear of all Lots.  The east property line of Lot Twenty-six (26) in this Block is considered the rear.  There is an easement five (5) feet in width off the north side of Lot Three (3); an easement twenty (20) feet in width off the south side of Lot Four (4) an easement five (5) feet in width off the south side of Lot Fifteen (15); and easement five (5) feet in width off the north side of Lot Sixteen (16); an easement five (5) feet in width off the south side of Lot Twenty (20); an easement five (5) feet in width off the north side of Lot Twenty-one (21); and an easement twenty (20) feet wide off the south side of Lot Twenty-five (25) and an easement five (5) feet in width off the north side of Lot Twenty-six (26),

In BLOCK FIFTEEN (15) there is an easement ten (10) feet in width off the south side of Lot One (1); an easement five (5) feet in width off the rear of Lots One (1) and Two (2); an easement five (5) feet in width off the east side of Lot Three (3); an easement ten (10) feet in width off the rear of all Lots from Three (3) to Fifteen (15), inclusive.

In BLOCK SIXTEEN (16) there is an easement five (5) feet in width off the rear of Lots One (1) to Eleven (11), inclusive, and an easement twenty (20) feet in width off the rear of all Lots from Twelve (12) to Twenty-one (21), inclusive.

In BLOCK SEVENTEEN (17), there is an easement five (5) feet in width off the rear of all Lots.

In BLOCK EIGHTEEN (18), there is an easement five (5) feet in width off the rear of all Lots.

## ARTICLE IX. UPKEEP

The Owners of property in said Subdivision shall be required to keep the weeds cut on the particular property owned by each, and shall not permit the accumulation of trash, rubbish, or other unsightly obstacles on the premises, the easements, or in the alley, or in the Street abutting the same. The area in the Street between the pavement and the property line shall at all times be kept clean and free of unsightly obstacles.

## ARTICLE X. ORGANIZATION

(a)   Every Owner of a Lot will, solely by virtue of ownership and without further action, be a member of Garden Oaks Maintenance Organization, Inc., a Texas non-profit corporation (the "Organization").  The Organization establishes, assesses, and collects mandatory assessments, making it subject to Chapter 209 of the Texas Property Code.  The business and affairs of the Organization is managed by its Board of Directors.

(b)   Each Lot is entitled to one (1) vote, regardless of the number of Owners of a Lot. Multiple Owners of any single Lot must vote in agreement (under any method they devise among themselves) but, in no case will such multiple Owners cast portions of votes.  The vote attributable to any single Lot must be voted in the same manner (i.e. all Owners of the Lot for, or all Owners of the Lot against a particular issue) but, in no event can there be more than one (1) vote cast per Lot.

A Lot is entitled to two (2) votes only if all of the following conditions are satisfied: (i) applicable City of Houston subdivision ordinances would permit subdivision of the Lot by re-platting, (ii) each resulting Lot would satisfy the frontage requirements imposed herein, (iii) no Structure that is located on one resulting Lot would encroach onto the adjacent Lot or violate setback lines after subdivision (e.g., a building may not be located on the original Lot such that the lot line created by the subdivision would, with respect to existing Structures, result in an encroachment or violation of setback lines), and (iv) each resulting Lot may be conveyed to a separate Owner as a fee simple tract of land.

No Owner will have a right to vote unless (i) the Owner is shown on the membership rolls of the Organization, or (ii) the recorded deed evidencing ownership of the Lot has been delivered to the Organization.

(c)   The Organization's Bylaws govern the Organization and may be amended pursuant to the Bylaws.

(d)   After the effective date of this Amended and Restated Declaration, the Organization shall be renamed to the Garden Oaks Homeowners Association, Inc. which will continue with the same rights of the Organization including any new rights as may be created or designated in its Bylaws.

This Amended and Restated Declaration shall be effective as of the date of recording in the Official Public Records of Harris County, Texas.  If any

provision of this Declaration is found to be in conflict with the Restrictions and Amendment of Gardens Oaks, Section One, this Amended and Restated Declaration shall control.

IN WITNESS WHEREOF, pursuant to the authority provided herein, this Amended and Restated Declaration was approved by the affirmative vote of the Owners in Garden Oaks, Section One.

**CERTIFICATION**

I, the undersigned, do hereby certify:

That I am the President of the Garden Oaks Maintenance Organization, Inc.;

That this instrument constitutes the Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Garden Oaks, Section One, and was affirmatively approved by the Owners in Garden Oaks, Section One.


IN WITNESS WHEREOF, I have hereunto subscribed my name on this the _____ day of _____, 201___.

By: _____
Print Name: _____
Title: President

STATE OF TEXAS               §
                             §
COUNTY OF HARRIS             §


BEFORE ME, the undersigned authority, on this day personally appeared _____, the President of the Garden Oaks Maintenance Organization, Inc., known by me to be the person whose name is subscribed to this instrument, and acknowledged to me that s/he executed the same for the purposes expressed and in the capacity herein stated and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ the day of _____, 201___.


_____
Notary Public – State of Texas


*After Recording Return To:*
*Sipra S. Boyd*
*Roberts Markel Weinberg Butler Hailey PC*
*2800 Post Oak Blvd. 57th Floor*
*Houston, Texas 77056*

**AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR**
**GARDEN OAKS, SECTION TWO**

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §


This Amended and Restated Declaration of Covenants, Conditions and Restrictions for Garden Oaks, Section Two ("Amended and Restated Declaration") is approved and facilitated pursuant to the authority of the bankruptcy court and further approved by the affirmative vote of Owners in Garden Oaks, Section Two to become effective upon recording in the Official Real Property Records of Harris County, Texas.


**W I T N E S S E T H**

WHEREAS, Garden Oaks, Section Two is a subdivision in Harris County, Texas according to the map or plat recorded under Volume 15, Page 46 of the Map Records of Harris County, Texas and is encumbered by the Restrictions Applying to Garden Oaks Section Two recorded under Film Code No. 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 in the Official Public Records of Harris County, Texas ("Restrictions"); and

WHEREAS, the Restrictions were amended pursuant to Chapter 204 of the Texas Property Code by that Petition to Amend Restrictions to Create a Property Owners Association and Certificate of Compliance with Texas Property Code, Chapter 204 Garden Oaks, Section Two recorded under File No. V953650 on July 22, 2002 in the Official Public Records of Harris County, Texas ("Amendment"); and

WHEREAS, the Amendment created a mandatory Transfer Assessment payable to the Garden Oaks Maintenance Organization, Inc., a Texas nonprofit corporation (the "Organization"), being a mandatory association; and

WHEREAS, the Organization filed for Chapter 11 bankruptcy protection under Case No. 18-60018, in the Bankruptcy Court for the Southern District of Texas; and

WHEREAS, the Bankruptcy Court approved the Organization's Chapter 11 Plan by order dated _____; and

WHEREAS, the Bankruptcy Court had the authority to approve and facilitate the adoption of this Amended and Restated Declaration upon obtaining the affirmative vote of the Owners in Garden Oaks, Section Two in accordance with the Bankruptcy Code and Rules, which will become effective upon recording in the Official Real Property Records of Harris County, Texas; and

WHEREAS, the Bankruptcy Court, in confirming the Chapter 11 Plan, and approving and adopting this Amended and Restated Declaration has retained exclusive jurisdiction as to any and all issues related to the confirmation of the Chapter 11 Plan, and the approval and adoption of this Amended and Restated Declaration; and

WHEREAS, the Owners in Garden Oaks, Section Two desire to supersede, amend, restate, and wholly replace the Restrictions and Amendment for Garden

Oaks, Section Two in their entirety and replace them with this Amended and Restated Declaration; and

WHEREAS, the Owners of Garden Oaks, Section Two desire to protect and maintain the park-like character by careful and thoughtful planning, including protective restrictions, which include architectural review of plans, a maintenance fund, and many other beneficial restrictions, based on its original environment, natural beauty, permanent improvements, comfort, drainage, and parks and playgrounds; and

NOW THEREFORE, the Owners in Garden Oaks, Section Two, hereby amend, alter, and change the Restrictions and Amendment for Garden Oaks, Section Two by replacing them in their entirety with this Amended and Restated Declaration which shall include the following reservations, restrictions and covenants, and Garden Oaks, Section Two shall be improved, sold, used and enjoyed in accordance with, including the conditions, covenants, easements, reservations, and restrictions hereinafter set forth, all of which are hereby adopted for, and placed upon Garden Oaks, Section Two and shall run with Garden Oaks, Section Two and be binding on all parties, now and at any time hereinafter, having or claiming any right, title or interest in Garden Oaks, Section Two or any part thereof, their heirs, executors, administrators, successors and assigns, regardless of the source of, or the manner in which any such right, title or interest is or may be acquired, and shall inure to the benefit of each owner of any part of Garden Oaks, Section Two to wit:

## ARTICLE I. DEFINITIONS

(a) "Architectural Review Committee" or "ARC" shall mean the architectural review committee established by the Organization to review plans submitted to the Organization for architectural review.

(b) "Attic" means the space between the ceiling beams of the top story and the Roof rafters. An Attic whether finished or unfinished is not a story.

(c) "Board" shall mean the Board of Directors of the Organization.

(d) "Corner Lot" is one that abuts on more than one Street. Any Lot, except a corner, is deemed to front on the Street upon which it abuts. A Corner Lot shall be deemed to front on the Street on which it has its smaller dimension, or if dimensions on more than one Street are approximately the same, Organization reserves the right to designate which Street the Lot shall face.

(e) "Dwelling" means a main residential structure constructed on a Lot intended for single-family residential purposes.

(f) "Duplex" means a main residential structure constructed on a Lot intended for one or two family residential purposes and owned by one or more Owners with an undivided interest.

(g) "Garage" means a building or part of a building used to house motor vehicles.

(h) "Irregular Shaped Lot" means any Lot with a frontage width which differs by greater than thirty-five percent (35%) from the rear width of the Lot. The Board shall have the discretion to determine whether any other Lot can be considered an Irregular Shaped Lot.

(i)   "Lot" means a parcel of property within the Plat of the subdivision recorded in the real property records of Harris County, Texas, and encumbered by this Amended and Restated Declaration, and restricted to single-family residential purposes.  For purposes of this Amended and Restated Declaration, a Lot may consist of a platted Lot, less than a platted Lot, more than a platted Lot, or portions of two or more platted Lots.

(j)   "Organization" shall mean and refer to the Garden Oaks Maintenance Organization, Inc.

(k)   "Outbuilding" shall mean and refer to structures such as (by way of example and not limitation) storage buildings, sheds, greenhouses, gazebos and other Roofed Structures.

(l)   "Owner" means an owner of any portion of the Subdivision.  Persons or entities holding title only as a lienholder shall not be an Owner for purposes of this Amended and Restated Declaration.

(m)   "Roof" means a non-porous cover for a structure such as (by way of example and not limitation) Lexan barriers or shingles but not a shade trellis, ivy or other open or porous material that may also be used as a cover.

(n)   "Short Lot" means a Lot whose depth does not allow for an Outbuilding.

(o)   "Street" as used herein shall include any street, drive, boulevard, road, lane, avenue, or place as shown on the recorded plat as a thoroughfare.

(p)   "Structure" means any building (including a Dwelling) or improvement, placed, maintained or constructed on a Lot, whether or not affixed to the land, and any addition to, or modification of any existing building or improvement.

(q)   "Subdivision" means Garden Oaks, Section Two.


## ARTICLE II. RESTRICTIONS

(a) Except as herein noted, no Lots shall be used for anything other than single-family residential purposes. As used herein, the term "single-family residential purposes" refers to the architectural design of a Dwelling.  Said Lot may contain up to a total of two (2) domiciles to include (i) a Duplex, or (ii) a single-family Dwelling and Garage apartment. Specifically prohibited, without limitation, is the use of a Lot for an apartment (excluding Garage apartments with ARC plan approval), multi-family Dwelling for more than two (2) families, or for any business, professional or other commercial activity of any type, unless such business, professional or commercial activity is unobtrusive and merely incidental to the primary use of the Lot and the Dwelling for residential purposes.  An Owner may not have a Garage apartment on a Lot on which a Duplex is constructed.  An Owner may not subdivide a Duplex or the Lot on which a Duplex is constructed.

(b) No trade or business may be conducted in or from any Dwelling, Structure or Lot except such use where (i) the existence or operation of the business activity is not apparent or detectable by sight, sound or smell from outside the Dwelling, Structure or Lot; (ii) the business activity conforms to

all zoning requirements and other restrictive covenants applicable to the Subdivision; (iii) the business activity does not involve visitation to the Dwelling, Structure or Lot by clients, customers, workers, employees, suppliers or other business invitees or door-to-door solicitation of residents of the Subdivision; and (iv) the business activity is consistent with the residential character of the Subdivision and does not constitute a nuisance, or a hazardous or offensive use, or threaten the security or safety of other residents of the Subdivision, as may be determined in the sound discretion of the Board.  The uses set out in this section shall be referred to singularly or collectively as an "Incidental Business Use."  At no time may an Incidental Business Use cause increased parking or traffic within the Subdivision such that egress or ingress is impeded.  Any increased parking or traffic within the Subdivision as a result of an Incidental Business Use that impedes egress or ingress shall be deemed to be a deed restriction violation.  Examples of expressly prohibited uses include, but are not limited to, a bed and breakfast, boarding house, vacation rental daily/weekly rentals of the entire Dwelling, Structure or Lot, or portions of the Dwelling, Structure or Lot, a day-care facility, home day-care facility, church, nursery, pre-school, beauty parlor, or barber shop or other similar facility.  No lease or rental of a Dwelling, Structure, or Lot shall be for less than thirty (30) consecutive and guaranteed days.

(c) The Organization, for itself, its successors and assigns, makes the following reservations:

BLOCK THIRTY-ONE (31) may be used for school purposes, and when so used, the restrictions applying to single-family residential purposes do not apply. If not used for school purposes, it is to be platted and used for single-family residential purposes only, the same general restrictions applying as those in the balance of the Subdivision.

