**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | | |
|---|---|---|---|
| IN RE: | § | | |
| | § | | |
| Garden Oaks Maintenance Org., Inc, | § | CASE NO. | 18-60018-H2-11 |
| | § | | |
| DEBTOR | § | | |

**DEBTOR'S <span style="color:red">FIRST AMENDED</span> DISCLOSURE STATEMENT**

Garden Oaks Maintenance Organization, Inc., the Debtor in this Bankruptcy Case, files this <span style="color:red">Amended</span> Disclosure Statement pursuant to the provisions of 11 U.S.C. § 1125.

IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CREDITORS AND THE INTEREST HOLDERS UNDER THE PLAN PROVIDES A GREATER CHANCE OF RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES REGARDING THE REORGANIZATION OR LIQUIDATION OF THE DEBTOR.  ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN WOULD BE IN THE BEST INTERESTS OF CREDITORS, AND RECOMMENDS ACCEPTANCE OF THE PLAN.

1

I.      **I. INTRODUCTION**

    A.      **Introductory Facts**

        1.      Garden Oaks Maintenance Organization, Inc. is the debtor in this Chapter 11 bankruptcy case.

        2.      On April 11, 2018, Garden Oaks Maintenance Organization, Inc. ("Garden Oaks" or "Debtor") filed this Chapter 11 case.

        3.      This document is the Disclosure Statement in Support of its Chapter 11 Plan, and it is provided to you to help you understand Garden Oaks's Chapter 11 Plan.

        4.      Information contained in this Disclosure Statement summarizes the Plan and should not be solely relied upon in determining how you vote on the Debtor's Plan.

        5.      Creditors, Interest Holders, and Homeowners are urged to read the Plan carefully, and are further urged to consult with their counsel in order to understand the Plan fully. The Plan, if accepted, is a legally binding document.

        6.      Under the Bankruptcy Code, a Debtor (and under some circumstances, creditors too) may propose a Chapter 11 plan.   The plan may provide for a Debtor to reorganize its debts and other obligations, to liquidate by selling assets of the estate, or a combination of both.

        7.      Garden Oaks is proposing a Plan to reorganize to address its obligations.

    B.      **Purpose of this Document**

        1.      This Disclosure Statement summarizes what is in the Chapter 11 Plan and provides information regarding the process the Bankruptcy Court follows to determine whether or not to approve the Plan.

---

READ THIS DISCLOSURE STATEMENT CAREFULLY TO LEARN

    a.   WHO CAN VOTE FOR OR AGAINST THE PLAN;
    b.   WHO CAN OBJECT TO THE PLAN;
    c.   THE PROPOSED TREATMENT OF YOUR CLAIM – THIS MEANS WHAT YOU WILL RECEIVE IF THE PLAN IS CONFIRMED AND HOW THIS TREATMENT COMPARES TO WHAT YOU WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION;
    d.   THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;
    e.   WHAT THE BANKRUPTCY COURT WILL CONSIDER WHEN DECIDING WHETHER TO CONFIRM A CHAPTER 11 PLAN;
    f.   FEASIBILITY OF THE CHAPTER 11 PLAN

---

2.      Be sure to read the Plan as well as the Disclosure Statement. If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

3.      This Disclosure Statement cannot tell you everything about your rights in this case. You should consider consulting with a lawyer to obtain advice on how the Plan will affect you, and what is the best course of action for you.

4.      This Disclosure Statement is provided to each creditor whose claim has been scheduled by the Debtor, or who has filed a proof of claim against Debtor.

5.      Under the Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement.

6.      Bankruptcy Code § 1125 requires a Disclosure Statement to contain "adequate information" concerning the Debtor and the Plan. The term "adequate information" is defined as, "information of a kind, and in sufficient detail," about the debtor and its operations "that would enable a hypothetical reasonable investor typical of holders of claims or interests" of the debtor to make an informed judgment about accepting or rejecting the Plan.

7.      The Bankruptcy Court has determined that the information contained in this Disclosure Statement is likely adequate, and it has therefore conditionally approved this document.   The Bankruptcy Court's approval of this Disclosure Statement does not mean that the Bankruptcy Court has approved the Plan or determined that the Plan meets the requirements of the Bankruptcy Code.

## II.      CONFIRMATION PROCEDURES

1.      **Persons Potentially Eligible to Vote on the Plan**

2.      In determining acceptance of the Plan, votes will only be counted if submitted by a Creditor whose Claim is scheduled by the Debtor as undisputed, non-contingent, and unliquidated, or who, prior to the hearing on confirmation of the Plan, has filed with the Bankruptcy Court a proof of claim that has not been disallowed or suspended prior to computation of the votes on the Plan. To be

3

eligible to vote, a Creditor's claim must be impaired.

3.      The Ballot Form you received does not constitute a proof of claim. If you are uncertain if your Claim has been correctly scheduled, you should check the Debtor's Schedules which are on file with the Clerk of the Bankruptcy Court.

4.      THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. IF, HOWEVER, THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND PARTIES-IN-INTEREST IN THIS CASE.

5.      Identity of Person to contact for More Information Regarding the Plan

    a)      Any interested party desiring further information about the Plan should contact Johnie Patterson, counsel for the Debtor, via telephone at 713.956.5577, or via email at jjp@walkerandpatterson.com, or via regular mail at P.O. Box 61301, Houston, Texas 77208.