A building or buildings may be erected by the Organization, its successors or assigns, on Lot One (1), Two (2) and Three (3), BLOCK TWENTY-SEVEN (27), and used for office and/or display purposes, but any such building or buildings must be two-story in design, and the exterior of such building or buildings must be attractive in appearance, and be of residential design, and such building or buildings must be placed on any or all of these Lots in conformity with all residential building line restrictions and requirements.

(d) Except as herein noted, no signs, billboards, posters, or advertising devices of any character shall be erected in this Subdivision without the written consent of the Organization, and such consent shall be revocable at any time.  The Board has the authority to adopt a policy or guidelines regarding signs.

## ARTICLE III. ARCHITECTURAL RESTRICTIONS

No Dwelling, Outbuilding, or improvements of any character shall be erected or modified, or the erection thereof begun, or changes made in the exterior thereof after construction, on any Lot, Dwelling, or Outbuilding in Garden Oaks, Section Two, until plans and specifications have been submitted to and approved in writing by the Architectural Review Committee of the Organization.  Such submission is to include exterior design, survey and site plan and such approval by the Organization is to be based on the following general requirements, stipulations and restrictions, together with any other requirements, stipulations and restrictions that the Organization may deem advisable.  In the event the ARC fails to approve such plans and specifications

within thirty (30) days after receipt thereof, they shall be deemed to be
disapproved.

(a) No Dwelling shall be erected on any Lot or homesite of less frontage
than seventy-five (75) feet and no Lot shall be subdivided to be less than
eleven thousand (11,000) square feet.  No Lot shall be subdivided to create a
Lot with frontage of less than seventy-five (75) feet.  No Lot shall be
subdivided in a manner which will result in an Irregular Shaped Lot or Short
Lot.

(b) No Duplex shall be constructed to accommodate more than two (2)
families.  Except as herein provided, all Lots in the Subdivision shall be known
and described as single-family residential Lots, and all Lots shall have one (1)
detached single-family Dwelling.  A detached Garage may not be converted to a
livable space without ARC plan approval.  All permissible Dwellings and
Outbuildings, including the Garage, on a Lot, shall be erected and maintained in
compliance with all setback limitations provided herein.

(c) No Dwelling shall be moved onto any Lot without ARC plan approval.

(d) No trailer, tent, shack, or other temporary Outbuilding erected or
moved on to the Lot shall at any time be used as habitable space, nor shall any
residence of a temporary character be permitted.

No trailer, trailer house, or movable Structure of any kind or type, or
temporary building shall be erected or maintained on any Lot except during
actual construction of the Dwelling being erected thereon, and then such trailer
house or temporary building must be on the Lot on which construction is in
progress and not on adjoining Lots, Streets or easements, and at completion of
construction, the temporary building must be removed immediately.

(e) No Garage apartment may be used for rental purposes for a period of
less than thirty (30) guaranteed and consecutive days.

(f) All Dwellings shall be constructed on the Lot so as to front the
Street upon which such Lot faces.

(g) Where Corner Lots are of equal or nearly equal dimensions on two
Streets, or they are Irregular Shaped Lots, the Organization reserves the right
to designate the direction in which such improvements shall face, and such
decision shall be made with the thought in mind of the best general appearance
to that immediate section.  If a Corner Lot is subdivided resulting in a Lot
with a rear setback which is adjacent to the side setback of the adjacent Lot,
the resulting rear setback shall maintain the dimensions of the original side
setback.

(h) Except as herein noted, the building lines of any Dwelling to be
erected shall be as follows:

1.  The front building line shall not be nearer than fifty (50) feet to
the front property line, including the gallery, terrace or porch exclusive
of steps used to access the ground floor.

2.  The rear building line shall not be nearer than the rear easement.

3.  No fence, wall, nor any pergola or other detached Structure shall be
erected or maintained on any part of any Lot forward of the front building

line of said Lot except that the Organization may grant a variance for Lots along the boundary of the Subdivision as to Lot lines shared with non-Subdivision property.

4.  No detached Garage, barn, or other Outbuilding of any kind shall be erected on any Lot nearer than one hundred (100) feet to the front property line, unless it is in the rear of the Dwelling and in compliance with the setbacks described in subsection (5).

5.  The side building lines shall not be nearer than fifteen (15) feet to either side property line in the area from the front building line (50-foot line) to the Outbuilding build line (100-foot line); or nearer than ten (10) feet to either side property line in the area from the Outbuilding build line (100-foot line) to the rear building line.

6.  The right is reserved by the Organization to change these restrictions in the case of unusual or Irregular Shaped Lots, Short lots, or Lots unusual in size, where same is considered desirable for the advantage and best appearance of the immediate community.

On all Lots facing on North Shepperd Drive, Sue Barnett Drive, West Thirty-Eighth Street, West Thirty-Ninth Street, West Forty First Street, and West Forty Second Street, the Dwelling to be erected shall be not nearer than fifty (50) feet to the front property line of each Lot nor nearer than fifteen (15) feet to either side property line of each Lot;

On all Lots facing on Garden Oaks Boulevard and West Forty-Third Street, the Dwelling to be erected shall not be nearer than seventy-five (75) feet to the front property line of each Lot nor nearer than fifteen (15) feet to either side property line of each Lot.

The building line on certain corner Lots is to be as follows:

Lot One (1), BLOCK TWENTY-THREE (23), the east building line of improvements on this Lot to be fifty (50) feet from the east side line of said Lot;

Lot One (1), BLOCK TWENTY-FOUR (24), the south building line of improvements on this Lot to be fifty (50) feet from the south side line of said Lot;

Lot Four (4), BLOCK TWENTY-FOUR (24), the north building line of improvements of this Lot to be fifty (50) feet from the north side line of said Lot;

Lot One (1), BLOCK TWENTY-FIVE (25), the south building line of improvements on this Lot to be fifty (50) feet north of the south side line of said Lot;

Lot Four (4), BLOCK TWENTY-FIVE (25), the north building line of improvements on this Lot to be fifty (50) feet from the north side line of said Lot;

Lot One (1), BLOCK TWENTY-SIX (26), the south building line of improvements on this Lot to be fifty (50) feet from the south side line of said Lot;

Lot Fifteen (15), BLOCK TWENTY-SIX (26), the east building line of improvements on this Lot to be fifty (50) feet from the east side line of said Lot;

Lot One (1), BLOCK TWENTY-SEVEN (27), the east building line of improvements on this Lot to be fifty (50) feet from the east side line of said Lot;

Lot Sixteen (16), BLOCK TWENTY-SEVEN (27), the north side building line of improvements on this Lot to be fifty (50) feet from the north side line of said lot;

Lot One (1), BLOCK TWENTY-EIGHT (28), the south side building line of improvements on this Lot to be fifty (50) feet from the south side line of said Lot;

Lot Four (4), BLOCK TWENTY-EIGHT (28), the north building line of improvements on this Lot to be fifty (50) feet from the north side line of said Lot;

Lot One (1), BLOCK TWENTY-NINE (29), the south building line of improvements of this Lot to be fifty (50) feet from the south side line of said lot;

Lot Twenty-three (23), BLOCK TWENTY-NINE (29), the east building line of improvements on this Lot to be fifty (50) feet from the east side line of said Lot;

Lot One (1), BLOCK THIRTY (30), the east building line of improvements on this Lot to be fifty (50) feet from the east side line of said Lot.

All Dwellings and/or buildings erected on Garden Oaks Boulevard must be of two-story type and attractive in design.

Any detached Garage, barn, or other Outbuilding erected on Lot One (1), BLOCK TWENTY-THREE (23), must be set back from the side street line seventy (70) feet, and must not be nearer than ten (10) feet to the inside property line nor nearer than the easement of the rear of said property.

Any detached Garage, barn, or other Outbuilding erected on Lot One (1), BLOCK TWENTY-FOUR (24), must be set back from side street line not less than sixty (60) feet and must not be nearer than twenty-five (25) feet to rear property line nor nearer than ten (10) feet to the inside property line of said lot.

Any detached Garage, barn, or other Outbuildings erected on Lot Four (4), BLOCK TWENTY-FOUR (24); Lots One (1) and Four (4), BLOCK TWENTY-FIVE (25); Lot One (1), BLOCK TWENTY-SIX (26); Lot Sixteen (16), BLOCK Twenty-seven (27); and Lot One (1), BLOCK TWENTY-EIGHT (28) must set back from side street line not less than seventy (70) feet, and must not be nearer than twenty-five (25) feet to the rear property line, nor nearer than ten (10) feet to the inside property line of said lot.

Any detached Garage, barn, or other Outbuildings erected on Lot Fifteen (15), BLOCK TWENTY-SIX (26); Lot one (1), BLOCK TWENTY-SEVEN (27); Lot Four (4), BLOCK TWENTY-EIGHT (28); Lot One (1), BLOCK TWENTY-NINE (29) must set back from side street line not less than sixty (60) feet and must not be nearer than

twenty-five (25) feet to the rear property line of said Lot, nor nearer than ten (10) feet to the inside property line of said Lot.

Any detached Garage, barn, or other Outbuildings erected on Lot Twenty-three (23), BLOCK TWENTY-NINE (29) and Lot One (1), BLOCK THIRTY (30), must be set back from side street line not less than seventy (70) feet and must not be nearer than twenty-five (25) feet to inside property line, nor nearer than the easement line on the rear of said Lot.

Any detached Garage, barn, or other Outbuildings erected on Lot Sixteen (16), BLOCK TWENTY-FOUR (24); Lots Thirteen (13) and Fourteen (14), BLOCK TWENTY-FIVE (25); Lots Eight (8) and Nine (9), BLOCK TWENTY-SIX (26); and Lots Seven (7) and Eight (8), BLOCK TWENTY-SEVEN (27) must set back from side street line twenty-five (25) feet, and must not be nearer than ten (10) feet to the inside property line nor nearer than the easement line on the rear of said Lot.

(i)   No Outbuildings shall exceed in height or number of stories (not including Attics), beyond the highest ridgeline, the Dwelling to which they are appurtenant.

(j)   No building material of any kind or character shall be placed or stored upon the Lot until the Owner is ready to commence construction, and then such material shall be placed within the property lines of the Lot or parcel of land upon which the improvements are to be erected, and shall not be placed in the Street or between the pavement and property line.

(k)   No stumps, trees, underbrush or any refuse of any kind nor scrap material from the improvements being erected an any Lot shall be placed on any adjoining Lots, Streets, or easements.   All such material, if not disposed of immediately, must remain on the Lot on which construction work is in progress, and at the completion of such improvements, such materials must be immediately removed from the property.

(l)   Any property on which a condition exists on the date this Amended and Restated Declaration is recorded in the Official Public Records of Harris County, Texas that is a violation of this Amended and Restated Declaration shall be grandfathered until and unless the condition on the property is replaced. Repairing the condition shall not require compliance so long as it simply restores the violation to the condition as it existed on the effective date of this Amended and Restated Declaration. The repair shall not enhance or extend any portion of the violation. The Board shall use sound discretion to determine whether any such repair is to such a degree which requires compliance with this Amended and Restated Declaration.

## ARTICLE IV. VARIANCES

The Board, or its duly authorized representative, may authorize variances from compliance with any of the architectural provisions of this Amended and Restated Declaration, unless specifically prohibited, including restrictions upon height, size, placement of Structures, or similar restrictions, when circumstances such as topography, natural obstruction, hardship, aesthetic, or environmental considerations may require.   The Board, or its duly authorized representative, shall conduct a hearing with the Lot Owner seeking such variance and any Lot Owners adjacent or contiguous to such Lot, in order to consider any objections, concerns or comments regarding such variance, except that the decision to grant a variance is to be determined solely by the Board.   Such

variances must be evidenced in writing, must be approved by at least eighty percent (80%) of the Board, and shall become effective upon execution. The variance must be signed by a member of the Board and recorded in the Official Public Records of Harris County, Texas. If such variances are granted, no violation of the covenants, conditions, or restrictions contained in this Amended and Restated Declaration shall be deemed to have occurred with respect to the matter for which the variance was granted. The granting of such a variance shall not operate to waive any of the terms and provisions of this Amended and Restated Declaration for any purpose except as to the particular provision hereof covered by the variance, nor shall it affect in any way the Owner's obligation to comply with all applicable governmental laws and regulations.

No granting of a variance shall be relied on by an Owner, or any other person or entity (whether privy or party to the subject variance or not), as a precedent in requesting or assuming variance as to any other matter of potential or actual enforcement of any provision of this Amended and Restated Declaration. Action of the Board in granting or denying a variance is a decision based expressly on one unique set of circumstances and need not be duplicated for any other request by any party or the same party for any reason whatsoever.


## ARTICLE V. TERM AND MODIFICATION OF RESTRICTIONS

(a) The provisions of this Amended and Restated Declaration will remain in full force and effect until January 1, 2038, and are extended automatically for successive ten (10)year periods; provided, however that the provisions of this Amended and Restated Declaration may be terminated on January 1, 2038, or on the commencement of any successive ten (10) year period by filing for record in the Official Public Records of Real Property of Harris County, Texas, an instrument in writing signed by Owners representing not less than eighty percent (80%) of the Lots in the Subdivision.

(b) Approval by the Owners of a majority (fifty percent (50%) plus one (1)) of the Lots shall be required to amend or modify this Amended and Restated Declaration. Upon approval of the Owners, as set out above of said amended declaration (as evidenced by the President's or Vice-President's signature certifying such approval) the amended declaration shall be recorded in the Official Public Records of Harris County, Texas, whereupon to the extent of any conflict with this Amended and Restated Declaration and any amendment thereto, the more restrictive provision shall control. For purposes of this Section, the approval of multiple Owners of a Lot may be reflected by the signature of any one Owner of such Lot.