## III.    EXPLANATION OF CHAPTER 11

### A.      Chapter 11 of the Bankruptcy Code

1.      Upon filing of a Chapter 11 petition, Section 362 of the Bankruptcy Code provides for a temporary automatic stay of all attempts to collect claims that arose prior to the Filing Date, or otherwise to interfere with the Debtor's property or business, in order to permit the Debtor to attempt to reorganize.

2.      Formulation of a Plan of Reorganization is the primary purpose of a Chapter 11 Reorganization Case.   A Plan of Reorganization sets forth the means for satisfying the holders of all claims against, and interests in, a debtor. Confirmation of a Chapter 11 Plan of Reorganization requires that either: (i) all classes of claims and interests entitled to vote accept the plan, or (ii) that the plan be accepted by the holders of at least one impaired class of claims not counting the votes of claims held by "insiders" as that term is defined by the Bankruptcy Code and, that the Plan be confirmed as to each objecting class pursuant to section 1129(b) of the Bankruptcy Code (the so called "cramdown" provisions).

4

3.      In addition to the acceptance requirements of at least one impaired class, Section 1129 of the Bankruptcy Code contains additional criteria that must be satisfied before a Bankruptcy Court may confirm a Plan of Reorganization.

4.      Confirmation of the Plan under Chapter 11 will relieve the Debtor of liability for any and all of the Debtor's pre-confirmation debts except as provided in the Plan, the Confirmation Order, or Section 1141(d) of the Bankruptcy Code.

5.      Confirmation makes the Plan binding upon the Debtor and all Creditors, whether or not they have accepted the Plan.

B.      **Disclaimers/Representations**

1.      The financial data relied upon in formulating the Plan is based on readily available documents such as the Debtor's books and records, appraisals, and evaluations.

2.      The financial information contained in this Disclosure Statement was compiled primarily from information provided by disclosures previously made by the Debtor. Accounting is on a cash basis. The Debtor has, and continues to maintain its books and records.   No representation can be made as to the accuracy of the Debtor's disclosures.

3.      This Disclosure Statement has been prepared solely for the benefit of creditors and interest holders of the Debtor.  No representations concerning the Plan are authorized other than those set forth in this Disclosure Statement.

4.      Any representation of inducement that is not contained herein should be reported to the attorneys for the Debtor, who will inform the court, and the court will take such action as it deems appropriate.

5.      The plan proponent does not warrant or represent that the information contained herein is correct, although great effort has been made to be accurate.

6.      This Disclosure Statement contains only a summary of the Plan. The Plan that accompanies this Disclosure Statement is ian integral part of the Disclosure Statement, and each creditor and interest holder is urged to review the Plan.

5

7.      The Debtor makes no representations with respect to the effects of taxation (state or federal) on the creditors with respect to the treatment of their claims under the plan, and no such representations are authorized.   Any tax information contained herein is made for information purposes only. Parties-in-interest are urged to seek the advice of their own professional advisors should they have any questions with respect to any taxation issues.

8.      The confirmation of the plan discharges the debtor from all dischargeable pre-confirmation debts pursuant to section 1141(d) of the Bankruptcy Code.

9.      In addition, other rights of creditors and other interest holders may be altered by the plan.

10.     Confirmation makes the plan binding upon all creditors and other parties-in-interest, regardless of whether or not they have accepted the plan.

11.     All initially capitalized words used in this Disclosure Statement have the same definitions set out in Article 1 of the Plan.

C.      **Procedure for Filing Proofs of Claim.**

1.      The Plan provides that Claims will be recognized only if evidenced by a timely filed proof of claim that is not disallowed by the Court, or if the Claim appears on the Debtor's schedules filed with the Court and is not designated as disputed, contingent or unliquidated.

2.      In addition, the Bankruptcy Code permits the Debtor to ask the Court to reject unexpired leases and executory contracts.

3.      The Plan provides that the party to any such lease or contract which is rejected must file a proof of claim for damages no later than thirty (30) days after the entry of the Order authorizing rejection of the lease or contract.

4.      Debtor's schedules may be reviewed in the Office of the Clerk of the Bankruptcy Court during regular business hours.

IV.     **BACKGROUND - THE CHAPTER 11 DEBTOR**

A.      **The Debtor, Business Background and Events Leading to the Chapter 11
Filing**

1.      **History Of Garden Oaks**

a)      The Garden Oaks neighborhood began in 1937 when the Garden
Oaks Company, through its President E. L. Crain, established Section 1,
north of the existing Houston Heights area.   Garden Oaks ultimately came
to have 5 sections, each a separately platted subdivision.

b)      Garden Oaks Company touted the neighborhood as "Houston's
Wooded Wonderland", stating "Garden Oaks is one of the most attractive
subdivisions ever offered the people of Houston.   The environment,
natural beauty, permanent improvements, comfort, drainage, parks and
playgrounds have been preserved for generations to come by careful and
thoughtful planning, protective restrictions which include architectural
supervision of home building, a maintenance fund, and many other
beneficial restrictions."

c)      Sections 1 and 2 were well established at the beginning of World
War II, and Section 3 was under development.   Expansion of the
neighborhood was progressing generally from south to north, and from east
to west.   The restrictions applicable to Section 5, the last Section
designated, were recorded in November 1942.

d)      Separate deed restriction documents were recorded by Garden Oaks
Company for each Section.   While each of the restriction documents is
slightly different from every other Section, all provided for a transfer fee of
40 cents per lineal frontage feet to be placed into a maintenance fund, when
sold, to be used for general neighborhood purposes.

e)      In 1950 the Garden Oaks Co. dissolved and left architectural review
and Deed Enforcement Responsibilities with the Garden Oaks Board of
Trustees.