Notwithstanding anything contained herein to the contrary, the Organization shall be entitled to use any combination of the following methods to obtain approval of the Owners for an amendment to this Amended and Restated Declaration:

> i.  by written ballot, or electronic ballot as same may be established by the Board, that states the substance of the amendment and specifies the date by which a written or electronic ballot must be received to be counted;
>
> ii. at a meeting of the Members of the Organization, if written notice of the meeting stating the purpose of the meeting is

delivered to the Owners of the Lots; such notice may be hand-
delivered to the Owners, sent via regular mail to the Owner's
last known mailing address, as reflected in the Organization's
records, or via email to the Owner's email address as
reflected in the Organization's records;

iii.  by door-to-door circulation of a petition by the Organization
or a person authorized by the Organization; and/or by any
other method permitted under this Amended and Restated
Declaration or applicable law.

## ARTICLE VI. RIGHT TO ENFORCE

The restrictions herein set forth shall be binding upon the Organization,
its successors and assigns, and all parties claiming by, through or under it or
them, and all subsequent Owners of property in said Subdivision, each of whom
shall be obligated and bound to observe such restrictions, covenants and
conditions, provided, however, that no such person or corporation shall be
liable except in respect to breaches committed during its, his or their
ownership of said property.  The violation of any such restriction, covenant or
condition shall not operate to invalidate any mortgage, deed of trust, or other
lien acquired and held in good faith against said property, or any part thereof,
but such liens may be enforced as against any and all property covered thereby,
subject nevertheless to the restrictions, covenants and conditions herein
mentioned.  The Organization shall have the right to enforce observance and
performance of such restrictions, covenants and conditions, and in order to
prevent a breach, or to enforce the observance or performance of same, shall
have the right in addition to all other legal remedies, to an injunction either
prohibitive or mandatory.  The Owner of any Lot or Lots affected shall have the
right either to prevent a breach of any such restriction, covenant, or condition
or to enforce performance of same.

## ARTICLE VII. ASSESSMENTS

(a)   Creation of Assessments

The Owners of any Lot, by virtue of ownership of property within the
Subdivision, covenant and agree to pay to the Organization an annual assessment
("Assessment") and any applicable late fees, interest and costs as more
particularly set forth in this Amended and Restated Declaration.

Each such Assessment, together with attorney's fees, late fees, interest
and costs, shall be the personal obligation of the person or entity who was the
Owner of the land at the time when the Assessment became due.  No diminution or
abatement of Assessments or set-off shall be claimed or allowed by reason of any
alleged failure of the Organization or Board to take some action or perform some
function required to be taken or performed by the Organization or the Board
under this Amended and Restated Declaration, or for inconvenience or discomfort
arising from the making of repairs or improvements which are the responsibility
of the Organization.  The obligation to pay Assessments is a separate covenant
on the part of each Owner of a Lot.

(b)   Annual Assessments

i.     Purpose. Assessments levied by the Organization shall be used for any legal purpose for the benefit of the Subdivision as determined by the Board and, in particular, may, by way of example and not limitation or obligation, include operational expenses of the Organization, enforcement of deed restrictions, payment of insurance premiums, costs of collection and litigation, administrative expenses, beautification, providing security, and any other services as may be in the Subdivision's and Owners' interest and all buildings, services, improvements and facilities deemed necessary or desirable by the Board in connection with the administration, management, control or operation of the Subdivision.  The Board may, in its sound discretion, give one or more of the purposes set forth herein preference over other purposes, and it is agreed that all expenses incurred and expenditures and decisions made by the Board in good faith shall be binding and conclusive on all Owners.

ii.     Creation. Payment of the Assessment shall be the obligation of each Owner, subject to the provisions below, and shall be binding and enforceable as provided in this Amended and Restated Declaration.

iii.     Rate. The initial Assessment established by the Organization shall not exceed EIGHTY DOLLARS AND NO/100 ($80.00) per Lot.  An Owner who formally re-plats two or more Lots into one Lot with the approval of the City of Houston Planning and Development Department shall owe one Assessment.  Similarly, an Owner who subdivides a Lot shall pay one Assessment per Lot created by the subdivision of the Lot.

iv.     Commencement. The initial Assessment for a Lot shall commence as soon as practical but in no event later than January 1, 2020.  Assessments shall be due in advance on January 1st for the coming year and shall be delinquent if not paid in full as of January 31st of each year.

v.     Proration. An Owner's initial Assessment shall be made for the balance of the calendar year as determined on a pro-rata basis and shall become due and payable on the commencement date described above.  The Assessment for any year after the first year shall be due and payable on the first day of January.  Any Owner who purchases a Lot or Lots after the first day of January in any year shall be personally responsible for a pro-rated Assessment amount for that year.

vi.     Levying of the Assessment. The Board shall determine the sufficiency or insufficiency of the then-current Assessment to reasonably meet the expenses for providing services and capital improvements in the Subdivision and may, at its sole discretion and without a vote by the Members, increase the Assessment in an amount up to three percent (3%) annually.  The Assessment may only be increased by more than three percent (3%) annually if such increase is approved by Owners of a majority of the Lots present, in person or by proxy, electronic ballot, or absentee ballot, at a meeting called for said purpose at which a quorum is present in person or by proxy, electronic ballot, or absentee ballot. The Assessment shall not be adjusted more than once in a calendar year nor shall any increase be construed to take effect retroactively, unless otherwise approved by Owners of a majority of the Lots subject to such Assessments present in person or by proxy, electronic ballot or absentee ballot at a meeting called for said purpose at which a quorum is present in person or by proxy, electronic ballot, or absentee ballot.

vii. Over-65 Exemption.  Any Owner who is sixty-five (65) years old or older on the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas and has also received an over-65 homestead exemption on the Lot owned by the Owner in the Subdivision from the Harris County Appraisal District may apply to be exempted from payment of the Assessment for so long as the Owner continues to own the Lot ("Over-65 Exemption").  This Over-65 Exemption shall not apply to: (1) any current Owners who become sixty-five (65) years old during the ownership of their Lot after the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas; and (2) any new Owners who purchase a Lot in the Subdivision who are or may become sixty-five (65) years old or older after the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas. An Owner must apply for and receive approval in writing from the Organization for the Over-65 Exemption.

(c)      Enforcement

The Organization may bring an action in law against the Owner personally obligated to pay the Assessment, late fees, interest, and costs, including attorneys' fees, incurred by the Organization in collecting same and obtain a personal judgment against the Owner.  No lien is created herein to secure the payment of the Assessment.

## ARTICLE VIII. EASEMENTS

It is agreed that all sales of Lots and dedication of Streets in said Subdivision shall be subject to easements over and across such portions of each Lot, as hereinafter designated, as may be deemed appropriate or necessary for the purpose of installing, using, repairing and maintaining public utilities, water, sewer lines, electric lighting and telephone poles, pipe lines, and drainage ditches or structures and/or any equipment necessary for the performance of any public or quasi-public utility service and function, with the right of access thereto for the purpose of further construction, maintenance and repairs.  Such right of access to include the right, without liability on the part of any one or all of the owners or operators of such utilities, to remove any or all obstructions on said easement right-of-way, caused by trees, brush, shrubs, either on or overhanging such right-of-way, as in their opinion may interfere with the installation or operation of their circuits, lines, pipes, or drainage ditches or structures.  Such easements shall be for the general benefit of the Subdivision and the property Owners thereof and are hereby reserved and created in favor of any and all utility companies entering into and upon said property for the purposes aforesaid, with the permission of the Organization, its successors or assigns, and shall extend to only the following portions of said Subdivision:

In BLOCK TWENTY-THREE (23), there is an easement ten (10) feet in width off the rear of each Lot; an easement five (5) feet in width off the west side of Lot Two (2); an easement five (5) feet in width off the east side of Lot Three (3); an easement five (5) feet in width off the west side of Lot Twelve (12); and an easement five (5) feet in width off the east side of Lot Thirteen (13).

In BLOCK TWENTY-FOUR (24), there is an easement five (5) feet in width off the rear of each Lot, the north side of Lot Fifteen (15) being considered the rear for this purpose; an easement five (5) feet in width off the north side of Lot Two (2); an easement five (5) feet in width off the south side of Lot Three (3); an easement five (5) feet in width off the east side of Lot Five (5); an easement five (5) feet in width off the east side of Lot Twenty-four (24); an

easement three (3) feet in width off the west property line of Lot Nine (9), for a distance of Twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the east side of Lot Ten (10), for a distance of twenty (20) feet from the rear property line toward the front property line.

In BLOCK TWENTY-FIVE (25), there is an easement five (5) feet in width off the rear of each Lot; an easement five (5) feet in width off the north side of Lot Two (2); an easement five (5) feet in width off the south side of Lot Three (3); an easement five (5) feet in width off the east side of Lot Five (5); an easement five (5) feet in width off the east side of Lot Twenty (20); an easement three (3) feet in width off the west side of Lot Eight (8) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the east side of Lot Nine (9), for a distance of twenty (20) feet from the rear property line toward the front property line.

In BLOCK TWENTY-SIX (26), there is an easement five (5) feet in width off the rear of each Lot; an easement five (5) feet in width off the north Side of Lot Two (2); an easement five (5) feet in width off the east side of Lot Three (3); an easement five (5) feet in width off the east side of Lot Thirteen (13); an easement five (5) feet in width off the west side of Lot Fourteen (14); an easement three (3) feet in width off the west side of Lot Six (6), for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the east side of Lot Seven (7), for a distance of twenty (20) feet from the rear property line toward the front property line.

In BLOCK TWENTY-SEVEN (27), there is an easement five (5) feet in width off the rear of each Lot; an easement five (5) feet in width off the west side of Lot Two (2); an easement five (5) feet in width off the east side of Lot Three (3); an easement five (5) feet in width off the east side of Lot Fourteen (14); and easement five (5) feet in width off the south side of Lot Fifteen (15); an easement three (3) feet in width off the east side of Lot Eight (8), for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the west side of Lot Nine (9), for a distance of twenty (20) feet from the rear property line toward the front property line.

In BLOCK TWENTY-EIGHT (28), there is an easement five (5) feet in width off the rear of each Lot from One (1) to Seventeen (17), inclusive; an easement fifteen (15) feet in width off the rear of each Lot from Eighteen (18) to Thirty (30), inclusive; an easement five (5) feet in width off the north side of Lot Two (2); an easement fifteen (15) feet in width off the south side of Lot Three (3); an easement five (5) feet in width off the east side of Lot Five (5); an easement five (5) feet in width off the east side of Lot Thirty (30); an easement ten (10) feet in width off the west side of Lot Seventeen (17); an easement ten (10) feet in width off the west side of Lot Eighteen (18).

In BLOCK TWENTY-NINE (29), there is an easement five (5) feet in width off the rear of each Lot; an easement five (5) feet in width off the north side of Lot Two (2); an easement five (5) feet in width off the east side of Lot Three (3); an easement ten (10) feet in width off the west side of Lot Fifteen (15); an easement ten (10) feet in width off the west side of Lot Sixteen (16); an easement five (5) feet in width off the east side of Lot Twenty-two (22); and an easement five (5) feet in width off the west side of Lot Twenty-three (23).

In BLOCK THIRTY (30), there is an easement ten (10) feet in width off the rear of each Lot; an easement five (5) feet in width off the west side of Lot One (1); an easement five (5) feet in width off the east side of Lot Two (2); an easement ten (10) feet in width off the west side of Lot Eight (8).

In BLOCK THIRTY-ONE (31), there is an easement ten (10) feet in width off the west side of BLOCK THIRTY-ONE (31).

In addition to the ground easements above listed, an additional aerial easement of five (5) feet is reserved, this easement being needed particularly by the light and telephone companies for the protection of all overhead wires.

## ARTICLE IX. UPKEEP

The Owners of property in said Subdivision shall be required to keep the weeds cut on the particular property owned by each, and shall not permit the accumulation of trash, rubbish, or other unsightly obstacles on the premises, the easements, or in the alley, or in the Street abutting the same.  The area in the Street between the pavement and the property line shall at all times be kept clean and free of unsightly obstacles.

## ARTICLE X. ORGANIZATION

(a)   Every Owner of a Lot will, solely by virtue of ownership and without further action, be a member of Garden Oaks Maintenance Organization, Inc., a Texas non-profit corporation (the "Organization").   The Organization establishes, assesses, and collects mandatory assessments, making it subject to Chapter 209 of the Texas Property Code.   The business and affairs of the Organization is managed by its Board of Directors.

(b)   Each Lot is entitled to one (1) vote, regardless of the number of Owners of a Lot. Multiple Owners of any single Lot must vote in agreement (under any method they devise among themselves) but, in no case will such multiple Owners cast portions of votes.   The vote attributable to any single Lot must be voted in the same manner (i.e. all Owners of the Lot for, or all Owners of the Lot against a particular issue) but, in no event can there be more than one (1) vote cast per Lot.

A Lot is entitled to two (2) votes only if all of the following conditions are satisfied: (i) applicable City of Houston subdivision ordinances would permit subdivision of the Lot by re-platting, (ii) each resulting Lot would satisfy the frontage requirements imposed herein, (iii) no Structure that is located on one resulting Lot would encroach onto the adjacent Lot or multiple setback lines after subdivision (e.g., a building may not be located on the original Lot such that the lot line created by the subdivision would, with respect to existing Structures, result in an encroachment or violation of setback lines), and (iv) each resulting Lot may be conveyed to a separate Owner as a fee simple tract of land.

No Owner will have a right to vote unless (i) the Owner is shown on the membership rolls of the Organization, or (ii) the recorded deed evidencing ownership of the Lot has been delivered to the Organization.

(c)   The Organization's Bylaws govern the Organization and may be amended pursuant to the Bylaws.

(d)    After the effective date of this Amended and Restated Declaration, the Organization shall be renamed to the Garden Oaks Homeowners Association, Inc. which will continue with the same rights of the Organization including any new rights as may be created or designated in its Bylaws.

This Amended and Restated Declaration shall be effective as of the date of recording in the Official Public Records of Harris County, Texas.   If any provision of this Declaration is found to be in conflict with the Restrictions and Amendment of Gardens Oaks, Section Two, this Amended and Restated Declaration shall control.