7

f)      The Garden Oaks Board Of Trustees functioned until 1999 when a Texas State Court issued a summary judgment in favor of an owner/resident who argued that the authority of the Board Of Trustees was not transferred to it from the Garden Oaks Company in conformance with either the existing Garden Oaks deed restrictions or Texas State law. The Board Of Trustees transferred its funds to the owner to cover legal costs and effectively dissolved.

g)      While the Deed Restrictions themselves remained in force, there was no organization with legal standing to enforce them.   Residents were left in the awkward position of suing or threatening to sue their neighbors. To relieve individual residents the responsibility of preserving and enforcing the deed restrictions, the Deed Restrictions Committee of the Garden Oaks Civic Club was formed in 2000.

h)      After considering various alternatives, including having the Garden Oaks Civic Club take over the Deed Restriction enforcement duties, the committee decided that creating a separate organization as provided for in the Texas Property Code would be the best way to go. That organization, the Garden Oaks Maintenance Organization (GOMO), a non-profit corporation, was presented to the neighborhood at large for approval. Results of the petition drive were:

| Section | Eligible Properties | Eligible Approvals | % | Eligible Land Area | Eligible Land Area Approvals | % |
|---------|--------------------|--------------------|------|--------------------|------------------------------|-------|
| 1 | 431 | 325 | 75.41 | 5,958,373 | 4,513,906 | 75.75 |
| 2 | 146 | 113 | 76.00 | 2,692,812 | 2,040,931 | 75.80 |
| 3 | 226 | 151 | 66.81 | 3,165,559 | 2,070,592 | 65.41 |
| 5 | 316 | 206 | 65.19 | 2,793,853 | 1,830,215 | 65.50 |

i)      The Garden Oaks Maintenance Organization was recorded and registered in 2002 as a Texas non-profit corporation and HOA**,** with both mandatory membership and mandatory fees.

j)      The sole mandatory fee adopted was a transfer fee paid by buyers of

8

property in Garden Oaks.

k)      In 2012, state court litigation was initiated involving the Debtor which resulted in a challenge to the enforcement of particular deed restrictions in section 3, and which also brought into question the validity of the 2002 Deed Restriction Amendments.

l)      Garden Oaks thereafter initiated this bankruptcy case to address the issues raised in the 2012 litigation, and to potentially address certain current legacy deficiencies in the current deed restriction scheme.

**V.      SIGNIFICANT EVENTS DURING THE BANKRUPTCY**

A.      <u>**Bankruptcy Proceedings**</u>

1.      The following is a chronological list of significant events which have occurred during this case.

a)      The Debtor filed its Schedules and Statement of Financial Affairs;

b)      An Order was entered by Court setting out notice procedures due to the large number of interested parties.

c)      A Creditors Committee was appointed.

d)      Application and order authorizing the employment of professionals, including counsel for the Debtor and the Creditors Committee.

e)      An Order was entered approving an interim budget for the Debtor.

f)      The Creditors Committee sued the Debtor requesting the Court to enjoin the collection of transfer fees.

g)      Neighborhood Town Halls were scheduled and conducted at the request of the Court to discuss and obtain feedback regarding the Debtor's proposed plan.

VI.    **DEBTOR'S ASSETS, DEBTS, AND INCOME**

    A.    <u>**The Debtor's Assets**</u>

        1.    The Debtor's bankruptcy schedules include a list of all assets (as of the date of filing), including:

            a)    Cash (Bank Deposits) - $501,872.53

                (1)    Cash Balance as of November 30, 2018 - $717,090.45

            b)    Undeposited Fees - $82,169.50

                (1)    Undeposited Fee Balance as of November 30, 2018 - $0.00

            c)    Receivables (Transfer Fees) - $34,360.20

            d)    Office Equipment (Computers/Printers) - $1,954.00

            e)    Office Furniture, Fixtures & Other Equipment - $5,184.00

            f)    Websites (gardenoaks.org & gardenoaks.net) – no value

            g)    Net Operating Loss Carryovers - $1,789,183.00

            h)    Commercial, general, and professional insurance policies.

    B.    <u>**Creditors**</u>

        1.    Debtor included in its Schedules all individuals paying transfer fees due to the allegations and claims that the Debtor was not authorized to collect the mandatory transfer fee.    The Debtor disputes the authorization allegation, and disputed all claims included in its Schedules.

        2.    <u>**Secured Creditors**</u> – The Debtor scheduled no secured Debt.   One claim included secured amounts was filed totaling $2,643.75 (Claim #47).

        3.    <u>**Priority Creditors**</u> – The Debtor scheduled no priority Debt.   Two claims included priority amounts were filed totaling $5,700.00 (Claims #160 and #332).

        4.    <u>**Unsecured Creditors**</u> –   397 general unsecured claims were filed, totaling $1,465,453.66.   Many claims were filed requesting $0.00.

    C.    <u>**Debtor's Monthly Income**</u>

        1.    The Debtor's only source of income was generated from transfer fees, *i.e.*, a mandatory fee collected from the purchasers of property in the neighborhood.   By agreement, the Debtor has ceased enforcing the mandatory transfer fee, therefore the Debtor is not currently generating any income.