IN WITNESS WHEREOF, pursuant to the authority provided herein, this Amended and Restated Declaration was approved by the affirmative vote of the Owners in Garden Oaks, Section Two.

**CERTIFICATION**

I, the undersigned, do hereby certify:

That I am the President of the Garden Oaks Maintenance Organization, Inc.;

That this instrument constitutes the Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Garden Oaks, Section Two, and was affirmatively approved by the Owners in Garden Oaks, Section Two.

IN WITNESS WHEREOF, I have hereunto subscribed my name on this the _____ day of _____, 201__.

By: _____
Print Name: _____
Title: President

STATE OF TEXAS              §
                           §
COUNTY OF HARRIS            §

BEFORE ME, the undersigned authority, on this day personally appeared _____, the President of the Garden Oaks Maintenance Organization, Inc., known by me to be the person whose name is subscribed to this instrument, and acknowledged to me that s/he executed the same for the purposes expressed and in the capacity herein stated and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ the day of _____, 201__.

_____
Notary Public – State of Texas

*After Recording Return To:*
*Sipra S. Boyd*
*Roberts Markel Weinberg Butler Hailey PC*
*2800 Post Oak Blvd. 57th Floor*
*Houston, Texas 77056*

**AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS**
**FOR**
**GARDEN OAKS, SECTION THREE**

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §


This Amended and Restated Declaration of Covenants, Conditions and Restrictions for Garden Oaks, Section Three ("Amended and Restated Declaration") is approved and facilitated pursuant to the authority of the bankruptcy court and further approved by the affirmative vote of Owners in Garden Oaks, Section Three to become effective upon recording in the Official Real Property Records of Harris County, Texas.


**W I T N E S S E T H**

WHEREAS, Garden Oaks, Section Three is a subdivision in Harris County, Texas according to the map or plat recorded under Volume 15, Page 71 of the Map Records of Harris County, Texas and is encumbered by the Restrictions Applying to Garden Oaks Section Three recorded under Film Code No. 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 in the Official Public Records of Harris County, Texas ("Restrictions"); and

WHEREAS, the Restrictions were amended pursuant to Chapter 204 of the Texas Property Code by that Petition to Amend Restrictions to Create a Property Owners Association and Certificate of Compliance with Texas Property Code, Chapter 204 Garden Oaks, Section Three recorded under File No. V842579 on June 03, 2002 in the Official Public Records of Harris County, Texas ("Amendment"); and

WHEREAS, the Amendment created a mandatory Transfer Assessment payable to the Garden Oaks Maintenance Organization, Inc., a Texas nonprofit corporation (the "Organization"), being a mandatory association; and

WHEREAS, the Organization filed for Chapter 11 bankruptcy protection under Case No. 18-60018, in the Bankruptcy Court for the Southern District of Texas; and

WHEREAS, the Bankruptcy Court approved the Organization's Chapter 11 Plan by order dated _____; and

WHEREAS, the Bankruptcy Court had the authority to approve and facilitate the adoption of this Amended and Restated Declaration upon obtaining the affirmative vote of the Owners in Garden Oaks, Section Three in accordance with the Bankruptcy Code and Rules, which will become effective upon recording in the Official Real Property Records of Harris County, Texas; and

WHEREAS, the Bankruptcy Court, in confirming the Chapter 11 Plan, and approving and adopting this Amended and Restated Declaration has retained exclusive jurisdiction as to any and all issues related to the confirmation of the Chapter 11 Plan and the approval and adoption of this Amended and Restated Declaration; and

WHEREAS, the Owners in Garden Oaks, Section Three desire to supersede, amend, restate, and wholly replace the Restrictions and Amendment for Garden Oaks, Section Three in their entirety and replace them with this Amended and Restated Declaration; and

WHEREAS, the Owners of Garden Oaks, Section Three desire to protect and maintain the park-like character by careful and thoughtful planning, including protective restrictions, which include architectural review of plans, a maintenance fund, and many other beneficial restrictions, based on its original environment, natural beauty, permanent improvements, comfort, drainage, and parks and playgrounds; and

NOW THEREFORE, the Owners in Garden Oaks, Section Three, hereby amend, alter, and change the Restrictions and Amendment for Garden Oaks, Section Three by replacing them in their entirety with this Amended and Restated Declaration which shall include the following reservations, restrictions and covenants, and Garden Oaks, Section Three shall be improved, sold, used and enjoyed in accordance with, including the conditions, covenants, easements, reservations, and restrictions hereinafter set forth, all of which are hereby adopted for, and placed upon Garden Oaks, Section Three and shall run with Garden Oaks, Section Three and be binding on all parties, now and at any time hereinafter, having or claiming any right, title or interest in Garden Oaks, Section Three or any part thereof, their heirs, executors, administrators, successors and assigns, regardless of the source of, or the manner in which any such right, title or interest is or may be acquired, and shall inure to the benefit of each owner of any part of Garden Oaks, Section Three to wit:

## ARTICLE I. DEFINITIONS

(a)   "Architectural Review Committee" or "ARC" shall mean the architectural review committee established by the Organization to review plans submitted to the Organization for architectural review.

(b)   "Attic" means the space between the ceiling beams of the top story and the Roof rafters.  An Attic whether finished or unfinished is not a story.

(c)   "Board" shall mean the Board of Directors of the Organization.

(d)   "Corner Lot" is one that abuts on more than one Street.  Any Lot, except a corner, is deemed to front on the Street upon which it abuts.  A Corner Lot shall be deemed to front on the Street on which it has its smaller dimension, or if dimensions on more than one Street are approximately the same, Organization reserves the right to designate which Street the Lot shall face.

(e)   "Dwelling" means a main residential structure constructed on a Lot intended for single-family residential purposes.

(f)   "Garage" means a building or part of a building used to house motor vehicles.

(g)   "Irregular Shaped Lot" means any Lot with a frontage width which differs by greater than thirty-five percent (35%) from the rear width of the Lot.  The Board shall have the discretion to determine whether any other Lot can be considered an Irregular Shaped Lot.

(h)   "Lot" means a parcel of property within the Plat of the subdivision recorded in the real property records of Harris County, Texas, and encumbered by this Amended and Restated Declaration, and restricted to single-family residential purposes.  For purposes of this Amended and Restated Declaration, a Lot may consist of a platted Lot, less than a platted Lot, more than a platted Lot, or portions of two or more platted Lots.

(i)   "Organization" shall mean and refer to the Garden Oaks Maintenance Organization, Inc.

(j)   "Outbuilding" shall mean and refer to structures such as (by way of example and not limitation) storage buildings, sheds, greenhouses, gazebos and other Roofed Structures.

(k)   "Owner" means an owner of any portion of the Subdivision.  Persons or entities holding title only as a lienholder shall not be an Owner for purposes of this Amended and Restated Declaration.

(l)   "Roof" means a non-porous cover for a structure such as (by way of example and not limitation) Lexan barriers or shingles but not a shade trellis, ivy or other open or porous material that may also be used as a cover.

(m)   "Short Lot" means a Lot whose depth does not allow for an Outbuilding.

(n)   "Street" as used herein shall include any street, drive, boulevard, road, lane, avenue, or place as shown on the recorded plat as a thoroughfare.

(o)   "Structure" means any building (including a Dwelling) or improvement, placed, maintained or constructed on a Lot, whether or not affixed to the land, and any addition to, or modification of any existing building or improvement.

(p)   "Subdivision" means Garden Oaks, Section Three.


## ARTICLE II. RESTRICTIONS

(a) Except as herein noted, no Lots shall be used for anything other than single-family residential purposes.  As used herein, the term "single-family residential purposes" refers to the architectural design of a Dwelling and is deemed to specifically prohibit, without limitation, the use of a Lot for a duplex, apartment (excluding Garage apartments with ARC plan approval), multi-family Dwelling, or for any multi-family use, or for any business, professional or other commercial activity of any type, unless such business, professional or commercial activity is unobtrusive and merely incidental to the primary use of the Lot and the Dwelling for residential purposes.

(b) No trade or business may be conducted in or from any Dwelling, Structure or Lot except such use where (i) the existence or operation of the business activity is not apparent or detectable by sight, sound or smell from outside the Dwelling, Structure or Lot; (ii) the business activity conforms to all zoning requirements and other restrictive covenants applicable to the Subdivision; (iii) the business activity does not involve visitation to the Dwelling, Structure or Lot by clients, customers, workers, employees, suppliers or other business invitees or door-to-door solicitation of residents of the

Subdivision; and (iv) the business activity is consistent with the residential character of the Subdivision and does not constitute a nuisance, or a hazardous or offensive use, or threaten the security or safety of other residents of the Subdivision, as may be determined in the sound discretion of the Board. The uses set out in this section shall be referred to singularly or collectively as an "Incidental Business Use." At no time may an Incidental Business Use cause increased parking or traffic within the Subdivision such that egress or ingress is impeded. Any increased parking or traffic within the Subdivision as a result of an Incidental Business Use that impedes egress or ingress shall be deemed to be a deed restriction violation. Examples of expressly prohibited uses include, but are not limited to, a bed and breakfast, boarding house, vacation rental daily/weekly rentals of the entire Dwelling, Structure or Lot or portions of the Dwelling, Structure or Lot a day-care facility, home day-care facility, church, nursery, pre-school, beauty parlor, or barber shop or other similar facility. No lease or rental of a Dwelling, Structure, or Lot shall be for less than thirty (30) consecutive and guaranteed days.

(c) Except as herein noted, no signs, billboards, posters, or advertising devices of any character shall be erected in this Subdivision without the written consent of the Organization, and such consent shall be revocable at any time. The Board has the authority to adopt a policy or guidelines regarding signs.

## ARTICLE III. ARCHITECTURAL RESTRICTIONS

No Dwelling, Outbuilding, or improvements of any character shall be erected or modified, or the erection thereof begun, or changes made in the exterior thereof after construction, on any Lot, Dwelling, or Outbuilding in Garden Oaks, Section Three, until plans and specifications have been submitted to and approved in writing by the Architectural Review Committee of the Organization. Such submission is to include exterior design, survey and site plan, and such approval by the Organization is to be based on the following general requirements, stipulations and restrictions, together with any other requirements, stipulations, and restrictions that the Organization may deem advisable. In the event the ARC fails to approve such plans and specifications within thirty (30) days after receipt thereof, they shall be deemed to be disapproved.

(a) No Dwelling shall be erected on any Lot or homesite of less frontage than seventy-five (75) feet and no Lot shall be subdivided to be less than nine thousand (9,000) square feet. No Lot shall be subdivided to create a Lot with frontage of less than seventy-five (75) feet. No Lot shall be subdivided in a manner which will result in an Irregular Shaped Lot or Short Lot.

(b) All Lots in the Subdivision shall be known and described as single-family residential Lots, and all Lots shall have one (1) detached single-family Dwelling not to exceed two stories plus an Attic and forty-two (42) feet above natural grade plane in height, as measured from the center of the fronting street to the highest ridgeline. The height limitation provided herein shall include any portion of the natural grade plane that is built up or the area, whether consisting of livable or non-livable space, underneath the Dwelling if it is raised above the natural grade plane. A detached Garage may not be converted to livable space without ARC plan approval. All permissible Dwellings and Outbuildings, including the Garage, on a Lot, shall be erected and maintained in compliance with all height and setback limitations provided herein.

(c) No Dwelling shall be moved onto any Lot without ARC plan approval.

(d) No trailer, tent, shack, or other temporary Outbuilding erected or moved on to the Lot shall at any time be used as habitable space, nor shall any residence of a temporary character be permitted.

No trailer, trailer house, or movable Structure of any kind or type or temporary building shall be erected or maintained on any Lot except during actual construction of the Dwelling being erected thereon, and then such trailer house or temporary building must be on the Lot on which construction is in progress and not on adjoining Lots, Streets, or easements, and at completion of construction, the temporary building must be removed immediately.

(e) No Garage apartment may be used for rental purposes for a period of less than thirty (30) guaranteed and consecutive days.

(f) All Dwellings shall be constructed on the Lot so as to front the Street upon which such Lot faces.

(g) Where Corner Lots are of equal or nearly equal dimensions on two Streets, or they are Irregular Shaped Lots, the Organization reserves the right to designate the direction in which such improvements shall face, and such decision shall be made with the thought in mind of the best general appearance to that immediate section. If a Corner Lot is subdivided resulting in a Lot with a rear setback which is adjacent to the side setback of the adjacent Lot, the resulting rear setback shall maintain the dimensions of the original side setback.

(h) Except as herein noted, the building lines of any Dwelling to be erected on any lot shall be as follows:

1. The front building line shall not be nearer than fifty (50) feet to the front property line, including the gallery, terrace or porch, but exclusive of steps used to access the ground floor.

2. The rear building line shall not be nearer than the rear easement.

3. No fence, wall, nor any pergola or other detached Structure shall be erected or maintained on any part of any Lot forward of the front building line of said Lot except that the Organization may grant a variance for Lots along the boundary of the Subdivision as to Lot lines shared with non-Subdivision property.

4. No detached Garage, barn, or other Outbuilding of any kind shall be erected on any Lot nearer than one hundred (100) feet to the front property line, unless it is in the rear of the Dwelling and in compliance with the setbacks described in subsection (5).

5. The side building lines shall not be nearer than fifteen (15) feet to either side property line in the area from the front building line (50-foot line) to the Outbuilding build line (100-foot line); or nearer than ten (10) feet to either side property line in the area from the Outbuilding build line (100-foot line) to the rear building line.

6. The right is reserved by the Organization to change these restrictions in the case of unusual or Irregular Shaped Lots, Short Lots, or Lots

unusual in size, where same is considered desirable for the advantage and best appearance of the immediate community.