    D.    <u>**Debtor's Monthly Expenses**</u>

10

       1.      The Debtor's post-petition monthly expenses have averaged as follows:

         a)     Rent - $950.00

         b)     Administrative costs - $2,690.00

         c)     Legal (non-bankruptcy) - $450.00

         d)     U.S. Trustee Fees - $110.00

## VII.   SUMMARY OF THE PLAN

A.      The Plan classifies Claims in various Classes.   The plan states whether each Class of Claims is impaired or unimpaired.   Members of ~~un~~impaired classes are entitled to vote on the Debtor's Plan.

B.      Several issues are dealt with by the Debtor's Chapter 11 plan.

       1.      Upon confirmation, the Debtor's name shall be changed to "Garden Oaks Homeowners Association, Inc."

       2.      The Debtor's Bylaws will be amended to include the authority, but not the requirement, for the Reorganized Debtor to perform the functions currently provided by the Garden Oaks Civic Club.   The Bylaw amendments will functionally allow the neighborhood to merge the Civic Club and its functions into the Reorganized Debtor.

       3.      Management of the Reorganized Debtor shall continue with the existing board of directors for only so long until a special election can be scheduled and conducted.   Current and previous board members serving between January 1, 2012 and October 1, 2018 – will be asked to voluntarily refrain from running in the special election.   The current board members are – Sheila Briones, Joe Casarez, Mark Saranie, Vic Seghers, Lori Kennedy, Brenda de Alba, Al Thomas, Frances Schwartz, Stuart Arouty, and Kip Noser. _Once the newly elected board is installed, the newly elected board shall be responsible for identifying, selecting and hiring an outside management company to enforce the amended deed restrictions._

       4.      The Classes consisting of homeowners will be given the opportunity to consider and approve Amended Deed Restrictions for each individual Section of the neighborhood.   The Amended Deed Restrictions, among other things, replaces the mandatory transfer fee with a mandatory annual fee of $80.00 per lot. _The budget, based upon the $80.00 annual fee has been estimated to be as follows:_

11

| | SOURCES[1] | |
|---|---|---|
| | Pre-Petition | Proposed |
| Transfer Fee | $231,000.00 | $0.00 |
| Annual Fee | $0.00 | $73,152.00 |
| **TOTAL** | $231,000.00 | $73,152.00 |
| | USES | |
| Office Rent | ($11,400.00) | $0.00 |
| Office Manager | ($12,000.00) | $0.00 |
| Management Co./DR's | ($50,000.00) | ($65,000.00) |
| Miscellaneous[2] | ($5,000.00) | ($5,000.00) |
| **TOTAL** | ($73,400.00) | ($70,000.00) |
| **Excess** | $157,600.00 | $3,152.00 |
| | | |
| Participation | 100% | 80% (estimated) |
| Monthly | | $6.67 per lot |
| Annual | | $80.00 |

5.      The Debtor shall refund all transfer fees collected on or after the Petition Date (the "Post Petition Transfer Fees").  The Post Petition Transfer Fees total approximately $160,880.00.  The Debtor and the Committee will agree to the amounts and payees of the Post Petition Transfer Fees.

6.      The Debtor will provide $50,000.00 to be paid to the unsecured creditors. Allowed Claims in Classes 2 and 3 will be paid there pro-rata share of the $50,000.00.

7.      The funds remaining after compliance with the Confirmed Plan and the payment of the Post Petition Transfer Fees shall be utilized to fund the operation of the Reorganized Debtor for approximately two (2) years – payment of outsourcing of contracts for deed restriction enforcement and other services, and to offset any 65+ age and other exemptions that are timely filed with the Reorganized Debtor.

8.      The Plan generally provides the treatment of each Class as follows:[3]

---

1 All amounts are estimates and reflect annual totals.
2 D&O Insurance, Website, and Online Storage
3 Refer to the Amended Plan for specific treatment.   Any discrepancy shall be controlled by the Plan.

12

C. **Non-Voting Classes**

    1.    Certain types of Claims are not placed into voting Classes; instead they are unclassified.   They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them under the Bankruptcy Code.

    2.    As such, the Debtor has not placed the following Claims in a Class.   The treatment of these Claims is provided below.

D. **Administrative Expenses and Priority Tax Claims**

    1.    Administrative Expenses are Claims for costs or expenses administering the Debtor's Chapter 11 case, which are allowed under Bankruptcy Code § 503(b). Fees payable to the Clerk of the Bankruptcy Court and the Office of the United States Trustee were also incurred during the Chapter 11 Case.   The Debtor may be liable for attorney fees and costs for its own counsel, as well as the attorney fees and costs of the Unsecured Creditors Committee.   All fees and costs of professionals must be approved by the Bankruptcy Court prior to any obligation to pay.

    2.    The Bankruptcy Code requires that all administrative expenses be paid on the Effective Date of the Plan, unless a particular claimant agrees to different treatment.   The Bankruptcy Court must approve all professional compensation and expenses.   Each Professional Person requesting compensation in the case pursuant to Bankruptcy Code §§ 327, 328, 330, 331, 503(b) and/or 1103 shall file an application for allowance of final compensation and reimbursement of expenses not later than ninety (90) days after the Confirmation Date.

    3.    Nothing in the Plan prohibits a Professional Person from requesting interim compensation during the course of this case pending Confirmation of this Plan. No motion or application is required to fix fees payable to the Clerk's office of the United States Trustee, as those fees are determined by statute.