On all Lots in BLOCK THIRTY-TWO (32), the Dwelling to be erected shall not be nearer than fifty (50) feet to the front property line of each Lot nor nearer than fifteen (15) feet to either side property line of each Lot;

On all Lots in BLOCK THIRTY-THREE (33), the Dwelling to be erected shall be as follows:

On Lots One (1), Two (2), Three (3), and Four (4), the Dwelling shall not be nearer than fifty (50) feet to the front property line, nor nearer than fifteen (15) feet to either side property line;

On Lot Five (5), the Dwelling to be erected shall not be nearer than seventy-five (75) feet to the front property line, nor nearer than fifty (50) feet to the west side property, line nor nearer than fifteen (15) feet to the east side property line;

On Lot Six (6), the Dwelling to be erected shall not be nearer than seventy-five (75) feet to the front property line, nor nearer than fifteen (15) feet to either side property line;

On all Lots in BLOCKS THIRTY-FOUR (34) THIRTY-FIVE (35), THIRTY-SIX (36) THIRTY-SEVEN (37), THIRTY-EIGHT (38) and THIRTY-NINE (39) except Lots Twenty-one (21) Twenty-two (22) and Twenty-three (23) in BLOCK THIRTY-SIX (36) and Lots Sixteen (16) to Twenty-five (25), in BLOCK THIRTY-NINE (39) the Dwelling to be erected shall not be nearer than fifty (50) feet to the front property line of each Lot nor nearer than fifteen (15) feet to either side property line;

On Lots Twenty-one (21) Twenty-two (22), and Twenty-three (23) in BLOCK THIRTY-SIX (36) the Dwelling to be erected shall not be nearer than fifteen (15) feet to the front property line of each Lot nor nearer than fifteen (15) feet to either side property line, of each Lot;

On Lots Sixteen (16) to Twenty-five (25), inclusive, in BLOCK THIRTY-NINE (39) the Dwelling to be erected shall not be nearer than seventy-five (75) feet to the front property line nor nearer than fifteen (15) feet to either side property line;

On all Lots in BLOCK FORTY (40) the Dwelling to be erected shall not be nearer than seventy-five (75) feet to the front property line nor nearer than fifteen (15) feet to either side property line.

(i) All Dwellings to be erected facing Azalea Street must be of two-story type and attractive in design.

(j) No Outbuildings shall exceed in height, or number of stories (not including Attics), beyond the highest ridgeline, the Dwelling to which they are appurtenant

(k) No building material of any kind or character shall be placed or stored upon the Lot until the Owner is ready to commence construction, and then such material shall be placed within the property lines of the Lot or parcel of land upon which the improvements are to be erected, and shall not be placed in the Street or between the pavement and property line.

(l) No stumps, trees, underbrush or any refuse of any kind nor scrap material from the improvements being erected an any Lot shall be placed on any adjoining Lots, Streets, or easements.  All such material, if not disposed of immediately, must remain on the Lot on which construction work is in progress, and at the completion of such improvements, such materials must be immediately removed from the property.

(m) Any property on which a condition exists on the date this Amended and Restated Declaration is recorded in the Official Public Records of Harris County, Texas that is a violation of this Amended and Restated Declaration shall be grandfathered until and unless the condition on the property is replaced. Repairing the condition shall not require compliance so long as it simply restores the violation to the condition as it existed on the effective date of this Amended and Restated Declaration.  The repair shall not enhance or extend any portion of the violation. The Board shall use sound discretion to determine whether any such repair is to such a degree which requires compliance with this Amended and Restated Declaration.

## ARTICLE IV. VARIANCES

The Board, or its duly authorized representative, may authorize variances from compliance with any of the architectural provisions of this Amended and Restated Declaration, unless specifically prohibited, including restrictions upon height, size, placement of Structures, or similar restrictions, when circumstances such as topography, natural obstruction, hardship, aesthetic, or environmental considerations may require.  The Board, or its duly authorized representative, shall conduct a hearing with the Lot Owner seeking such variance and any Lot Owners adjacent or contiguous to such Lot, in order to consider any objections, concerns or comments regarding such variance, except that the decision to grant a variance is to be determined solely by the Board.  Such variances must be evidenced in writing, must be approved by at least eighty percent (80%) of the Board, and shall become effective upon execution.  The variance must be signed by a member of the Board and recorded in the Official Public Records of Harris County, Texas.  If such variances are granted, no violation of the covenants, conditions, or restrictions contained in this Amended and Restated Declaration shall be deemed to have occurred with respect to the matter for which the variance was granted.  The granting of such a variance shall not operate to waive any of the terms and provisions of this Amended and Restated Declaration for any purpose except as to the particular provision hereof covered by the variance, nor shall it affect in any way the Owner's obligation to comply with all applicable governmental laws and regulations.

No granting of a variance shall be relied on by an Owner, or any other person or entity (whether privy or party to the subject variance or not), as a precedent in requesting or assuming variance as to any other matter of potential or actual enforcement of any provision of this Amended and Restated Declaration. Action of the Board in granting or denying a variance is a decision based expressly on one unique set of circumstances and need not be duplicated for any other request by any party or the same party for any reason whatsoever.

## ARTICLE V. TERM AND MODIFICATION OF RESTRICTIONS

(a) The provisions of this Amended and Restated Declaration will remain in full force and effect until January 1, 2038, and are extended automatically for

successive ten (10)year periods; provided, however that the provisions of this Amended and Restated Declaration may be terminated on January 1, 2038, or on the commencement of any successive ten (10) year period by filing for record in the Official Public Records of Real Property of Harris County, Texas, an instrument in writing signed by Owners representing not less than eighty percent (80%) of the Lots in the Subdivision.

(b) Approval by the Owners of a majority (fifty percent (50%) plus one (1)) of the Lots shall be required to amend or modify this Amended and Restated Declaration.  Upon approval of the Owners, as set out above of said amended declaration (as evidenced by the President's or Vice-President's signature certifying such approval) the amended declaration shall be recorded in the Official Public Records of Harris County, Texas, whereupon to the extent of any conflict with this Amended and Restated Declaration and any amendment thereto, the more restrictive provision shall control.  For purposes of this Section, the approval of multiple Owners of a Lot may be reflected by the signature of any one Owner of such Lot.

Notwithstanding anything contained herein to the contrary, the Organization shall be entitled to use any combination of the following methods to obtain approval of the Owners for an amendment to this Amended and Restated Declaration:

   i.   by written ballot, or electronic ballot as same may be established by the Board, that states the substance of the amendment and specifies the date by which a written or electronic ballot must be received to be counted;

   ii.  at a meeting of the Members of the Organization, if written notice of the meeting stating the purpose of the meeting is delivered to the Owners of the Lots; such notice may be hand-delivered to the Owners, sent via regular mail to the Owner's last known mailing address, as reflected in the Organization's records, or via email to the Owner's email address as reflected in the Organization's records;

   iii. by door-to-door circulation of a petition by the Organization or a person authorized by the Organization; and/or by any other method permitted under this Amended and Restated Declaration or applicable law.

## ARTICLE VI. RIGHT TO ENFORCE

The restrictions herein set forth shall be binding upon the Organization, its successors and assigns, and all parties claiming by, through or under it or them, and all subsequent Owners of property in said Subdivision, each of whom shall be obligated and bound to observe such restrictions, covenants and conditions, provided, however, that no such person or corporation shall be liable except in respect to breaches committed during its, his or their ownership of said property.  The violation of any such restriction, covenant or condition shall not operate to invalidate any mortgage, deed of trust, or other lien acquired and held in good faith against said property, or any part thereof, but such liens may be enforced as against any and all property covered thereby, subject nevertheless to the restrictions, covenants, and conditions herein mentioned.  The Organization shall have the right to enforce observance and performance of such restrictions, covenants, and conditions, and in order to

prevent a breach, or to enforce the observance or performance of same, shall have the right in addition to all other legal remedies, to an injunction either prohibitive or mandatory.  The Owner of any Lot or Lots affected shall have the right either to prevent a breach of any such restriction, covenant, or condition or to enforce performance of same.

## ARTICLE VII. ASSESSMENTS

(a)   Creation of Assessments

The Owners of any Lot, by virtue of ownership of property within the Subdivision, covenant and agree to pay to the Organization an annual assessment ("Assessment") and any applicable late fees, interest and costs as more particularly set forth in this Amended and Restated Declaration.

Each such Assessment, together with attorney's fees, late fees, interest and costs, shall be the personal obligation of the person or entity who was the Owner of the land at the time when the Assessment became due.  No diminution or abatement of Assessments or set-off shall be claimed or allowed by reason of any alleged failure of the Organization or Board to take some action or perform some function required to be taken or performed by the Organization or the Board under this Amended and Restated Declaration, or for inconvenience or discomfort arising from the making of repairs or improvements which are the responsibility of the Organization.  The obligation to pay Assessments is a separate covenant on the part of each Owner of a Lot.

(b)   Annual Assessments

i. Purpose. Assessments levied by the Organization shall be used for any legal purpose for the benefit of the Subdivision as determined by the Board and, in particular, may, by way of example and not limitation or obligation, include operational expenses of the Organization, enforcement of deed restrictions, payment of insurance premiums, costs of collection and litigation, administrative expenses, beautification, providing security, and any other services as may be in the Subdivision's and Owners' interest and all buildings, services, improvements and facilities deemed necessary or desirable by the Board in connection with the administration, management, control or operation of the Subdivision.  The Board may, in its sound discretion, give one or more of the purposes set forth herein preference over other purposes, and it is agreed that all expenses incurred and expenditures and decisions made by the Board in good faith shall be binding and conclusive on all Owners.

ii. Creation. Payment of the Assessment shall be the obligation of each Owner, subject to the provisions below, and shall be binding and enforceable as provided in this Amended and Restated Declaration.

iii. Rate. The initial Assessment established by the Organization shall not exceed EIGHTY DOLLARS AND NO/100 ($80.00) per Lot.  An Owner who formally re-plats two or more Lots into one Lot with the approval of the City of Houston Planning and Development Department shall owe one Assessment. Similarly, an Owner who subdivides a Lot shall pay one Assessment per Lot created by the subdivision of the Lot.

iv. Commencement. The initial Assessment for a Lot shall commence as

soon as practical but in no event later than January 1, 2020. Assessments shall be due in advance on January 1st for the coming year and shall be delinquent if not paid in full as of January 31st of each year.

v. Proration. An Owner's initial Assessment shall be made for the balance of the calendar year as determined on a pro-rata basis and shall become due and payable on the commencement date described above. The Assessment for any year after the first year shall be due and payable on the first day of January. Any Owner who purchases a Lot or Lots after the first day of January in any year shall be personally responsible for a pro-rated Assessment amount for that year.

vi. Levying of the Assessment. The Board shall determine the sufficiency or insufficiency of the then-current Assessment to reasonably meet the expenses for providing services and capital improvements in the Subdivision and may, at its sole discretion and without a vote by the Members, increase the Assessment in an amount up to three percent (3%) annually. The Assessment may only be increased by more than three percent (3%) annually if such increase is approved by Owners of a majority of the Lots present, in person or by proxy, electronic ballot, or absentee ballot, at a meeting called for said purpose at which a quorum is present in person or by proxy, electronic ballot, or absentee ballot. The Assessment shall not be adjusted more than once in a calendar year nor shall any increase be construed to take effect retroactively, unless otherwise approved by Owners of a majority of the Lots subject to such Assessments present in person or by proxy, electronic ballot or absentee ballot at a meeting called for said purpose at which a quorum is present in person or by proxy, electronic ballot, or absentee ballot.

vii. Over-65 Exemption. Any Owner who is sixty-five (65) years old or older on the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas and has also received an over-65 homestead exemption on the Lot owned by the Owner in the Subdivision from the Harris County Appraisal District may apply to be exempted from payment of the Assessment for so long as the Owner continues to own the Lot ("Over-65 Exemption"). This Over-65 Exemption shall not apply to: (1) any current Owners who become sixty-five (65) years old during the ownership of their Lot after the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas; and (2) any new Owners who purchase a Lot in the Subdivision who are or may become sixty-five (65) years old or older after the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas. An Owner must apply for and receive approval in writing from the Organization for the Over-65 Exemption.

(c)      Enforcement

The Organization may bring an action in law against the Owner personally obligated to pay the Assessment, late fees, interest, and costs, including attorneys' fees, incurred by the Organization in collecting same and obtain a personal judgment against the Owner. No lien is created herein to secure the payment of the Assessment.

## ARTICLE VIII. EASEMENTS

It is agreed that all sales of Lots and dedication of Streets in said Subdivision shall be subject to easements over and across such portions of each Lot, as hereinafter designated, as may be deemed appropriate or necessary for the purpose of installing, using, repairing and maintaining public utilities, water, sewer lines, electric lighting, and telephone poles, pipe lines, and drainage ditches or structures and/or any equipment necessary for the performance of any public or quasi-public utility service and function, with the right of access thereto for the purpose of further construction, maintenance and repairs.  Such right of access to include the right, without liability on the part of any one or all of the owners or operators of such utilities, to remove any or all obstructions on said easement right-of-way caused by trees, brush, shrubs, either on or overhanging such right-of-way, as in their opinion may interfere with the installation or operation of their circuits, lines, pipes, or drainage ditches or structures.  Such easements shall be for the general benefit of the Subdivision and the property Owners thereof and are hereby reserved and created in favor of any and all utility companies entering into and upon said property for the purposes aforesaid, with the permission of the Organization, its successors or assigns, and shall extend to only the following portions of said Subdivision:

In BLOCK THIRTY-TWO (32) no ground easements have been reserved because of the fact that a ten (10) foot easement has been reserved on the property immediately adjoining on the east, however, a five (5) foot aerial easement has been reserved on the east line of Lots one (1), two (2), and three (3).

In BLOCK THIRTY-THREE (33) there is an easement five (5) feet in width off the rear of each Lot; an easement five (5) feet in width off the north side of Lot four (4); an easement three (3) feet in width off the east side of Lot Five (5), for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the west side of Lot Six (6) for a distance of twenty (20) feet from the rear property line toward the front property line.  There is also a five (5) foot aerial easement off the east side of Lot One (1), and a five (5) foot aerial easement off the east side of Lot Six (6).