    4.    Allowed Administrative Claims arising under 11 U.S.C. § 503(b) will be paid in Cash and in full by the Reorganized Debtor on the later of (a) the Effective Date, (b) the date on which such Administrative Claim becomes an Allowed Claim; or (c) such other date as the Reorganized Debtor and the holder of the Allowed

13

Administrative Claim shall agree.

5.       Allowed Priority Tax Claims against the Debtor will be paid in Cash by the Reorganized Debtor within 5 years of the entry of the Order for Relief in this case, (with statutory interest as determined by applicable non-bankruptcy law) or such other date as the Reorganized Debtor and the holder of the Allowed Priority Tax Claim shall agree.

VIII.   **CLASSIFIED CLAIMS AND INTEREST**

The right to dispute or object to any/all of the claims listed in this Disclosure Statement is not waived by the listing, description, identification or other reference. Debtor's listing of claim amounts is for informational purposes only and is not binding in future claim objection proceedings. The listed claim amounts are either from filed proofs of claim or the Debtor's estimate of the claims as reflected in the Debtor's Schedules.

A.       **Class 1 - Secured Claims.**

1.       Class 1 is impaired and is entitled to vote.

2.       Class 1 includes all Allowed Secured Claims.

3.       All Allowed Secured Claims will be paid in full, without interest, over twelve (12) months after the Effective Date.

4.       All Class 1 Claims will retain their prepetition lien.

5.       Debtor will reserve the right to prepay any Allowed Class 1 Claim without penalty.

B.       **Class 2 – Unsecured Litigation Claims**

1.       Class 2 is impaired and is entitled to vote

2.       Class 2 includes all Allowed Unsecured Claims of creditors asserting claims arising from prepetition litigation with the Debtor.

3.       $50,000.00 will be provided by the Debtor for payment of all Allowed Claims in Classes 2, and 3.  All Allowed Class 2 Claims will be paid their pro-rated share of the $50,000.00.

4.       Payment of Allowed Class 2 Claims will be made within the later of ninety (90) days after the Effective Date, or thirty (30) days after all objections to unsecured claims have been resolved by final order of the Bankruptcy Court.

5.       Debtor reserves the right to prepay any Class 2 Allowed Claim without penalty.

14

C.     **Class 3 – Unsecured Refund Claims**

1.     Class 3 is impaired and is entitled to vote.

2.     Class 3 includes all Allowed Unsecured Claims asserting refunds of transfer fees paid to the Debtor.

3.     $50,000.00 will be provided by the Debtor for payment of all Allowed Claims in Classes 2, and 3.   All Allowed Class 3 Claims will be paid their pro-rata share of the $50,000.00.

4.     Payment of Allowed Class 3 Claims will be made within the later of ninety (90) days after the Effective Date, or thirty (30) days after all objections to unsecured claims have been resolved by final order of the Bankruptcy Court.

5.     Debtor reserves the right to prepay any Class 3 Allowed Claim without penalty.

D.     **Class 4 – Relinquished Unsecured Claims**

1.     Class 4 is impaired and is entitled to vote.

2.     Class 4 includes claims filed with $0.00 amounts claimed, and all Class 2 and Class 3 Claims that elect to be treated as Class 4 Claims.

3.     Election to be treated as a Class 4 Claim incudes a relinquishment of any prepetition claim right to claim a refund for payment of a transfer fee.

4.     Class 4 will not receive any distribution.

E.     **Class 5 – Homeowner Claims**

1.     Class 5 is impaired and is entitled to vote.

2.     Class 5 includes four subclasses, consisting of each section of the Garden Oaks neighborhood – Section 1, Section 2, Section 3, and Section 5.

3.     Class 5(a) consists of the home and lot owners in Section 1 of Garden Oaks.

a)     Class 5(a) releases any claim that may exists to challenge, in any manner the enforceability of the 2002 Amended Deed Restrictions, the viability or any defects in the formation of the Petition Committee formed to draft, circulate and petition for the approval of the 2002 Deed Restrictions.

b)     With sufficient acceptances, Class 5(a) adopts the 2019 Amended Deed Restrictions, a copy of which is attached to both this Disclosure Statement and the Chapter 11 Plan.

15

4.      Class 5(b) consists of the home and lot owners in Section 2 of Garden Oaks.

a)      Class 5(b) releases any claim that may exists to challenge, in any manner the enforceability of the 2002 Amended Deed Restrictions, the viability or any defects in the formation of the Petition Committee formed to draft, circulate and petition for the approval of the 2002 Deed Restrictions.

b)      With sufficient acceptances, Class 5(b) adopts the 2019 Amended Deed Restrictions, a copy of which is attached to both this Disclosure Statement and the Chapter 11 Plan.

5.      Class 5(c) consists of the home and lot owners in Section 3 of Garden Oaks.

a)      Class 5(c) releases any claim that may exists to challenge, in any manner the enforceability of the 2002 Amended Deed Restrictions, the viability or any defects in the formation of the Petition Committee formed to draft, circulate and petition for the approval of the 2002 Deed Restrictions.

b)      With sufficient acceptances, Class 5(c) adopts the 2019 Amended Deed Restrictions, a copy of which is attached to both this Disclosure Statement and the Chapter 11 Plan.