In BLOCK THIRTY-FOUR (34) a tract of land twenty (20) feet in width has been dedicated in the rear of all Lots in this Block; and the right is reserved for all utilities to be installed in a five (5) foot strip on the north side of this dedicated tract of land; there is an easement five (5) feet in width off the west side of Lot Eight (8); an easement five (5) feet in width off the east side of Lot Nine (9). There is further retained a five (5) foot aerial easement off the rear of all Lots; there is a five (5) foot aerial off the east side of Lot One (1).

In BLOCK THIRTY-FIVE (35) there is an easement five (5) feet in width off the rear of each Lot; an easement five (5) in width off the west side of Lot Eight (8); an easement five (5) feet in width off the east side of Lot nine (9); an easement five (5) feet in width off the east side of Lot Thirty-nine (39); an easement five (5) feet in width off the west side of Lot Forty (40); an easement three (3) feet in width off the west side of Lot Thirteen (13), for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the east side of Lot Fourteen (14), for a distance of twenty (20) feet from the rear property line toward the front property line. There is further retained a five (5) foot aerial easement off the east side of Lot One (1) where same adjoins the Park in Section two.

In BLOCK THIRTY-SIX (36) there is an easement five (5) feet in width off the rear of all Lots; an easement five (5) feet in width off the west side of Lot Five (5); an easement five (5) feet in width off the east side of Lot Six (6); an easement five (5) feet in width off the east side of Lot Thirty-six (36); an easement five (5) feet in width off the west side of Lot Thirty-seven (37); an easement five (5) feet in width off the south side of Lot Twenty-one (21); an easement five (5) feet in width off the north side of Lot Twenty-three (23); an easement three (3) feet in width off the west side of Lot Eleven (11); for a distance of twenty (20) feet from the rear property line toward the front property line; an easement five (5) feet in width off the east side of Lot Twelve (12), for a distance of twenty (20) feet from the rear property line toward the front property line.

In BLOCK THIRTY-SEVEN (37) there is an easement five (5) feet in width off the rear of each Lot; an easement five (5) feet in width off the west side of Lot Four (4); an easement five (5) feet in width off the east side of Lot Five (5); an easement five (5) feet in width off the east side of Lot Thirty (30); an easement five (5) feet in width off the west side of Lot Thirty-one (31); an easement three (3) feet in width off the west side of Lot Eight (8) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the east side of Lot Nine (9) for a distance of twenty (20) feet from the rear property line toward the front property line.

In BLOCK THIRTY-EIGHT (38), there is an easement five (5) feet in width off the rear of each Lot; an easement five (5) feet in width off the west side of Lot Three (3); an easement five (5) feet in width off the east side of Lot Four (4); an easement five (5) feet in width off the east side of Lot Twenty-nine (29); an easement five (5) feet in width off the west side of Lot Thirty (30); an easement three (3) feet in width off the west side of Lot Nine (9) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement (5) feet in width off the east side of Lot Ten (10), for a distance of twenty (20) feet from the rear property line toward the front property line.

In BLOCK THIRTY-NINE (39) there is an easement five (5) feet in width off the rear of all Lots; an easement five (5) feet in width off the west side of Lot Two (2); an easement five (5) feet in width off the east side of Lot Three (3); an easement Five (5) feet in width off the north side of Lot Fifteen (15); an easement five (5) feet in width off the south side of Lot Twenty-five (25); an easement three (3) feet in width off the east side of Lot Sixteen (16) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the west side of Lot Seventeen (17), for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the east side of Lot Twenty-one (21) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the west side of Lot Twenty-two (22) for a distance of twenty (20) feet from the rear property line toward the front property line.

In BLOCK FORTY (40) a tract of land twenty (20) feet in width has been dedicated in the rear of all Lots in this Block; and the right is reserved for all utilities to be installed in a five (5) foot strip on the west side of this dedicated tract of land where same abuts Lots One (1) to Six (6,) inclusive, and a portion of Lot Seven (7); and the right is reserved for all utilities to be installed in a five (5) foot strip on the south side of this dedicated tract of land where same abuts a portion of Lot Seven (7) and all of Lots Eight (8) to

Sixteen (16), inclusive; there is an easement five (5) feet in width off the north side of Lot Four (4); an easement five (5) feet in width off the south side of Lot Five (5). No ground easement has been retained on the east side of Lot One (1) there is, however, a five (5) foot aerial easement retained on the east side of Lot One (1), and on the rear of all other Lots in this Block.

In addition to the ground easements above listed, an additional aerial easement of five (5) feet is reserved; resulting in a total overall unobstructed ground easement ten (10) feet wide from the ground upward and an unobstructed aerial easement twenty (20) feet wide from a plane twenty (20) feet above the ground upward centered on the ground easement, this easement being needed particularly by the light and telephone companies for the protection of all overhead wires.

### ARTICLE IX. UPKEEP

The Owners of property in said Subdivision shall be required to keep the weeds cut on the particular property owned by each, and shall not permit the accumulation of trash, rubbish, or other unsightly obstacles on the premises, the easements, or in the alley, or in the Street abutting the same. The area in the Street between the pavement and the property line shall at all times be kept clean and free of unsightly obstacles.

### ARTICLE X. ORGANIZATION

(a) Every Owner of a Lot will, solely by virtue of ownership and without further action, be a member of Garden Oaks Maintenance Organization, Inc., a Texas non-profit corporation (the "Organization"). The Organization establishes, assesses, and collects mandatory assessments, making it subject to Chapter 209 of the Texas Property Code. The business and affairs of the Organization is managed by its Board of Directors.

(b) Each Lot is entitled to one (1) vote, regardless of the number of Owners of a Lot. Multiple Owners of any single Lot must vote in agreement (under any method they devise among themselves) but, in no case will such multiple Owners cast portions of votes. The vote attributable to any single Lot must be voted in the same manner (i.e. all Owners of the Lot for, or all Owners of the Lot against a particular issue) but, in no event can there be more than one (1) vote cast per Lot.

A Lot is entitled to two (2) votes only if all of the following conditions are satisfied: (i) applicable City of Houston subdivision ordinances would permit subdivision of the Lot by re-platting, (ii) each resulting Lot would satisfy the frontage requirements imposed herein, (iii) no Structure that is located on one resulting Lot would encroach onto the adjacent Lot or violate setback lines after subdivision (e.g., a building may not be located on the original Lot such that the lot line created by the subdivision would, with respect to existing Structures, result in an encroachment or violation of setback lines), and (iv) each resulting Lot may be conveyed to a separate Owner as a fee simple tract of land.

No Owner will have a right to vote unless (i) the Owner is shown on the membership rolls of the Organization, or (ii) the recorded deed evidencing ownership of the Lot has been delivered to the Organization.

(c)     The Organization's Bylaws govern the Organization and may be amended pursuant to the Bylaws.

(d)     After the effective date of this Amended and Restated Declaration, the Organization shall be renamed to the Garden Oaks Homeowners Association, Inc. which will continue with the same rights of the Organization including any new rights as may be created or designated in its Bylaws.

This Amended and Restated Declaration shall be effective as of the date of recording in the Official Public Records of Harris County, Texas.   If any provision of this Declaration is found to be in conflict with the Restrictions and Amendment of Gardens Oaks, Section Three, this Amended and Restated Declaration shall control.

IN WITNESS WHEREOF, pursuant to the authority provided herein, this Amended and Restated Declaration was approved by the affirmative vote of the Owners in Garden Oaks, Section Three.

**CERTIFICATION**

I, the undersigned, do hereby certify:

That I am the President of the Garden Oaks Maintenance Organization, Inc.;

That this instrument constitutes the Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Garden Oaks, Section Three, and was affirmatively approved by the Owners in Garden Oaks, Section Three.

IN WITNESS WHEREOF, I have hereunto subscribed my name on this the _____ day of _____, 201__.

By: _____
Print Name: _____
Title: President

STATE OF TEXAS              §
                           §
COUNTY OF HARRIS            §

BEFORE ME, the undersigned authority, on this day personally appeared _____, the President of the Garden Oaks Maintenance Organization, Inc., known by me to be the person whose name is subscribed to this instrument, and acknowledged to me that s/he executed the same for the purposes expressed and in the capacity herein stated and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ the day of _____, 201__.

_____
Notary Public – State of Texas

*After Recording Return To:*
*Sipra S. Boyd*
*Roberts Markel Weinberg Butler Hailey PC*
*2800 Post Oak Blvd. 57th Floor*
*Houston, Texas 77056*

**AMENDED AND RESTATED DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS
FOR
GARDEN OAKS, SECTION FIVE**

STATE OF TEXAS     §
                        §
COUNTY OF HARRIS   §

This Amended and Restated Declaration of Covenants, Conditions and Restrictions for Garden Oaks, Section Five ("Amended and Restated Declaration") is approved and facilitated pursuant to the authority of the bankruptcy court and further approved by the affirmative vote of Owners in Garden Oaks, Section Five to become effective upon recording in the Official Real Property Records of Harris County, Texas.

## W I T N E S S E T H

WHEREAS, Garden Oaks, Section Five is a subdivision in Harris County, Texas according to the map or plat recorded under Volume 19, Page 19 of the Map Records of Harris County, Texas and is encumbered by the Restrictions Applying to Garden Oaks, Section Five recorded under Film Code No. 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 in the Official Public Records of Harris County, Texas ("Restrictions"); and

WHEREAS, the Restrictions were amended pursuant to Chapter 204 of the Texas Property Code by that Petition to Amend Restrictions to Create a Property Owners Association and Certificate of Compliance with Texas Property Code, Chapter 204 Garden Oaks, Section Five recorded under File No. V968826 on July 29, 2002 in the Official Public Records of Harris County, Texas ("Amendment"); and

WHEREAS, the Amendment created a mandatory Transfer Assessment payable to the Garden Oaks Maintenance Organization, Inc., a Texas nonprofit corporation (the "Organization"), being a mandatory association; and

WHEREAS, the Organization filed for Chapter 11 bankruptcy protection under Case No. 18-60018, in the Bankruptcy Court for the Southern District of Texas; and

WHEREAS, the Bankruptcy Court approved the Organization's Chapter 11 Plan by order dated _____; and

WHEREAS, the Bankruptcy Court had the authority to approve and facilitate the adoption of this Amended and Restated Declaration upon obtaining the affirmative vote of the Owners in Garden Oaks, Section Five in accordance with the Bankruptcy Code and Rules, which will become effective upon recording in the Official Real Property Records of Harris County, Texas; and

WHEREAS, the Bankruptcy Court, in confirming the Chapter 11 Plan, and approving and adopting this Amended and Restated Declaration has retained exclusive jurisdiction as to any and all issues related to the confirmation of the Chapter 11 Plan, and the approval and adoption of this Amended and Restated Declaration; and

WHEREAS, the Owners in Garden Oaks, Section Five desire to supersede, amend, restate, and wholly replace the Restrictions and Amendment for Garden Oaks, Section Five in their entirety and replace them with this Amended and Restated Declaration; and

WHEREAS, the Owners of Garden Oaks, Section Five desire to protect and maintain the park-like character by careful and thoughtful planning, including protective restrictions, which include architectural review of plans, a maintenance fund, and many other beneficial restrictions, based on its original environment, natural beauty, permanent improvements, comfort, drainage, and parks and playgrounds; and

NOW THEREFORE, the Owners in Garden Oaks, Section Five, hereby amend, alter, and change the Restrictions and Amendment for Garden Oaks, Section Five by replacing them in their entirety with this Amended and Restated Declaration which shall include the following reservations, restrictions and covenants, and Garden Oaks, Section Five shall be improved, sold, used and enjoyed in accordance with, including the conditions, covenants, easements, reservations, and restrictions hereinafter set forth, all of which are hereby adopted for, and placed upon Garden Oaks, Section Five and shall run with Garden Oaks, Section Five and be binding on all parties, now and at any time hereinafter, having or claiming any right, title or interest in Garden Oaks, Section Five or any part thereof, their heirs, executors, administrators, successors and assigns, regardless of the source of, or the manner in which any such right, title or interest is or may be acquired, and shall inure to the benefit of each owner of any part of Garden Oaks, Section Five to wit:

## ARTICLE I. DEFINITIONS

(a)  "Architectural Review Committee" or "ARC" shall mean the architectural review committee established by the Organization to review plans submitted to the Organization for architectural review.

(b)  "Attic" means the space between the ceiling beams of the top story and the Roof rafters.  An Attic whether finished or unfinished is not a story.

(c)  "Board" shall mean the Board of Directors of the Organization.

(d)  "Corner Lot" is one that abuts on more than one Street.  Any Lot, except a corner, is deemed to front on the Street upon which it abuts.  A Corner Lot shall be deemed to front on the Street on which it has its smaller dimension, or if dimensions on more than one Street are approximately the same, Organization reserves the right to designate which Street the Lot shall face.

(e)  "Dwelling" means a main residential structure constructed on a Lot intended for single-family residential purposes.

(f)  "Garage" means a building or part of a building used to house motor vehicles.

(g)  "Irregular Shaped Lot" means any Lot with a frontage width which differs by greater than thirty-five percent (35%) from the rear width of the

Lot.  The Board shall have the discretion to determine whether any other Lot can be considered an Irregular Shaped Lot.

(h)  "Lot" means a parcel of property within the Plat of the subdivision recorded in the real property records of Harris County, Texas, and encumbered by this Amended and Restated Declaration, and restricted to single-family residential purposes.  For purposes of this Amended and Restated Declaration, a Lot may consist of a platted Lot, less than a platted Lot, more than a platted Lot, or portions of two or more platted Lots.

(i)  "Organization" shall mean and refer to the Garden Oaks Maintenance Organization, Inc.

(j)  "Outbuilding" shall mean and refer to structures such as (by way of example and not limitation) storage buildings, sheds, greenhouses, gazebos and other Roofed Structures.

(k)  "Owner" means an owner of any portion of the Subdivision. Persons or entities holding title only as a lienholder shall not be an Owner for purposes of this Amended and Restated Declaration.