6.      Class 5(d) consists of the home and lot owners in Section 5 of Garden Oaks.

a)      Class 5(d) releases any claim that may exists to challenge, in any manner the enforceability of the 2002 Amended Deed Restrictions, the viability or any defects in the formation of the Petition Committee formed to draft, circulate and petition for the approval of the 2002 Deed Restrictions.

b)      With sufficient acceptances, Class 5(d) adopts the 2019 Amended Deed Restrictions, a copy of which is attached to both this Disclosure Statement and the Chapter 11 Plan.

F.      **Cramdown and Absolute Priority Rule**

1.      If a Class of Creditors does not accept the Plan, the Debtor will seek to obtain Confirmation through the cramdown provisions of Bankruptcy Code § 1129(b).

16

2.      This means that the Plan must be fair and equitable to the Class that does not accept the Plan.

3.      The test for whether the Plan is fair and equitable is found under Bankruptcy Code § 1129(b).

G.      **Acceptance or Rejection of Plan**

1.      Each Impaired Class of Creditors with Claims against the Debtor's estate shall be entitled to vote separately to accept or reject the Plan.

2.      A Class of Creditors shall have accepted the Plan if the Plan is accepted by at least two-thirds in the aggregate dollar amount and more than one-half in number of holders of the Allowed Claims of such Class that have accepted or rejected the Plan.

3.      In the event that any Impaired Class of Creditors or Interest holders shall fail to accept the Plan in accordance with Bankruptcy Code § 1129(a), the Proponent reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code § 1129(b).

4.      In some circumstances, failure to cast a vote for or against the Plan may be deemed an acceptance of the Plan.  A non-vote by any Class 5 member will be deemed an acceptance of the proposed Amended Deed Restrictions.

IX.      **MEANS OF EFFECTUATING A PLAN**

A.      **Compromise, Release, And Distributions**

1.      Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve such good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such

17

settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to holders of Allowed Claims in any Class are intended to be final.

2.      The Reorganized Debtor shall act as the distribution agent under the Plan.

3.      Distributions made to the various Classes will be funded from funds on hand by the Debtor.

X.      **FEASIBILITY**

A.      **Feasibility of this Plan**

1.      A requirement for Confirmation is that the Plan must be feasible, which means that Plan Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

2.      The Debtor contends that this plan is feasible as there is enough cash on hand to fund the Debtor's Chapter 11 Plan.

XI.     **TREATMENT OF MISCELLANEOUS ITEMS**

A.      **Executory Contracts**

1.      All Executory Contracts disclosed by the Debtor in Schedule G filed with the Court are assumed.

2.      All other contracts, to the extent they existed on the petition date are rejected.

B.      **Retention of Jurisdiction**

1.      Notwithstanding confirmation of the Plan, The Bankruptcy Court shall retain the exclusive jurisdiction over the Reorganization Case and the Reorganized Debtor for the following purposes:

a)      to determine any and all objections to the allowance of Claims and Equity Security Interests;

b)      to determine any and all pending applications for the rejection or assumption of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and

18

determine, and if necessary to liquidate, any and all Claims arising therefrom;

c)      to determine any and all applications, adversary proceedings and contested or litigated matters that may be pending on the Effective Date, or instituted by the Reorganized Debtor after the Effective Date, including, without limitation, any Claims arising under the Bankruptcy Code to avoid any preferences, fraudulent conveyances or other voidable transfers;

d)      to consider any modifications of the Plan, any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

e)      to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or the execution and delivery of any Plan exhibit;

f)      to issue such orders in aid of execution of the Plan to the extent authorized by Section 1142 of the Bankruptcy Code;

g)      to determine such other matters which may be set forth in the Confirmation Order or which may arise in connection with the Plan or the Confirmation Order;

h)      to determine any and all pre-confirmation applications for allowances of compensation, entitled to priority under §507(a)(l) of the Code; and reimbursement of expenses and any other pre-confirmation fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

i)      to determine if a default by the Reorganized Debtor has occurred under the Plan as Ordered by the Court and if default has occurred, to enter such Orders as are necessary and appropriate to ensure compliance with the Plan as confirmed and/or subsequently modified;

j)      to determine the scope of the discharge entered in this case;

k)      to hear and determine any claims related to the scope of the Class 5 releases; and

l)      to hear and determine any and all claims related to the adoption of the 2019 Amended Deed Restrictions.

C.     **Discharge of Debtor**

1.     Except as otherwise provided herein, upon the Effective Date, all Claims against the Debtor shall be discharged, subject to sections 523 and 1141(d)(3).

2.     All entities shall be precluded from asserting against the Debtor or its assets or properties, any other or further Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date, including claims related to the formation of the 2002 petition committee, the adoption or enforceability of the 2002 Amended Deed Restrictions, or any acts or omissions in enforcing or not enforcing the 2002 Amended Deed Restrictions.

D.     **Forfeiture**

1.     The Reorganized Debtor shall make distributions to Creditors at the addresses set forth on the Proofs of Claim filed by such Creditors, or at their last-known addresses if no Proof of Claim is filed.

2.     If any Creditor's distributions are returned as undeliverable, no further distributions to such Creditor shall be made unless and until notification is received of such Creditor's then current address, at which time, all missed distributions shall be made to such Creditor, without interest.

3.     The Reorganized Debtor shall be under no obligation to locate or contact any Creditor.

4.     All Claims for undeliverable distributions shall be made on or before the first anniversary of the Confirmation Date. Until such time, undeliverable distributions shall be retained.