(l)  "Roof" means a non-porous cover for a structure such as (by way of example and not limitation) Lexan barriers or shingles but not a shade trellis, ivy or other open or porous material that may also be used as a cover.

(m)  "Short Lot" means a Lot whose depth does not allow for an Outbuilding.

(n)  "Street" as used herein shall include any street, drive, boulevard, road, lane, avenue, or place as shown on the recorded plat as a thoroughfare.

(o)  "Structure" means any building (including a Dwelling) or improvement, placed, maintained or constructed on a Lot, whether or not affixed to the land, and any addition to, or modification of any existing building or improvement.

(p)  "Subdivision" means Garden Oaks, Section Five.


## ARTICLE II. RESTRICTIONS

(a) Except as herein noted, no Lots shall be used for anything other than single-family residential purposes.  As used herein, the term "single-family residential purposes" refers to the architectural design of a Dwelling and is deemed to specifically prohibit, without limitation, the use of a Lot for a duplex, apartment (excluding Garage apartments with ARC plan approval), multi-family Dwelling, or for any multi-family use, or for any business, professional or other commercial activity of any type, unless such business, professional or commercial activity is unobtrusive and merely incidental to the primary use of the Lot and the Dwelling for residential purposes.

(b)  No trade or business may be conducted in or from any Dwelling, Structure or Lot except such use where (i) the existence or operation of the business activity is not apparent or detectable by sight, sound or smell from outside the Dwelling, Structure or Lot; (ii) the business activity conforms

3

to all zoning requirements and other restrictive covenants applicable to the Subdivision; (iii) the business activity does not involve visitation to the Dwelling, Structure or Lot by clients, customers, workers, employees, suppliers or other business invitees or door-to-door solicitation of residents of the Subdivision; and (iv) the business activity is consistent with the residential character of the Subdivision and does not constitute a nuisance, or a hazardous or offensive use, or threaten the security or safety of other residents of the Subdivision, as may be determined in the sound discretion of the Board.  The uses set out in this section shall be referred to singularly or collectively as an "Incidental Business Use."  At no time may an Incidental Business Use cause increased parking or traffic within the Subdivision such that egress or ingress is impeded.  Any increased parking or traffic within the Subdivision as a result of an Incidental Business Use that impedes egress or ingress shall be deemed to be a deed restriction violation. Examples of expressly prohibited uses include, but are not limited to, a bed and breakfast, boarding house, vacation rental daily/weekly rentals of the entire Dwelling, Structure or Lot, or portions of the Dwelling, Structure or Lot, a day-care facility, home day-care facility, church, nursery, pre-school, beauty parlor, or barber shop or other similar facility.  No lease or rental of a Dwelling, Structure, or Lot shall be for less than thirty (30) consecutive and guaranteed days.

(c)  Except as herein noted, no signs, billboards, posters, or advertising devices of any character shall be erected in this Subdivision without the written consent of the Organization, and such consent shall be revocable at any time. The Board has the authority to adopt a policy or guidelines regarding signs.

## ARTICLE III. ARCHITECTURAL RESTRICTIONS

No Dwelling, Outbuilding, or improvements of any character shall be erected or modified, or the erection thereof begun, or changes made in the exterior thereof after construction, on any Lot, Dwelling, or Outbuilding in Garden Oaks, Section Five, until plans and specifications have been submitted to and approved in writing by the Architectural Review Committee of the Organization.  Such submission is to include exterior design, survey and site plan, and such approval by the Organization is to be based on the following general requirements, stipulations and restrictions, together with any other requirements, stipulations, and restrictions that the Organization may deem advisable.   In the event the ARC fails to approve such plans and specifications within thirty (30) days after receipt thereof, they shall be deemed to be disapproved.

(a) No Dwelling shall be erected on any Lot or homesite where the width of the Lot at the front building line is less than sixty (60) feet and no Lot shall be subdivided to be less than six thousand (6,000) square feet.  No Lot shall be subdivided to create a Lot with a front building line of less than sixty (60) feet.  No Lot shall be subdivided in a manner which will result in an Irregular Shaped Lot or Short Lot.

(b) All Lots in the Subdivision shall be known and described as single-family residential Lots, and all Lots shall have one (1) detached single-family Dwelling not to exceed two stories plus an Attic and forty-two (42) feet above natural grade plane in height, as measured from the center of the fronting street to the highest ridgeline.   The height limitation provided herein shall include any portion of the natural grade plane that is built up

4

or the area, whether consisting of livable or non-livable space, underneath the Dwelling if it is raised above the natural grade plane. A detached Garage may not be converted to livable space without ARC plan approval. All permissible Dwellings and Outbuildings, including the Garage, on a Lot, shall be erected and maintained in compliance with all height and setback limitations provided herein.

(c) No Dwelling shall be moved onto any Lot without ARC plan approval.

(d) No trailer, tent, shack, or other temporary Outbuilding erected or moved on to the Lot shall at any time be used as habitable space, nor shall any residence of a temporary character be permitted.

No trailer, trailer house, or movable Structure of any kind or type, or temporary building shall be erected or maintained on any Lot except during actual construction of the Dwelling being erected thereon, and then such trailer house or temporary building must be on the Lot on which construction is in progress and not on adjoining Lots, Streets or easements, and at completion of construction, the temporary building must be removed immediately.

(e) No Garage apartment may be used for rental purposes for a period of less than thirty (30) guaranteed and consecutive days.

(f) All Dwellings shall be constructed on the Lot so as to front the Street upon which such Lot faces.

(g) Where Corner Lots are of equal or nearly equal dimensions on two Streets, or they are Irregular Shaped Lots, the Organization reserves the right to designate the direction in which such improvements shall face, and such decision shall be made with the thought in mind of the best general appearance to that immediate section. If a Corner Lot is subdivided resulting in a Lot with a rear setback which is adjacent to the side setback of the adjacent Lot, the resulting rear setback shall maintain the dimensions of the original side setback.

(h) The building lines of any Dwelling to be erected on any Lot shall be as follows:

1. The front building line shall not be nearer than forty (40) feet to the front property line, including the gallery, terrace or porch but exclusive of steps used to access the ground floor.

2. The rear building line shall not be nearer than ten (10) feet to the rear property line.

3. No fence, wall, nor any pergola or other detached Structure shall be erected or maintained on any part of any Lot forward of the front building line of said Lot except that the Organization may grant a variance for Lots along the boundary of the Subdivision as to Lot lines shared with non-Subdivision property.

4. No detached Garage, barn, or other Outbuilding of any kind shall be erected on any Lot nearer than one hundred (100) feet to the front property line, unless it is in the rear of the Dwelling and in compliance with the setbacks described in subsection (5).

5. The side building lines shall not be nearer than ten (10) feet to either side property line in the area from the front building line (40-foot line) to the Outbuilding build line (100-foot line); or nearer than five (5) feet to either side property line in the area from the Outbuilding build line (100-foot line) to the rear building line.

6. The right is reserved by the Organization to change these restrictions in the case of unusual or Irregular Shaped Lots, Short Lots, or Lots unusual in size, where same is considered desirable for the advantage and best appearance of the immediate community.

(i) No Outbuildings shall exceed in height, or number of stories (not including Attics), beyond the highest ridgeline, the Dwelling to which they are appurtenant.

(j) No building material of any kind or character shall be placed or stored upon the Lot until the Owner is ready to commence construction, and then such material shall be placed within the property lines of the Lot or parcel of land upon which the improvements are to be erected, and shall not be placed in the Street or between the pavement and property line.

(k) No stumps, trees, underbrush or any refuse of any kind nor scrap material from the improvements being erected an any Lot shall be placed on any adjoining Lots, Streets, or easements.  All such material, if not disposed of immediately, must remain on the Lot on which construction work is in progress, and at the completion of such improvements, such materials must be immediately removed from the property.

(l)  Any property on which a condition exists on the date this Amended and Restated Declaration is recorded in the Official Public Records of Harris County, Texas that is a violation of this Amended and Restated Declaration shall be grandfathered until and unless the condition on the property is replaced. Repairing the condition shall not require compliance so long as it simply restores the violation to the condition as it existed on the effective date of this Amended and Restated Declaration.  The repair shall not enhance or extend any portion of the violation. The Board shall use sound discretion to determine whether any such repair is to such a degree which requires compliance with this Amended and Restated Declaration.

## ARTICLE IV. VARIANCES

The Board, or its duly authorized representative, may authorize variances from compliance with any of the architectural provisions of this Amended and Restated Declaration, unless specifically prohibited, including restrictions upon height, size, placement of Structures, or similar restrictions, when circumstances such as topography, natural obstruction, hardship, aesthetic, or environmental considerations may require.  The Board, or its duly authorized representative, shall conduct a hearing with the Lot Owner seeking such variance and any Lot Owners adjacent or contiguous to such Lot, in order to consider any objections, concerns or comments regarding such variance, except that the decision to grant a variance is to be determined solely by the Board.  Such variances must be evidenced in writing, must be approved by at least eighty percent (80%) of the Board, and shall become effective upon execution.  The variance must be signed by a member of the Board and recorded in the Official Public Records of Harris County, Texas.

6

If such variances are granted, no violation of the covenants, conditions, or restrictions contained in this Amended and Restated Declaration shall be deemed to have occurred with respect to the matter for which the variance was granted.  The granting of such a variance shall not operate to waive any of the terms and provisions of this Amended and Restated Declaration for any purpose except as to the particular provision hereof covered by the variance, nor shall it affect in any way the Owner's obligation to comply with all applicable governmental laws and regulations.

No granting of a variance shall be relied on by an Owner, or any other person or entity (whether privy or party to the subject variance or not), as a precedent in requesting or assuming variance as to any other matter of potential or actual enforcement of any provision of this Amended and Restated Declaration.  Action of the Board in granting or denying a variance is a decision based expressly on one unique set of circumstances and need not be duplicated for any other request by any party or the same party for any reason whatsoever.

## ARTICLE V. TERM AND MODIFICATION OF RESTRICTIONS

(a) The provisions of this Amended and Restated Declaration will remain in full force and effect until January 1, 2038, and are extended automatically for successive ten (10)year periods; provided, however that the provisions of this Amended and Restated Declaration may be terminated on January 1, 2038, or on the commencement of any successive ten (10) year period by filing for record in the Official Public Records of Real Property of Harris County, Texas, an instrument in writing signed by Owners representing not less than eighty percent (80%) of the Lots in the Subdivision.

(b) Approval by the Owners of a majority (fifty percent (50%) plus one (1)) of the Lots shall be required to amend or modify this Amended and Restated Declaration.  Upon approval of the Owners, as set out above of said amended declaration (as evidenced by the President's or Vice-President's signature certifying such approval) the amended declaration shall be recorded in the Official Public Records of Harris County, Texas, whereupon to the extent of any conflict with this Amended and Restated Declaration and any amendment thereto, the more restrictive provision shall control.  For purposes of this Section, the approval of multiple Owners of a Lot may be reflected by the signature of any one Owner of such Lot.

Notwithstanding anything contained herein to the contrary, the Organization shall be entitled to use any combination of the following methods to obtain approval of the Owners for an amendment to this Amended and Restated Declaration:

    i.   by written ballot, or electronic ballot as same may be established by the Board, that states the substance of the amendment and specifies the date by which a written or electronic ballot must be received to be counted;

    ii.  at a meeting of the Members of the Organization, if written notice of the meeting stating the purpose of the meeting is delivered to the Owners of the Lots; such notice may be hand-

delivered to the Owners, sent via regular mail to the Owner's last known mailing address, as reflected in the Organization's records, or via email to the Owner's email address as reflected in the Organization's records;

iii.     by door-to-door circulation of a petition by the Organization or a person authorized by the Organization; and/or by any other method permitted under this Amended and Restated Declaration or applicable law.

### ARTICLE VI. RIGHT TO ENFORCE

The restrictions herein set forth shall be binding upon the Organization, its successors and assigns, and all parties claiming by, through or under it or them, and all subsequent Owners of property in said Subdivision, each of whom shall be obligated and bound to observe such restrictions, covenants, and conditions, provided, however, that no such person or corporation shall be liable except in respect to breaches committed during its, his or their ownership of said property.  The violation of any such restriction, covenant or condition shall not operate to invalidate any mortgage, deed of trust, or other lien acquired and held in good faith against said property, or any part thereof, but such liens may be enforced as against any and all property covered thereby, subject nevertheless to the restrictions, covenants, and conditions herein mentioned.  The Organization shall have the right to enforce observance and performance of such restrictions, covenants and conditions, and in order to prevent a breach, or to enforce the observance or performance of same, shall have the right in addition to all other legal remedies, to an injunction either prohibitive or mandatory.  The Owner of any Lot or Lots affected shall have the right either to prevent a breach of any such restriction, covenant, or condition or to enforce performance of same.

### ARTICLE VII. ASSESSMENTS

(a)     Creation of Assessments

The Owners of any Lot, by virtue of ownership of property within the Subdivision, covenant and agree to pay to the Organization an annual assessment ("Assessment") and any applicable late fees, interest and costs as more particularly set forth in this Amended and Restated Declaration.

Each such Assessment, together with attorney's fees, late fees, interest and costs, shall be the personal obligation of the person or entity who was the Owner of the land at the time when the Assessment became due.  No diminution or abatement of Assessments or set-off shall be claimed or allowed by reason of any alleged failure of the Organization or Board to take some action or perform some function required to be taken or performed by the Organization or the Board under this Amended and Restated Declaration, or for inconvenience or discomfort arising from the making of repairs or improvements which are the responsibility of the Organization.  The obligation to pay Assessments is a separate covenant on the part of each Owner of a Lot.