5.     After such date, all unclaimed payments shall revert to the Reorganized Debtor to be used in the ordinary course of business, and the Claim of any Creditor with respect to such payments shall be discharged and forever barred.

E.     **Bar Dates For Filing Proofs of Claim**

1.     The Debtor has filed as a part of his schedules a list of all creditors, setting forth the identity of each such creditor and an indication of the amount due each such creditor.

2.     Unless a claim is listed as disputed, contingent or unliquidated, each

creditor's claim will be allowed in the amount and status stated on the schedules in absence of filing of a proof of claim in a different amount or status on or before the claims bar date.

3.      Claims listed as disputed, contingent, or unliquidated will not be allowed unless a proof of claim with all supporting documents is filed on or before the claims bar date.

4.      Any proof of claim which is not timely filed shall be of no force and effect. No distribution will be made to any creditor that has not timely complied with this provision.

## XII.  EFFECT OF CONFIRMATION, CONFIRMATION PROCEDURES AND STANDARDS

A.      **Summary of Confirmation Procedures/Standards**

1.      In order for the Plan to be confirmed, various statutory conditions must be satisfied, including:

a)      a finding by the Court that the Plan is feasible,

b)      the acceptance of the Plan by at least one impaired class entitled to vote on the Plan not counting insiders, and

c)      provision for payment or distribution to each claimant under the Plan of money and/or other property equal in value to at least what the claimant would have received in liquidation or, with respect to each Class, either acceptance by the Class or a finding by the Court that the Plan is "fair and equitable" and does not "discriminate unfairly" against the Class.

B.      **Who May Vote**

1.      Distributed along with the Disclosure Statement is a ballot on which Creditors and interest holders will vote to accept or reject the Plan.

2.      Only classes that are impaired under the Plan are entitled to vote on acceptance or rejection of the Plan.

3.      Generally, section 1124 of the Bankruptcy Code provides that a class of claims or interests is considered impaired unless a plan does not alter the legal, equitable, and contractual rights of the holder of the claim or interest.

4.      In addition, these classes are impaired unless all outstanding defaults, other

21

than defaults relating to the insolvency or financial condition of the Debtor or the commencement of the Chapter 11 case, have been cured and the holders of the claims or interests in these classes have been compensated for any damages incurred as a result of any reasonable reliance or any contractual provisions or applicable law to demand accelerated payment.

5.      Classes not impaired under the Plan, pursuant to section 1126(f) of the Bankruptcy Code, are deemed to have accepted the Plan without voting.

6.      All impaired classes under the Plan are entitled to vote to accept or reject the Plan.

7.      All classes of creditors are impaired under the Plan (Classes 1-5).    As a result of the Debtor's proposed Plan, there are five (5) impaired classes.

C.      **Feasibility of the Plan**

1.      In order for the Plan to be confirmed, the Court must determine that a further reorganization or subsequent liquidation of the Debtor is not likely to result following confirmation of the Plan.

2.      The Plan Proponent believes that the Plan is feasible.

3.      All payments under the Plan are to be made from continued operation of the business, and cash on hand.

D.      **Best Interests Test**

1.      With respect to each impaired class contemplated by Section 1129(a)(7)(A), each member must either: (a) Accept the Plan or (b) Receive or retain under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount the holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

2.      To determine what the holders in each impaired class of Claims and Interests would receive if the Debtor were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in a context of Chapter 7 liquidation case, reduced by the costs and expenses of the liquidation and by such additional administration and priority expenses that may result from the termination of the Debtor's business and

use of Chapter 7 for the purposes of liquidation.

3.      The costs of liquidation under Chapter 7 would include the fees payable to the trustee appointed in the Chapter 7 case, as well as those that might be payable to additional attorneys and other professionals that the trustee might engage. Costs of liquidation would also include any unpaid expenses incurred by the Debtor during the Chapter 11 case, such as compensation for attorneys, financial advisors, and accountants and costs and expenses of any committee, that are allowed in the Chapter 7 case. In addition, Claims may arise by reason of the breach of or rejection of obligations incurred and executory contracts entered into by the Debtor during the pendency of the Chapter 11 case.

4.      To determine if the Plan is in the best interest of each impaired class, the present value of the distributions from the proceeds of the liquidation of the Proponent's assets and properties (after subtracting the amounts attributable to the claims described above) are then compared with the present value offered to each of the classes of Allowed Claims and Allowed Interests under the Plan.

5.      In applying the "best interests" test, it is necessary to consider that Claims and Interests in a Chapter 7 case might not be classified in the same manner as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all allowed unsecured claims which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from a Chapter 7 case of the Proponent. The distribution of the liquidation proceeds would be calculated pro rata according to the amount of the allowed unsecured claim held by each Creditor in the class.

**XIII.   SOURCE OF INFORMATION FOR THIS DISCLOSURE STATEMENT**

      A.      **Source of Information/Disclosures**

1.      The information contained herein has not been subject to a certified audit. Most of the information, descriptions, values and facts contained herein are derived from disclosure made by the Debtor during this bankruptcy proceeding.

2.      Accordingly, the Debtor does not warrant or represent that the information contained herein is correct, although great effort has been made to be accurate.

23

3.      This Disclosure Statement does not contain the Plan in its entirety, the Plan itself is controlling in the event of any inconsistencies. Each creditor is urged to review the Plan prior to voting.