8

(b)   Annual Assessments

i.     Purpose. Assessments levied by the Organization shall be used for any legal purpose for the benefit of the Subdivision as determined by the Board and, in particular, may, by way of example and not limitation or obligation, include operational expenses of the Organization, enforcement of deed restrictions, payment of insurance premiums, costs of collection and litigation, administrative expenses, beautification, providing security, and any other services as may be in the Subdivision's and Owners' interest and all buildings, services, improvements and facilities deemed necessary or desirable by the Board in connection with the administration, management, control or operation of the Subdivision. The Board may, in its sound discretion, give one or more of the purposes set forth herein preference over other purposes, and it is agreed that all expenses incurred and expenditures and decisions made by the Board in good faith shall be binding and conclusive on all Owners.

ii.    Creation. Payment of the Assessment shall be the obligation of each Owner, subject to the provisions below, and shall be binding and enforceable as provided in this Amended and Restated Declaration.

iii.   Rate. The initial Assessment established by the Organization shall not exceed EIGHTY DOLLARS AND NO/100 ($80.00) per Lot. An Owner who formally re-plats two or more Lots into one Lot with the approval of the City of Houston Planning and Development Department shall owe one Assessment. Similarly, an Owner who subdivides a Lot shall pay one Assessment per Lot created by the subdivision of the Lot.

iv.    Commencement. The initial Assessment for a Lot shall commence as soon as practical but in no event later than January 1, 2020. Assessments shall be due in advance on January 1st for the coming year and shall be delinquent if not paid in full as of January 31st of each year.

v.     Proration. An Owner's initial Assessment shall be made for the balance of the calendar year as determined on a pro-rata basis and shall become due and payable on the commencement date described above. The Assessment for any year after the first year shall be due and payable on the first day of January. Any Owner who purchases a Lot or Lots after the first day of January in any year shall be personally responsible for a pro-rated Assessment amount for that year.

vi.    Levying of the Assessment. The Board shall determine the sufficiency or insufficiency of the then-current Assessment to reasonably meet the expenses for providing services and capital improvements in the Subdivision and may, at its sole discretion and without a vote by the Members, increase the Assessment in an amount up to three percent (3%) annually. The Assessment may only be increased by more than three percent (3%) annually if such increase is approved by Owners of a majority of the Lots present, in person or by proxy, electronic ballot, or absentee ballot, at a meeting called for said purpose at which a quorum is present in person or by proxy, electronic ballot, or absentee ballot. The Assessment shall not be adjusted more than once in a calendar year nor shall any increase be construed to take effect retroactively, unless otherwise approved by Owners of a majority of the Lots subject to such Assessments present in person or by proxy, electronic ballot or absentee ballot at a meeting called for said purpose at which a quorum is present in person or by proxy, electronic ballot, or absentee ballot.

10

vii. Over-65 Exemption.  Any Owner who is sixty-five (65) years old or older on the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas and has also received an over-65 homestead exemption on the Lot owned by the Owner in the Subdivision from the Harris County Appraisal District may apply to be exempted from payment of the Assessment for so long as the Owner continues to own the Lot ("Over-65 Exemption").  This Over-65 Exemption shall not apply to: (1) any current Owners who become sixty-five (65) years old during the ownership of their Lot after the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas; and (2) any new Owners who purchase a Lot in the Subdivision who are or may become sixty-five (65) years old or older after the date this Amended and Restated Declaration is recorded in the Official Real Property Records of Harris County, Texas. An Owner must apply for and receive approval in writing from the Organization for the Over-65 Exemption.

(c)      Enforcement

The Organization may bring an action in law against the Owner personally obligated to pay the Assessment, late fees, interest, and costs, including attorneys' fees, incurred by the Organization in collecting same and obtain a personal judgment against the Owner. No lien is created herein to secure the payment of the Assessment.

## ARTICLE VIII. EASEMENTS

It is agreed that all sales of Lots and dedication of Streets in said Subdivision shall be subject to easements over and across such portions of each Lot, as hereinafter designated, as may be deemed appropriate or necessary for the purpose of installing, using, repairing, and maintaining public utilities, water, sewer lines, electric lighting and telephone poles, pipe lines, and drainage ditches or structures and/or any equipment necessary for the performance of any public or quasi-public utility service and function, with the right of access thereto for the purpose of further construction, maintenance and repairs.  Such right of access to include the right, without liability on the part of any one or all of the owners or operators of such utilities, to remove any or all obstructions on said easement right-of-way, caused by trees, brush, shrubs, either on or overhanging such right-of-way, as in their opinion may interfere with the installation or operation of their circuits, lines, pipes, or drainage ditches or structures.  Such easements shall be for the general benefit of the Subdivision and the property Owners thereof and are hereby reserved and created in favor of any and all utility companies entering into and upon said property for the purposes aforesaid, with the permission of the Organization, its successors or assigns, and shall extend to only the following portions of said Subdivision:

BLOCK FORTY-NINE (49): A tract of land twenty (20) feet in width has been dedicated in the rear of all lots in this block, and the right is reserved for all utilities to serve this block to be installed in a ten (10) foot strip on the north side of this dedicated tract of land.

BLOCK FIFTY (50): There is an easement five (5) feet in width off the rear of all lots, except Lot Seventeen (17); an easement three (3) feet in

11

width off the west side of Lot Twelve (12) for a distance of twenty (20) feet from the rear property line toward the front property line; and easement three (3) feet in width off the east side of Lot Thirteen (13) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement five (5) feet in width off the west side of Lot Sixteen (16); an easement five (5) feet in width off the east side, or rear, of Lot Seventeen (17); and an easement five (5) feet in width off the west side of Lot Eighteen (18).

BLOCK FIFTY ONE (51): There is an easement five (5) feet in width off the rear of all lots except Lots Eighteen (18) and Twenty (20); an easement five (5) feet in width off the west side of Lot Seventeen (17); an easement five (5) feet in width off the east side, or rear, of Lot Eighteen (18); an easement five (5) feet in width off the east side, or rear, of Lot Twenty (20); and an easement five (5) feet in width off the west side of Lot Twenty-one (21).

BLOCK FIFTY-TWO (52): There is an easement five (5) feet in width off the rear of all lots, except Lots Twenty (20) and Twenty-two (22); an easement five (5) feet in width off the west side of Lot Eighteen (18); an easement five (5) feet in width off the east side of Lot Nineteen (19); an easement five (5) feet in width off the north, or rear, of Lot Twenty (20); an easement five (5) feet in width off the south side of Lot Twenty-one (21); an easement five (5) feet in width off the east side, or rear, of Lot Twenty-two (22); an easement five (5) feet in width off the west side of Lot Twenty-three (23); an easement three (3) feet in width off the east side of Lot Thirty-one (31) for a distance of twenty (20) feet from the rear property line toward the front property line; and an easement three (3) feet in width off the west side of Lot Thirty-two (32) for a distance of twenty (20) feet from the rear property line toward the front property line.

BLOCK FIFTY-THREE (53): There is an easement five (5) feet in width off the rear of all lots except Lots Twenty-one (21) and Twenty-three (23); an easement five (5) feet in width off the west side of Lot Twenty (20); an easement five (5) feet in width off the east side, or rear, of Lot Twenty-one (21); an easement five (5) feet in width off the east side, or rear, of Lot Twenty-three (23); an easement five (5) feet in width off the west side of Lot Twenty-four (24); an easement three (3) feet in width off the east side of Lot Thirty-three (33) for a distance of twenty (20) feet from the rear property line toward the front property line; and an easement three (3) feet in width off the west side of Lot Thirty-four (34) for a distance of twenty (20) feet from the rear property line toward the front property line.

BLOCK FIFTY-FOUR (54): There is an easement five (5) feet in width off the rear of all lots, except Lots Twenty-three (23), Twenty-four (24) and Twenty-five (25); an easement five (5) feet in width off the west side of Lot Twenty-two (22); an easement five (5) feet in width off the east side, or rear, of Lot Twenty-three (23); an easement five (5) feet in width off the north side of Lot Twenty-three (23); an easement five (5) feet in width off the south side of Lot Twenty-four (24) where same adjoins both Lots Twenty-two (22) and Twenty-three (23); an easement five (5) feet in width off the south side of Lot Twenty-five (25) where same adjoins the rear of Lot Twenty-one (21); an easement three (3) feet in width off the east side of Lot Thirty-five (35) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the west side of Lot Thirty-six (36) for a distance of twenty (20) feet from the rear property line toward the front property line.

BLOCK FIFTY-FIVE (55): There is an easement five (5) feet in width off the rear of all lots except Lots Twenty-three (23) and Twenty-seven (27); an easement five (5) feet in width off the west side of Lot twenty-two (22) where same adjoins Lots Twenty-three (23) and Twenty-four (24); an easement five (5) feet in width off the east side, or rear, of Lot Twenty-three (23); an easement five (5) feet in width off the north side of Lot Twenty-six (26); an easement five (5) feet in width off the south side of Lot Twenty-seven (27); an easement three (3) feet in width off the east side of Lot Twenty-seven (27) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the west side of Lot Twenty-eight (28) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the east side of Lot Thirty-seven (37) for a distance of twenty (20) feet from the rear property line toward the front property line; an easement three (3) feet in width off the west side of Lot Thirty-eight (38) for a distance of twenty (20) feet from the rear property line toward the front property line.

BLOCK FIFTY-SIX (56). There is an easement twenty-five (25) feet in width in the rear of all lots from One (1) to Twenty-five (25), inclusive, and also an easement five (5) feet in width off the rear of all lots from Lot One (1) to Twenty-five (25), inclusive, the same being south of and abutting the twenty-five (25) foot easement above mentioned; an easement thirty-five (35) feet in width in the rear and west of all Lots Twenty-five (25) to Thirty-one (31), inclusive, and the right is reserved for all utilities to serve these lots to be installed in a ten (10) foot strip on the east side of this dedicated tract of land; and an easement five (5) feet in width off the south side of Lot Twenty-six (26); and an easement five (5) feet in width off the north side of Lot Twenty-seven (27).

BLOCK FIFTY-SEVEN (57). There is an easement thirty-five (35) feet in width in the rear of all lots in this block, and the right is reserved for all utilities to serve these lots to be installed in a ten (10) foot strip on the east side of this dedicated tract of land.

In addition to the ground easements above listed, an additional aerial easement of five (5) feet is reserved; resulting in a total overall unobstructed ground easement ten (10) feet wide from the ground upward and an unobstructed aerial easement twenty (20) feet wide from a plane thirty (30) feet above the ground upward centered on the ground easement, this easement being needed particularly by the light and telephone companies for the protection of all overhead wires.

## ARTICLE IX. UPKEEP

The Owners of property in said Subdivision shall be required to keep the weeds cut on the particular property owned by each, and shall not permit the accumulation of trash, rubbish, or other unsightly obstacles on the premises, the easements, or in the alley, or in the Street abutting the same. The area in the Street between the pavement and the property line shall at all times be kept clean and free of unsightly obstacles.

## ARTICLE X. ORGANIZATION

13

(a)   Every Owner of a Lot will, solely by virtue of ownership and without further action, be a member of Garden Oaks Maintenance Organization, Inc., a Texas non-profit corporation (the "Organization").   The Organization establishes, assesses, and collects mandatory assessments, making it subject to Chapter 209 of the Texas Property Code.   The business and affairs of the Organization is managed by its Board of Directors.

(b)   Each Lot is entitled to one (1) vote, regardless of the number of Owners of a Lot. Multiple Owners of any single Lot must vote in agreement (under any method they devise among themselves) but, in no case will such multiple Owners cast portions of votes.   The vote attributable to any single Lot must be voted in the same manner (i.e. all Owners of the Lot for, or all Owners of the Lot against a particular issue) but, in no event can there be more than one (1) vote cast per Lot.

A Lot is entitled to two (2) votes only if all of the following conditions are satisfied: (i) applicable City of Houston subdivision ordinances would permit subdivision of the Lot by re-platting, (ii) each resulting Lot would satisfy the frontage requirements imposed herein, (iii) no Structure that is located on one resulting Lot would encroach onto the adjacent Lot or violate setback lines after subdivision (e.g., a building may not be located on the original Lot such that the lot line created by the subdivision would, with respect to existing Structures, result in an encroachment or violation of setback lines), and (iv) each resulting Lot may be conveyed to a separate Owner as a fee simple tract of land.

No Owner will have a right to vote unless (i) the Owner is shown on the membership rolls of the Organization, or (ii) the recorded deed evidencing ownership of the Lot has been delivered to the Organization.

(c)   The Organization's Bylaws govern the Organization and may be amended pursuant to the Bylaws.

(d)   After the effective date of this Amended and Restated Declaration, the Organization shall be renamed to the Garden Oaks Homeowners Association, Inc. which will continue with the same rights of the Organization including any new rights as may be created or designated in its Bylaws.

This Amended and Restated Declaration shall be effective as of the date of recording in the Official Public Records of Harris County, Texas.   If any provision of this Declaration is found to be in conflict with the Restrictions and Amendment of Gardens Oaks, Section Five, this Amended and Restated Declaration shall control.

IN WITNESS WHEREOF, pursuant to the authority provided herein, this Amended and Restated Declaration was approved by the affirmative vote of the Owners in Garden Oaks, Section Five.

14

**CERTIFICATION**

I, the undersigned, do hereby certify:

That I am the President of the Garden Oaks Maintenance Organization, Inc.;

That this instrument constitutes the Amended and Restated Declaration of Covenants, Conditions, and Restrictions for Garden Oaks, Section Five, and was affirmatively approved by the Owners in Garden Oaks, Section Five.

IN WITNESS WHEREOF, I have hereunto subscribed my name on this the _____ day of _____, 201___.

By: _____
Print Name: _____
Title: President

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

BEFORE ME, the undersigned authority, on this day personally appeared _____, the President of the Garden Oaks Maintenance Organization, Inc., known by me to be the person whose name is subscribed to this instrument, and acknowledged to me that s/he executed the same for the purposes expressed and in the capacity herein stated and as the act and deed of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this _____ the day of _____, 201___.

_____
Notary Public – State of Texas

*After Recording Return To:*
*Sipra S. Boyd*
*Roberts Markel Weinberg Butler Hailey PC*
*2800 Post Oak Blvd. 57th Floor*
*Houston, Texas 77056*

15