4.      The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein and the delivery of this Disclosure Statement shall not under any circumstances create an implication that there has not been any change in the facts as set forth herein since the date hereof. All the terms herein have the same meanings as in the Plan unless the context requires otherwise.

**XIV.   PROFESSIONAL FEES**

A.      **Professional Fees**

1.      It is estimated that, as of the filing of this Disclosure statement and Plan, the amount of accrued professional fees for the Debtor is $50,000.00 - $75,000.00. No requests have been made to the Court by any professional requesting allowance of fees or costs.

2.      Counsel for the Committee Of Unsecured Creditors has filed one interim request for fees, covering June 4, 2018 through September 30, 2018.   Counsel for the Committee has requested the Court to approve payment of $100,663.81 for fees and expenses over this time period.

3.      It is unknown what the total estimated attorney fees for the Committee will be.

**XV.    PENDING LITIGATION**

A.      **General and Chapter 5 Causes of Action, Including But Not Limited to, Fraudulent and Preferential Transfers**

1.      Any avoidance power actions will be retained by the Reorganized Debtor under the Plan. The Reorganized Debtor will be given the exclusive right to enforce any and all causes of action owned by the Debtor, including any causes of action which may exist under the Bankruptcy Code or state law.

2.      Any recoveries made from Avoidance Actions will be property of the Reorganized Debtor.   The Debtor does not believe that there are preference or fraudulent conveyance causes of action, however to the extent there are claims that

24

upon further investigation exists against creditors, prepetition insiders or others, including but not limited to payments and transfers disclosed in the Debtor's Statement Of Financial Affairs, those claims are specifically retained and may be pursued by the Reorganized Debtor.

3.      Without limiting the general retention of claims above, to the extent specific claims exists, the Debtor will provide a schedule to be attached to the final proposed Plan prior to confirmation.

**XVI.   ALTERNATIVES TO THE PLAN**

A.   **Rejection Of The Plan:**

1.      ~~If the Plan is rejected, The Debtor remains as a Texas nonprofit corporation, in good standing.  The 2002 Amended Deed Restrictions would remain in full force and effect, including the existing Transfer Fee.~~ If the Plan is rejected, the Debtor believes it will remain a valid Texas nonprofit corporation in good standing with the authority to enforce all existing prepetition deed restrictions, including mandatory transfer fees, and the Debtor also believes the 2002 Amended Deed Restrictions will remain in full force and effect, including the existing Transfer Fee. The Debtor is aware of and acknowledges an adverse ruling as to one homeowner that questions the authority and ability of the prepetition debtor to enforce existing deed restrictions.  See *Garden Oaks Maintenance Organization, Inc. v. Chang*, 542 S.W.2d 117 (Tex. App. - Houston [14th Dist] 2017, *no writ*)

B.   **Conversion:**

1.      The Debtor expects that this Plan will enable the Reorganized Debtor to realize the most benefits for all of its creditors and the neighborhood as a whole.

2.      The Debtor is a non-profit corporation, and involuntary conversion under the Bankruptcy Code is not available.

3.      The Debtor has attempted to set forth possible alternatives to the proposed Plan.  Accordingly, one should recognize that a vote against the Plan and the ultimate rejection of the Plan would not alter the present status of the Debtor.

a)      The vote on the Plan does not include a vote on alternatives to the Plan. There is no assurance what turn the proceedings will take if the Plan is rejected. If you believe one of the alternatives referred to above is

25

preferable to the Plan and you wish to urge it upon the Court, you should consult your counsel.

**XVII.    FEDERAL INCOME TAX CONSEQUENCE**

    A.    **Consequences**:

      1.    The Debtor believes that the following discussion generally sets forth the Federal income tax consequences to Creditors upon confirmation and consummation of the Plan.   No ruling has been sought or obtained by the Debtor from the Internal Revenue Service ("IRS") with respect to any of these matters.

      2.    The following discussion of Federal income tax consequences is not binding on the IRS and is general in nature. No statement can be made herein with respect to the particular Federal income tax consequences to any Creditor.

      3.    Creditors may be taxed on distributions they receive from the Estate. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the Claim of each particular Creditor.

      4.    The method of accounting utilized by a Creditor for Federal income tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss) recognized by any such Creditor distributes will be the difference between (i) the Creditor's basis for Federal income tax purposes, if any, in the Claim and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

AS A RESULT OF THE COMPLEXITY OF THE APPLICABLE PROVISIONS OF THE INTERNAL REVENUE CODE, EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR IN ORDER TO ASCERTAIN THE ACTUAL TAX CONSEQUENCES TO IT, UNDER FEDERAL AND APPLICABLE STATE AND LOCAL LAWS, OF CONFIRMATION AND CONSUMMATION OF THE PLAN.

      5.    This Disclosure Statement is subject to the approval by the Bankruptcy

26

Court.

THE APPROVAL BY THE UNITED STATES BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE DEBTOR'S PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Respectfully submitted this 27<del>7</del>th day of January<del>December</del>, 201<del>8</del>9<del>8</del>.


  /s/ Victor Seghers          
By:   Victor Seghers - President


  /s/ Johnie Patterson   
Walker & Patterson, P.C.
Johnie Patterson
SBN 15601700
P.O. Box 61301
Houston, Texas 77208-1301
Telephone (713) 956-5577
Facsimile (713) 956-5570
jjp@walkerandpatterson.com

27