## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| GARDEN OAKS MAINTENANCE | § | CASE NO.    18-60018-H2-11 |
| ORGANIZATION, INC., | § | |
| | § | |
| DEBTOR. | § | |

## AMENDED DISCLOSURE STATEMENT FOR COMMITTEE'S PLAN OF REORGANIZATION OF GARDEN OAKS MAINTENANCE ORGANIZATION, INC.

This is the Amended Disclosure Statement[1] filed by the Official Committee of Unsecured Creditors (the "Committee") of Garden Oaks Maintenance Organization, Inc. ("GOMO") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "Bankruptcy Code"). This Disclosure Statement is filed in connection with the *Amended Plan of Reorganization of the Official Committee of Unsecured Creditors of Garden Oaks Maintenance Organization* (the "Plan").

The Committee believes that approval of the Plan is in the best interests of GOMO's creditors as well as other parties in interest including the current homeowners in Garden Oaks. The Committee urges all creditors and homeowners to vote in favor of the Plan and accept the Proposed Amendments to the Deed Restrictions (defined below).

---

[1] On January 8, 2019, the Committee filed the original *Disclosure Statement For Committee's Plan of Reorganization of Garden Oaks Maintenance Organization, Inc.* [ECF 70].

## ANSWERS TO LIKELY QUESTIONS:

**WHAT IS THIS DOCUMENT?**

This document is a disclosure statement.  A disclosure statement is intended to provide adequate information to creditors of a bankruptcy debtor so that each creditor can make an informed decision whether to support or oppose a bankrupt debtor's plan of reorganization.  Not only summarizing the plan of reorganization, a disclosure statement also describes the debtor's bankruptcy case and provides information—including important deadlines—to creditors regarding submitting votes on the debtor's plan.

**WHO SENT ME THIS DOCUMENT?**

This disclosure statement was drafted by the Committee.  The Committee is a group of creditors of GOMO who do not hold claims secured by a lien on GOMO's property.  The Committee was formed to ensure that the interests of GOMO's unsecured creditors were represented during GOMO's bankruptcy.

**WHY IS GOMO IN BANKRUPTCY?**

GOMO filed for bankruptcy on April 11, 2018 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").  Judge David Jones is the judge presiding over GOMO's bankruptcy case.

GOMO filed for bankruptcy under chapter 11 of title 11 of the United States Code, which is intended for businesses that seek to reorganize their debts so that they can exit bankruptcy and continue operating.

The specific events that caused GOMO to file for bankruptcy are described in more detail in the body of the disclosure statement.

**WHAT IS A BANKRUPTCY PLAN?**

A plan is a legally binding document that alters the legal rights of a debtor and the debtor's creditors. A plan divides all creditor claims against a debtor into various classes.  The plan then provides each class of claims with a specific treatment under the plan, such as a cash payment. Classes that do not receive complete payment of their claims and are considered to be "impaired."

Also, if a debtor reorganizes under a Chapter 11 bankruptcy plan, it receives a discharge from all of its debts that existed before it filed for bankruptcy.

The enclosed plan also outlines minimal changes to the deed restrictions and bylaws in order to (i) address the deficiencies that leave GOMO vulnerable to future claims regarding its authority to collect a mandatory fee, (ii) enact a more equitable funding mechanism, (iii) allow the new organization to move forward with the practical ability to make further needed changes to the deed restrictions, and (iv) establish new voting, quorum rules to ensure transparency and inclusivity of owners in key actions and decisions of the homeowners association.

**HOW DOES A PLAN GET APPROVED?**

Once authorized by the bankruptcy court, a disclosure statement and plan are mailed to each creditor who filed a proof of claim against the debtor.

Creditors whose claims are impaired will receive a ballot so that they can vote to accept or reject the plan. (If a class of creditors receives nothing under the plan, they are automatically deemed to reject the plan and therefore do not vote. On the other hand, creditors who claims are unimpaired do not vote because they are deemed to accept the plan.)

After reading the disclosure statement and reviewing the plan, a creditor will fill out its ballot to indicate whether it accepts or rejects the plan. A creditor then submits the completed ballot by one of the methods indicated in the disclosure statement and on the ballot.

Once the deadline for submitting votes has passed, the bankruptcy court will evaluate the votes of each class of creditors. A class of creditors is deemed to accept (that is, vote in favor of) a plan if the following requirements are met: (i) more than 50% of votes cast in that class were to accept the plan; and (ii) the votes cast to accept the plan represented at least two-thirds (2/3) of the total dollar amount of the claims for which votes were cast.[2]

If all classes vote to accept the plan, and all of the relevant requirements in the Bankruptcy Code[3] are satisfied, the plan is "confirmed" (i.e., approved).

Note that a plan can be confirmed even if an impaired class of creditors does not vote to accept the plan if the bankruptcy court finds that the plan does not "discriminate unfairly" and is "fair and acceptable" with respect to each non-accepting class.

In addition to voting, creditors (or other parties with an interest in the bankruptcy) can also file objections to the plan with the bankruptcy court.

## IS THERE ANYTHING SPECIAL ABOUT VOTING ON THIS PLAN?

In addition to providing treatment for GOMO's creditors, this plan also proposes certain changes to the deed restrictions that apply to the Garden Oaks subdivision. Thus, all property owners in the Garden Oaks subdivision, regardless whether they receive a ballot to vote on the plan, will receive a consent form seeking approval of the following four changes to Garden Oaks' deed restrictions.

(i)     change of GOMO's name to "Garden Oaks Homeowners Association";

(ii)    replacement of a 0.75% transfer fee with an $80.00/year annual assessment (with limitations and approval parameters defined for increasing this amount); this will address the legal disputes surrounding GOMO's authority to collect a mandatory fee;

(iii)   removal of unenforceable racial restrictions; and

(iv)    lowering the voting threshold for enacting changes to deed restrictions from two-thirds (2/3) of all owners to a majority of owners.

---

[2]     For example, assume that a class contains six creditors, each with a claim of $1.00. If only two creditors vote with one voting to accept and one voting to reject, the class does not meet either requirement. However, if three creditors vote and two vote to accept, the class is deemed to accept the plan because it meets both requirements.

[3]     The term "Bankruptcy Code" refers to Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended).

These changes require the affirmative vote of owners owning 67% of the lots of each Section of Garden Oaks for such Section of Garden Oaks to adopt the Proposed Amendments to the Deed Restrictions.

Additionally, the amendments to the Byalaws provide for the following:

(i)      Changes the name of GOMO to Garden Oaks Homeowners Association;

(ii)     Establishes new quorum rules for Directors and members to conduct business at a meeting;

(iii)    Allows for member voting by proxy, absentee ballot, or electronic ballot.

**WHAT ADDITIONAL INFORMATION IS IN THIS DOCUMENT?**

The answers to these questions are simply intended to provide you with an overview of the bankruptcy process. The rest of disclosure statement contains important, detailed information that you should review before submitting your ballot or consent form. This information includes, among other things, (i) a history of GOMO and the issues that led to its bankruptcy filing; (ii) a full description of the treatment of each class of creditors; and (iii) deadlines for voting and for objecting.

The Committee invites you to carefully read the disclosure statement and Plan. Since the Plan is a legally binding document that affects your rights, you should consider consulting a lawyer to obtain advice about how the plan will affect you and how you should vote.

## I.   INTRODUCTION

The Committee submits this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code to holders of Claims against GOMO, as well all property owners in Garden Oaks (collectively, "Recipients") in connection with: (1) the solicitation of acceptances of the Plan that the Committee filed with the Bankruptcy Court; and (2) the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), scheduled to commence on [●],[4]  2019 at [●]m. (prevailing Central Time). **Unless otherwise indicated or defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.**

A ballot for the acceptance or rejection of the Plan is enclosed with each copy of this Disclosure Statement that is submitted to the holders of Claims that are entitled to vote to accept or reject the Plan.

On [●], 2019, after notice and a hearing, the Bankruptcy Court entered an order (the "Disclosure Statement Order") [ECF [●]] approving this Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable hypothetical, reasonable persons typical of GOMO's creditors to make an informed judgment regarding the Plan.  Further, the Court deemed this Disclosure Statement approved for the purposes of soliciting votes on the Plan and acceptance of the Proposed Amendments to the Deed Restrictions, provided no objections are received by the relevant objection deadline. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for filing objections to confirmation of the Plan.  Detailed instructions for voting to accept or reject the Plan accompany each ballot. The Consent Form also explains how to vote on the Proposed Amendments to the Deed Restrictions and the Bylaws.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, any supplement to the Plan, any exhibits attached to all of the foregoing documents, the agreements and documents described therein, the Disclosure Statement Order, and the instructions accompanying the ballot in their entirety, before voting on the Plan.  These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes.

### A.   Chapter 11.

Chapter 11, the principal business reorganization chapter of the Bankruptcy Code, permits a debtor to reorganize or liquidate its business for the benefit of itself and its creditors.  The commencement of a Chapter 11 Case creates an estate comprised of all of the legal and equitable interests of the debtor as of the date the chapter 11 petition is filed.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

---

[4]     The bracketed circles represent information that will be filled in prior to the solicitation of the Plan and Disclosure Statement.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against a debtor. Confirmation of a plan by the Bankruptcy Court binds the debtor, any person acquiring property under the plan, any creditor or ownership interest holder of a debtor, and any other person or entity subject to the terms and conditions of the plan. Subject to certain limited exceptions, the order approving confirmation of a plan of reorganization discharges a debtor from any debt, ownership interest, or other claim that arose prior to the date of confirmation of the plan and substitutes in place of such debts and other claims the obligations specified in the confirmed plan.

Certain holders of claims against a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, § 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable claimant to make an informed judgment regarding the plan. The Committee is submitting this Disclosure Statement pursuant to § 1125 of the Bankruptcy Code to holders of Claims against GOMO that are entitled to vote to accept or reject the Plan.

The Plan here contemplates that one class of creditors — General Unsecured Claims — will be the only impaired class of claimants entitled to vote on the Plan. The creditors in all other classes under the Plan are not entitled to vote either because they are unimpaired or are deemed to reject the Plan. Regardless of these creditor classifications, all owners in Garden Oaks are being given the opportunity to vote on the Proposed Amendments to the Deed Restrictions and the Bylaws.

### B. Plan Summary.

The Plan contemplates a reorganization of GOMO by (1) using GOMO's funds to make a payment to GOMO's unsecured creditors; (2) changing GOMO's name to "Garden Oaks Homeowners Association", (3) updating GOMO's bylaws to make the governance more open and transparent and (4) amending the Garden Oaks deed restrictions to (i) replace the 0.75% transfer fee with an $80.00 per year annual fee; (ii) remove all racial restrictions; and (iii) lower the voting threshold for enacting changes to deed restrictions from two-thirds (2/3) of all owners to a majority of the owners.

## II. DESCRIPTION OF THE PLAN'S TREATMENT OF CLAIMS.

### A. Administrative and Priority Claims.

#### 1. Administrative Claims.

Administrative Claims are claims that arose in connection with the administration of GOMO's bankruptcy. Under the Bankruptcy Code, Administrative Claims are a type of "priority claim" that have higher priority in payment than most other Claims.

The Committee does not believe that GOMO will have unpaid administrative claims. To the extent any exist, such claims will be paid at such time and upon such terms as set forth in a future order of the Bankruptcy Court.

2.      **Professional Compensation and Reimbursement Claims.**

GOMO and the Committee have employed attorneys as Professionals to represent them in this Bankruptcy Case.  Professionals will be paid from GOMO's funds.

All Professionals must file applications for final allowances of compensation or reimbursement of expenses under Bankruptcy Code §§ 328, 330 or 503(b) by the Professional Fee Claim Bar Date set forth in the Plan.  The order confirming the Plan will establish the date on which the Bankruptcy Court will hear and determine all applications for final allowances of compensation or reimbursement of expenses.  Parties-in-interest will have an opportunity to object to any such fee requests.

3.      **Other Priority Claims.**

Two creditors filed Proofs of Claim asserting "priority" claims against GOMO in the combined amount of $5,700.00.  The Committee does not believe that these claims properly assert priority status.  If such claims are ultimately Allowed, they will be paid at such time and upon such terms as set forth in a future order of the Bankruptcy Court.

4.      **Transfer Fees Collected During the Bankruptcy Case.**

Upon the Effective Date of the Plan, any party that paid a transfer fee during GOMO's bankruptcy case, will receive the full amount returned, without any interest, as an administrative expense claim.

5.      **Treatment of Allowed Administrative Claims and Allowed Priority Claims.**

Allowed Administrative Claims and Allowed Priority Claims will be paid in full.  Allowed Claims for Accrued Professional Compensation shall be paid in full once Allowed.

B.      **Holders of Claims Entitled to Vote.**

Under the Bankruptcy Code, only holders of allowed claims in impaired classes of claims that are not deemed to have accepted or rejected a proposed plan are entitled to vote to accept or reject a proposed chapter 11 plan.

A class is "impaired" under a plan unless, with respect to each claim or interest of such class, the plan:

- leaves unaltered the legal, equitable or contractual rights to which the holder of the claim or interest is entitled; or

- notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the

legal, equitable or contractual rights of such holder based on such claim or interest.

Classes of claims that are unimpaired under a chapter 11 plan are conclusively presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are also not entitled to vote to accept or reject the plan.

### 1. Which Classes of Claims are Entitled to Vote on the Plan?

Holders of claims in the General Unsecured Class are entitled to vote on the Plan. Additionally, all owners in Garden Oaks are entitled to decide whether to accept or reject the Proposed Amendments to the Deed Restrictions and the Bylaws.

### 2. Which Classes of Claims Are Not Entitled to Vote on the Plan?

Secured Class Claims are not Impaired; therefore, holders of Claims in that class are not entitled to vote and are deemed to accept the Plan.

Only one creditor filed a Proof of Claim asserting a secured claim against GOMO. The Committee does not believe that this claim properly asserts secured status. If the claim is ultimately Allowed, it will be paid at such time and upon such terms as set forth in a future order of the Bankruptcy Court.

### C. Acceptance of a Plan by a Class.

The Bankruptcy Code defines "acceptance" of a plan by a class of impaired Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. In the event that the Bankruptcy Court enters an order holding that any Class of Claims is unimpaired, each holder of an Allowed Claim in any such Class will be conclusively presumed to have accepted the Plan, and any votes to accept or reject the Plan submitted by holders of Claims in any such Class will be null, void, and have no effect.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Committee reserves the right to amend the Plan, request confirmation of the Plan under § 1129(b) of the Bankruptcy Code, or both. Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of a plan by one or more impaired classes of claims through a procedure known as "cram-down."

Under § 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. If a Class of Claims entitled to vote does not vote to accept the Plan, the Committee will announce its determination on whether to request confirmation of the Plan under § 1129(b) of the Bankruptcy Code prior to or at the Confirmation Hearing.

**D.      Summary of Classification and Treatment of Claims.**

In accordance with § 1123(a)(1) of the Bankruptcy Code, the Committee has not classified Administrative Claims or Priority Claims.

The following table classifies Claims against GOMO, collectively, for all purposes, including voting, confirmation, and distribution pursuant to the provisions of the Plan and pursuant to §§ 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim to be classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that such Claim or any portion thereof qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that any such Claim is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. Each Class set forth below is treated under the Plan as a distinct Class for voting and distribution purposes.

**E.      Classification and Treatment of Claims Against GOMO.**

| Proposed Treatment of Classes of Creditors Under the Plan | | |
|---|---|---|
| GOMO's Expected Available Cash on the Effective Date: $400,000 to 500,000 | | |
| **Description of Class** | **Estimated Range of claims in Class** | **Proposed Treatment Under Plan** |
| **UNCLASSIFIED CLAIMS** | | |
| Administrative Claims | $100,000 to $200,000[5] | Paid in full |
| Priority Claims | $0.00 | Paid in full |
| **SECURED CLAIMS** | | |
| Secured Claims | $0.00 | Paid in full |
| **UNSECURED CLAIMS** | | |
| General Unsecured Creditors | $250,000 to $1,500,000 | Paid pro rata share of cash remaining after payment of all other claims. |

**F.      Treatment of Claims Against GOMO.**

**1.      Secured Claim Class.**

(a)      *Classification*: The Secured Claim Class consists of all Secured Claims.

(b)      *Allowance*: GOMO shall determine any Allowed Secured Claims by agreement or by an order of the Bankruptcy Court.

(c)      *Treatment*: Except to the extent that a holder of an Allowed Secured Claim agrees to a different treatment, holders of Allowed Secured Claims, in full and final satisfaction, compromise,

---

[5]      GOMO does not anticipate having any unpaid administrative claims on the effective date other than professional fees. Accordingly, this amount is the estimated sum of outstanding, unpaid Professional Fees.

settlement, release, and discharge of and in exchange for each Allowed Secured Claim, each holder of an Allowed Secured Claim shall receive payment of its Allowed Secured Claim from Available Cash upon the Effective Date.

(d)     *Voting*:  The Secured Claim Class is unimpaired and, therefore, each holder of an Allowed Secured Claim will not be entitled to vote to accept or reject the Plan.

(e)     *Amount of Claim*:  The Committee does not believe that any creditors hold valid Secured Claims. The only purported secured claim is in the amount of $2,643.75.

## 2.     General Unsecured Class.

(a)     *Classification*:  The General Unsecured Class consists of all General Unsecured Claims. To the extent an objection is pending against a holder of a General Unsecured Class Claim on the Effective Date, no Distributions shall be made until the entire Claim has been Allowed.

(b)     *Allowance*:  General Unsecured Claims shall be deemed allowed for voting purposes by an order of the Bankruptcy Court temporarily allowing the claim for voting purposes or as follows:

(i)     If GOMO listed a General Unsecured Class Claim on its Schedule in an undisputed capacity, the holder of the Claim does not file a Proof of Claim and no party files an objection to the Claim or a motion to seek allowance or disallowance of the claim for voting purposes, the Claim will be Allowed in the amount indicated on the Schedule.

(ii)     Whether or not GOMO listed a General Unsecured Class Claim on its Schedule, if the holder of the Claim files a Proof of Claim, the Claim will be Allowed for voting purposes in the amount indicated on the Proof of Claim.

(c)     *Treatment*:  Except to the extent that a holder of an Allowed General Unsecured Class Claim agrees to a different treatment, each holder of an Allowed General Unsecured Class Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Class Claim, its pro rata share of Available Cash, that is cash available on the Final Distribution Date.

(d)     *Voting*:  General Unsecured Class is Impaired and, therefore, each holder of an Allowed General Unsecured Class Claim is entitled to vote to accept or reject the Plan.

(e)     *Amount of Claims*:  GOMO's Schedules reflect that approximately $3 million is owed to holders of General Unsecured Class Claims; however, GOMO marked all, or nearly all, of these claims as disputed.  Parties have filed proofs of claim asserting that GOMO owes approximately $1.5 million in General Unsecured Claims.   The Committee believes that after the claim objections, the amount of claims may be reduced to an amount as low as $250,000.

G. **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect GOMO's rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

H. **Special Provision Governing Votes on Changes to the Deed Restrictions.**

Changes to the Deed Restrictions require the affirmative vote of two-thirds of the lots in each Section.  Because the Plan contemplates certain amendments to the Deed Restrictions, each property owner will receive a Consent Form. (A  property owner will also receive a ballot if the homeowner is otherwise entitled to vote on the Plan as described above).  The Consent Form asks the homeowner to indicate whether he the homeowner accepts or rejects the Proposed Amendment to the Deed Restrictions.

I. **Certain Rights Reserved.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect GOMO's rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

J. **Nonconsensual Confirmation.**

The Committee reserves the right to seek confirmation of the Plan under § 1129(b) of the Bankruptcy Code.  To the extent that any Class votes to reject the Plan, the Committee further reserves the right to modify the Plan as specified therein.

## III. OVERVIEW OF GOMO'S BUSINESS.

A. **History.**

Garden Oaks is a neighborhood in northwest Houston that was founded in the 1930's. It comprises five sections that were subdivided by a single developer. The developer recorded various deed restrictions, limiting the uses to which the parcels could be put.

In May 2000, three property owners in Garden Oaks filed a notice of formation of a petition committee to create and operate a property owners association (a "POA") pursuant to pursuant to sections 201.005 and 204.006 of the Texas Property Code.  The May 2000 petition committee failed to file a successful petition within one year of the notice, and the committee was dissolved by operation of law.

In July 2001, three property owners within each section of Garden Oaks filed another notice of formation of a petition committee in order to create and operate a POA pursuant to sections 201.005 and 204.006 of the Texas Property Code. The notice attached an exhibit captioned, "Amendment of Deed Restrictions."

The July 2001 notices of formation of petition committee were invalid, ineffective, and of no force and effect because the timing of the formation of this new committee did not comply with section 201.005(f).

11

In June 2002, representatives for sections 1, 2, 3 and 5 of Garden Oaks filed a petition to amend restrictions to create a homeowners' association and certificate of compliance with Texas Property Code, section 204. The petition attached the amendment exhibit and stated that it would be incorporated into the deed restrictions. The June 2002 petition purported to establish GOMO as the POA for sections 1, 2, 3 and 5 of Garden Oaks with powers under section 204.010 of the Texas Property Code.  In practical terms, GOMO was created solely for the purpose of enforcing deed restrictions.

Since 2002, GOMO has operated as a POA under the Texas Property Code for sections 1, 2 3 and 5 of Garden Oaks.  In this role, GOMO has enforced deed restrictions against property owners and collected assessments that it asserted were mandatory under the Texas Property Code.

GOMO charged assessments in the form of Transfer Fees by demanding payment of 0.75% of the greater of (i) the gross purchase price of property or (ii) the appraisal of the property reflected in the records of the Harris County Appraisal District (the "Transfer Fee").  Thus, for example, if a person purchased a home in Garden Oaks, Section 2 for $400,000, GOMO demanded payment of $3,000.

### B.     The Transfer Fee & Associated Litigation.

The sole mandatory fee adopted by GOMO was the Transfer Fee.  The Transfer Fee was in the amount of 0.75% of the greater of (i) the gross sale price of a property or (ii) the appraisal of the property reflected in the records of the Harris County Appraisal District.

In 2012, a dispute arose between Peter and Katherine Chang, residents of Section 3, and GOMO regarding the construction of a three-car garage. GOMO alleged that Mr. Chang's garage violated the Deed Restrictions.  The Changs and GOMO eventually became involved in a state-court lawsuit concerning the issue.

In that litigation, the trial court found that GOMO's founders failed to properly form a petition committee under Texas law and thus the deed restriction modification purporting to make GOMO a mandatory POA was invalid with respect to the Changs.  Specifically, Section 201.005 of the Texas Property Code provides in relevant part that: "a new committee for that subdivision may not be validly created under this chapter before the fifth anniversary of the date of dissolution of the previous committee."  Tex. Prop. Code Ann. § 201.005.  Because the petition committee creating the Transfer Fee was formed within five years of the dissolution of the prior petition committee, the petition committee creating the Transfer Fee was invalid and of no force and effect.

A Texas appeals court later held that the finding that GOMO was not properly formed applied only to the Changs, not other residents of the neighborhood because the other residents of the neighborhood were not parties to the litigation.  *Garden Oaks Maintenance Organization v. Chang*, 542 S.W.3d 117 (Tex. App.—Houston [14th Dist.] 2017).  Nevertheless, the formation finding casts doubt over whether the Transfer Fee was valid for any property owner, given that the factual basis for the decision was the actions taken by GOMO's founders and the circumstances under which GOMO was founded.

Also, as home prices in Garden Oaks increased, the amount of the Transfer Fee likewise increased.  This led to GOMO receiving more in revenue that it could spend. Despite having funded other civic organizations in the neighborhood, by the time it filed for bankruptcy, GOMO had

amassed in excess of $500,000 in cash and $80,000 in uncashed checks from the payment of the Transfer Fee.

According to GOMO, it initiated this bankruptcy case to address the issues raised in the 2012 litigation as well as certain current legacy deficiencies in the current deed restriction scheme. GOMO continued to collect Transfer Fees during the bankruptcy case until the Bankruptcy Court ordered the suspension of the collection of transfer fees on August 16, 2019.

### C.   Deed Restrictions.

The Deed Restrictions applicable to each Section of Garden Oaks were written during the original development in the 1930's and include a racial restriction stating that property in the neighborhood cannot be sold to anyone who is not a member of the "Caucasian" race.  This restriction has been unenforceable since the 1948 United States Supreme Court decision in *Shelley v. Kraemer.* While unenforceable, it still appears in the Deed Restrictions.

The Deed Restrictions also require that any amendment to the Deed Restrictions require the affirmative vote of two-third (2/3) of all properties in each Section.

## IV.   SIGNIFICANT EVENTS IN GOMO'S CASE.

GOMO filed for bankruptcy on April 11, 2018 (the "Petition Date"). While in bankruptcy, GOMO is operating its business and managing its properties as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

### A.   Financial Condition of GOMO.

On May 4, 2018, GOMO filed its bankruptcy Schedules, which list, among other things, (i) the property GOMO owned on the Petition Date, (ii) creditors whom GOMO knows asserts unsecured claims against GOMO; and (iii) contracts that GOMO has with third-parties.  That same day, GOMO also filed its statement of financial affairs (SOFA), which lists additional financial information.  GOMO filed an amended list of creditors with unsecured claims on May 14, 2018.

According to the Schedules and SOFA, on the Petition Date, GOMO had $501,872.53 in cash, $34,360.20 in accounts receivable, approximately $1.8 million in net-operating tax losses, and less than $10,000 worth of miscellaneous office equipment and inventory.

In its Schedules, GOMO listed creditors holding approximately $3,000,000 of unsecured claims.  These claims were largely potential claims made by individuals who had paid the Transfer Fee and now could demand a refund because GOMO was held to have been improperly formed with respect to the Transfer Fee.

GOMO stated that its monthly budget consisted of $17,026.58 as its anticipated monthly income against $8,686.47 in anticipated expenditures.

The Bankruptcy Code requires GOMO to file Monthly Operating Reports (MORs) detailing its financial condition, including revenues and expenditures. In its December 2018 MOR, GOMO indicated that it was holding approximately $700,000.00 in its bank accounts.

### B.      Formation of Committee.

On May 31, 2018, the United States Trustee appointing the following individuals to serve on the Committee: Peter Shun-Hsien Chang, Cheryl Luck, Patricia Mehrkam, Gary C. Ingram, and Susanna Schmidt.  On January 31, 2019, Susanna Schmidt resigned from the Committee.  On February 15, 2019, the U.S. Trustee's office filed a Notice of Reconstituted Committee of Unsecured Creditors to reflect the removal of Susanna Schmidt from the Committee.  All of the members of the Committee are property owners and residents of Garden Oaks.

### C.      Professionals.

GOMO is represented by Johnie Patterson of Walker & Patterson, P.C, as its general bankruptcy counsel, and by Sipra Boyd of Roberts Markel Weinberg Butler Hailey, PC, as its houseowners' association counsel.  The Committee is represented by Charles Rubio of Diamond McCarthy, LLP, as its general bankruptcy counsel, and by Nina Tran of Hoover Slovacek LLP, as its homeowners' association counsel.

### D.      Adversary Case.

On June 28, 2018, the Committee filed a lawsuit against GOMO seeking to enjoin GOMO from collecting the Transfer Fee because GOMO was not properly formed and thus did not have the power to collect the Transfer Fee under Texas Property Code § 204.010 (the "Adversary Case").

As a result of the Committee's lawsuit, the Court ultimately decided that GOMO should be barred temporarily from collecting the Transfer Fee.

GOMO collected approximately $200,000 from Transfer Fees between the Petition Date and the date the Court suspending collection of the fee.

The Court has not yet indicated when, or if, it will allow GOMO to collect the Transfer Fee in the future, but has strongly advised against a plan that includes continuation of the Transfer Fee as a funding mechanism for a future POA.

## V.      MEANS FOR IMPLEMENTING THE PLAN

### A.      Available Cash.

GOMO's Available Cash will be sufficient to pay all Administrative Claims, Priority Claims, Secured Claims, and Professional Fee Claims.  The remainder will be paid to GOMO's General Unsecured Creditors.

### B.      Proposed Amendments to Deed Restrictions.

As part of its Plan, the Committee has proposed the following four changes to GOMO's deed restrictions:

### 1.      Replacing the Transfer Fee with an Annual Assessment.

To remove the doubts surrounding the validity of the Transfer Fee while providing an appropriate source of revenue for GOMO, the Committee has proposed amendments to the Deed Restrictions replacing the Transfer fee with an $80.00 annual assessment. The following language is proposed to be added to the Deed Restrictions of each section of Garden Oaks:

<u>Maintenance Fund.</u>

(a) <u>Creation of Assessments.</u>

The owners ("Owners") of any lot in this Subdivision ("Lot"), by virtue of ownership of a Lot, covenant and agree to pay to the Association an annual assessment ("Assessment") and any applicable late fees, interest and costs as more particularly set forth in these restrictions (as amended, these "Deed Restrictions"). Each such Assessment, together with attorney's fees, late fees, interest and costs, shall be the personal obligation of the person or entity who was the Owner of the Lot at the time when the Assessment became due. No diminution or abatement of Assessments or set-off shall be claimed or allowed by reason of any alleged failure of the Association to take some action or perform some function required to be taken or performed by the Association under these Deed Restrictions. The obligation to pay Assessments is a separate covenant on the part of each Owner of a Lot and is independent of any obligation of the Association.

(b) <u>Assessments.</u>

i.    <u>Purpose.</u> Assessments levied by the Association shall be used for any legal purpose for the benefit of the Subdivision as determined by the Board of Directors of the Association (the "Board") and, in particular, may, by way of example and not limitation or obligation, include operational expenses of the Association, enforcement of these Deed Restrictions, payment of insurance premiums, costs of collection and litigation, administrative expenses, and any other services ancillary to the foregoing. The Board may, in its sound discretion, give one or more of the purposes set forth herein preference over other purposes, and it is agreed that all expenses incurred and expenditures and decisions made by the Board in good faith shall be binding and conclusive on the Association.

ii.    <u>Creation.</u> Payment of the Assessment shall be the obligation of each Owner, subject to the provisions below, and shall be binding and enforceable as provided in these Deed Restrictions.

iii.    <u>Initial Rate</u>. The initial Assessment established by the Association for the period from July 1, 2019 through December 31, 2019 (the "Initial Assessment Period") is FORTY DOLLARS AND NO/100 ($40.00) per Lot.

iv.    <u>Commencement and Subsequent Rate</u>. The Assessment for a Lot for the Initial Assessment Period ($40.00) is due and payable on July 1, 2019, and shall be delinquent if not paid in full on or before July 31, 2019.  Beginning with the calendar year 2020, the Assessment shall not exceed EIGHTY DOLLARS AND NO/100 ($80.00) per Lot per calendar year as determined annually by the Board and is due in advance on January 1 of each year, and shall be delinquent if not paid in full on or before January 31 of such year.

v.    <u>Replatted Lots.</u> An Owner who formally re-plats two (2) or more Lots into one (1) Lot with the approval of the City of Houston Planning and Development

Department shall owe one (1) Assessment. Similarly, an Owner who subdivides a Lot shall pay one (1) Assessment per Lot created by the subdivision of the Lot.

vi.     <u>Levying of the Assessment</u>. The Board shall determine the sufficiency or insufficiency of the then-current Assessment for the Association to reasonably meet its expenses (and within the limits as set forth in Section (b)(viii) below) and may, increase the Assessment in an amount up to three percent (3%) over the maximum amount of the Assessment that could have been assessed in the prior calendar year (the "Prior Year Maximum Assessment"). The Assessment may only be increased by more than three percent (3%) over the Prior Year Maximum Assessment, but no more than ten percent (10%) over the Prior Year Maximum Assessment if such increase is approved by a majority of the Members of the Association (the "Members") present, in person or by proxy, electronic ballot, or absentee ballot, at a meeting of the Members called for said purpose at which a quorum is present, in person or by proxy, electronic ballot, or absentee ballot. The Assessment may only be increased in an amount more than ten percent (10%) over the Prior Year Maximum Assessment if such increase is approved by Owners of a majority of the Lots in the Subdivision subject to such Assessments. The Assessment shall not be increased more than once in a calendar year nor shall any increase be construed to take effect retroactively.

vii.     <u>Cap on Association Reserve Funds.</u> The Association is limited on the amount of funds it may hold in reserve or otherwise ("Reserve Funds") to no more than an amount not to exceed the Association's estimated budget for the coming calendar year. In the event the Reserve Funds exceed such amount, the Association shall provide Owners with a prorated credit based upon the number of Lots in the Subdivision subject to Assessments for such excess. For example, if the Reserve Funds total $100,000.00 and the Association's estimated budget for the next calendar year is $80,000.00, the Association shall credit the Owners based upon the number of Lots in the Subdivision subject to Assessments, a prorated portion of the excess ($20,000.00) on the next levy of the Assessments. The cap on the Reserve Funds and credit, if any, shall not affect the levy of Assessments or any increase in the maximum amount of the Assessment.

(c) <u>Enforcement.</u>

The Association may bring an action in law against the Owner personally obligated to pay the Assessment, late fees as reasonably determined by the Board, interest as reasonably determined by the Board and not to exceed the maximum non-usurious rates that may be charged under Texas or Federal law, and costs, including attorneys' fees, incurred by the Association in collecting same and obtain a personal judgment against the Owner. No lien is created herein to secure the payment of the Assessment, late fees, interest, costs, and attorneys' fees.

(d) <u>Revocation of Other Mandatory Fees.</u>

Except as set forth in this Amendment to the extent that any provision in the Deed Restrictions or the Association's Bylaws seeks to impose any other mandatory assessment or fee, such a provision is null and void.

## 2. Removing Racial Restrictions.

The Deed Restrictions for each Section include the following racial restriction language:

None of the lots shown on said plat shall be conveyed, leased, given to, or placed in the care of, and no building erected thereon shall be used, owned or occupied by any person other than of the Caucasian Race. This prohibition however, is not intended to include the occupancy or use by persons other than of the Caucasian Race while employed as servants on the premises. The word "person" as used herein, shall include a corporation or association, any of the stockholders of which are not of the Caucasian Race.

The Proposed Amendment to the Restrictions removes this language entirely

## 3. Establishing Procedure for Making Future Amendments.

The Plan proposes that the following language be added to the Deed Restrictions in order to facilitate the process for amending the Deed Restrictions.

<u>Amending and Modifying Deed Restrictions:</u>

Notwithstanding any other provision in the Deed Restrictions to the contrary, the following shall apply:

(a) Approval by the Owners of a majority (fifty percent (50%) plus one (1)) of the Lots in this Subdivision shall be required to amend or modify these Deed Restrictions.  Upon approval of the Owners, as set out herein, the amendment or modification shall be recorded in the Official Public Records of Harris County, Texas, whereupon to the extent of any conflict with the current Deed Restrictions and the new amendment, the new amendment shall control.

(b) The approval of multiple Owners of a Lot may be reflected by the signature of any one (1) Owner of such Lot. Notwithstanding anything contained herein to the contrary, the Association shall be entitled to use any combination of the following methods to obtain approval of the Owners for an amendment to these Deed Restrictions:

   i.      by written ballot or electronic ballot, as same may be established by the Association, that states the substance of the amendment and specifies the date by which a written ballot or electronic ballot must be received to be counted;

   ii.     at a meeting of the members of the Association, if written notice of the meeting stating the purpose of the meeting is delivered to the Owners of the Lots;

such notice may be hand-delivered to the Owners, sent via regular mail to the Owner's last known mailing address, as reflected in the Association's records, or via email to the Owner's email address as reflected in the Association's records;

       iii.    by door-to-door circulation of a petition by the Association or a person authorized by the Association; and

       iv.    any combination of the foregoing and any other method not prohibited under the Deed Restrictions and otherwise in accordance with applicable law.

       **4.**      **Name Change and Successor-in-Interest.**

The Committee proposes changing GOMO's name to demarcate the transition to a reorganized property owners association for Garden Oaks. The new name will be "Garden Oaks Homeowners Association," which the Committee believes better describes the organization's role going forward.

       **C.**      **Proposed Amendments to Bylaws.**

Pursuant to the Texas Business Organizations Code, the adoption of the Bylaws is the function of the installed Board. Promptly following the confirmation of the Plan, the Board shall adopt the Proposed Amendment to the Bylaws. The Proposed Amendment to the Bylaws include the following changes:

(i)      Changes the name of GOMO to Garden Oaks Homeowners Association;

(ii)     Establishes quorum rules for members and Directors and allows for member voting by proxy, absentee ballot, or electronic ballot.

(iii)    Establishes member oversight to the Board's ability to increase the assessment beyond a certain amount.

The full terms of the Proposed Amendment to the Bylaws are attached to the Plan.

       **D.**      **Approval by Sections.**

If some, but not all, Sections receive sufficient consents to adopt the Proposed Amendments to the Deed Restrictions, then after the Effective Date, Garden Oaks HOA shall be in force only with respect to those Sections that adopt the Proposed Amendments to the Deed Restrictions.

If no Section votes in favor of the Proposed Amendments to the Deed Restrictions, then after the Effective Date, Garden Oaks HOA shall be funded exclusively through voluntary donations and it may enforce deed restrictions as permitted under applicable non-bankruptcy law.

For any Section that does not receive sufficient consents to adopt to the Proposed Amendments to the Deed Restrictions, Garden Oaks HOA shall consent to entry of a declaratory judgment in the Adversary Case prohibiting Garden Oaks HOA or GOMO from collecting the

Transfer Fee for such section.   Such declaratory judgment may be recorded in the real property records.

### E.      Election of New Board of Directors.

There will be an election of new directors that will coincide with the Effective Date (the "Plan Election"). The Plan Election will be conducted according to procedures set forth herein.

In connection with the Plan Election, the homeowners will be entitled to elect three (3) Directors to represent their respective Sections.  One director for each Section will serve a term of approximately one (1) year – from the Effective Date until the first annual meeting following the Effective Date.   One (1) Director for each Section will serve a term of approximately two (2) years – from the Effective Date until the second annual meeting following the Effective Date.    One (1) Director for each Section will serve a term of approximately three (3) years – from the Effective Date until the third annual meeting following the  Effective Date.

In connection with the Plan Election, the candidate from each Section receiving the highest number of votes will serve the term of approximately three years, the candidate from each Section receiving the next highest number of votes will serve the term of approximately two years and the candidate from each Section receiving the next highest numbers of votes will serve the partial-year term.

In an election where two (2) or more candidates receive the same number of votes resulting in a tie, the winner of the election will be chosen by lot.

### F.      Use of Third-Party Management Company

The new Board of Directors is authorized to contract with a management company that will be responsible for day-to-day oversight of Deed Restriction enforcement issues. The Committee believes that having Garden Oaks HOA hire a management company is the most cost-effective method for objectively and efficiently enforcing Deed Restrictions.

### G.      Operations of GOMO Between the Confirmation Date and the Effective Date.

GOMO shall continue to operate as debtor in possession during the period from the Confirmation Date through the Effective Date.

### H.      Terms of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays provided for in GOMO's Chapter 11 Case pursuant to §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Case is closed.

### I.      Conditions to Effectiveness

The Plan will become effective upon the occurrence of each of the following:

(i)     the Confirmation Order becomes a Final Order and no stay of the Confirmation Order is in effect, unless the Committee elects, in its sole discretion, to consummate the Plan on an earlier date if an appeal is timely filed;

(ii)    payment of any and all Allowed Secured Claims; and

(iii)   payment of any and all Allowed Priority Claims.

**J.      GOMO's and Creditors' Committee Professionals.**

Upon the Effective Date, the Professionals employed by GOMO and the Committee shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case; *provided, however*, that such Professionals shall be deemed retained after such date with respect to:  (i) applications filed pursuant to §§ 330 and 331 of the Bankruptcy Code; (ii) motions seeking enforcement of the provisions of the Plan or the Confirmation Order; (iii) review and, if appropriate, objections to any request for compensation or expense reimbursement filed by a Professional; (iv) defend against appeals of the Confirmation Order, if any; and (v) in the case of the Committee Professionals, the Post Effective Date Actions (defined below).  Garden Oaks HOA shall pay the fees, costs and expenses of such Professionals incurred after the Effective Date from Available Cash, if such fees, costs and expenses are approved by the Bankruptcy Court.

**K.      Post-Effective Date Actions.**

Following the Effective Date, that the Committee shall continue to exist and have authority to act in this Chapter 11 Case, and its Professionals shall be deemed retained, after such date with respect to (collectively, the "*Post-Effective Date Actions*"): (i) seek reimbursement of expenses sought by a member of the Committee; (ii) pursue and resolve objections to Claims, and (iii) any other action that the Committee and the Professionals are permitted to take after the Effective Date by the terms of the Plan or by a Final Order of the Bankruptcy Court.  Upon substantial completion of the Post-Effective Date Actions, as determined by the Committee in its reasonable business judgement, the Committee shall file a notice (the "*Completion Notice*") on the docket in the Bankruptcy Case.   Upon the filing of the Completion Notice, the Committee shall dissolve, and its members and Professionals shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Case.

Garden Oaks HOA shall pay the fees, costs and expenses of such Professionals incurred after the Effective Date from Available Cash, if the Bankruptcy Court approves such fees, costs and expenses.

Promptly following the Completion Notice, Garden Oaks HOA shall make the Final Distribution.

## VI.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distributions to Holders of Unsecured Claims.

After the Effective Date, Garden Oaks HOA may make interim distributions of Available Cash to claimholders in the General Unsecured Class on a pro rata basis; provided that, Garden Oaks HOA must reserve the amount that would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed; and provided further that, Garden Oaks HOA must make an appropriate reserve for administrative claims arising under the Plan after the Effective Date.

### B.    Delivery of Distributions.

#### 1.    General Provisions; Undeliverable Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made at (i) the address of each holder as set forth in the Schedule, unless superseded by the address set forth on proofs of Claim filed by such holder or (ii) the last known address of such holder if no proof of Claim is filed or if Garden Oaks HOA has been notified in writing of a change of address.  If any Distribution is returned as undeliverable, Garden Oaks HOA may, in its discretion, make such efforts to determine the current address of the holder of the Claim with respect to which the Distribution was made, but no Distribution to any holder shall be made unless and until the then-current address of the holder has been determined, at which time the Distribution to such holder shall be made to the holder without interest from and after the Effective Date through the date of Distribution.  Amounts in respect of any undeliverable Distributions shall be returned to, and held in trust by, Garden Oaks HOA until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth in the Plan.

#### 2.    Unclaimed Property.

Except with respect to property not distributed because it is being held in the Disputed Reserve, Distributions that are not claimed by the expiration of one year from the Effective Date shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code, and the Claims with respect to which those Distributions are made shall be automatically cancelled.  After the expiration of that one-year period, the right of any Person to those Distributions shall be discharged and forever barred.

### C.    Manner of Cash Payments Under the Plan.

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by Garden Oaks HOA.

### D.    Time Bar to Cash Payments by Check.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to the Plan shall be made directly to Garden Oaks HOA by the holder of the Allowed Claim to whom the check was originally issued.  Any Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Effective Date or

the first anniversary of the date on which the Claim at issue became an Allowed Claim. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall become unclaimed property in accordance with section 347(b) of the Bankruptcy Code.

### E.    Compliance with Tax Requirements.

In connection with making Distributions under the Plan, to the extent applicable, Garden Oaks HOA shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Garden Oaks HOA may withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by Garden Oaks HOA to the appropriate authority. If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within six months from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as an undeliverable Distribution in accordance with the Plan.

### F.    No Payments of Fractional Dollars and Minimum Distributions.

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar. Garden Oaks HOA shall not be obligated to make any Distribution of less than $5.00.

### G.    Interest on Claims.

Except as specifically provided for in the Plan or the Confirmation Order, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any Claim, or portion thereof, that is a Disputed Claim in respect of the period from the Effective Date to the date such Disputed Claim, or portion thereof, becomes an Allowed Claim and Distributions are made on account thereof. Except as expressly provided in the Plan or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

### H.    No Distribution in Excess of Allowed Amount of Claim.

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

### I.    Setoff and Recoupment.

GOMO may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that GOMO may have against the holder of such Claim, but neither the failure to do so

nor the allowance of any Claim under the Plan shall constitute a waiver or release by GOMO of any right of setoff or recoupment that any of them may have against the holder of any Claim.

J.    **Establishment of the Administrative Claims Bar Date.**

The Confirmation Order will establish a deadline by which creditors must file applications for Administrative Claims. That date is known as the Administrative Claims Bar Date.

On or before the Administrative Claims Bar Date, each holder of an Administrative Claim shall file with the Bankruptcy Court a request for payment of its Administrative Claim. The request for payment of an Administrative Claim will be timely filed only if it is actually received by the Bankruptcy Court by the Administrative Claims Bar Date.

Professionals shall not be required to file a request for fees and expenses arising under §§ 328, 330, 331 or 503(b)(2)–(5) of the Bankruptcy Code on or before the Administrative Claims Bar Date, as they will instead file final fee applications by the Professional Fee Claim Bar Date.

## VII.    DISPUTED CLAIMS

A.    **No Distribution Pending Allowance.**

Notwithstanding any other provision of the Plan, Garden Oaks HOA shall not distribute any Cash or other property on account of any Claim that is Disputed unless and until such Claim or portion thereof becomes Allowed.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been Allowed on the Effective Date.

B.    **Resolution of Disputed Claims; Claim Objection Deadline.**

Following the Effective Date, the Committee shall have the exclusive right to make and file objections to any Claims. No other party, including Garden Oaks HOA, shall have the right to object to Claims after the Effective Date.

All objections to Disputed Claims will be filed and served upon the holders of each such Claim not later than one hundred eighty (180) days after the Effective Date; provided that this time period may be extended for additional period of sixty (60) day if the Committee files a notice of extension on the docket prior to the expiration of the last period. Furthermore, the time period to object to claims will continue as long as there are unresolved claim objections.

C.    **Estimation of Claims.**

At any time, the Committee may ask the Bankruptcy Court to estimate any contingent or unliquidated Claim to the extent permitted by § 502(c) of the Bankruptcy Code, regardless whether any party previously objected to such Claim or whether the Bankruptcy Court ruled on any such objection.

The Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Claim, the Committee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.

All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## VIII.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.   Assumption and Rejection of Executory Contracts and Unexpired Leases.

The Plan will constitute a motion to reject all Executory Contracts and Unexpired Leases. The entry of the Confirmation Order by the Bankruptcy Court will constitute approval of all such rejections and assumptions and assignments pursuant to §§ 365(a) and 1123 of the Bankruptcy Code.

### B.   Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Claims resulting from the rejection of Executory Contracts and Unexpired Leases or the expiration or termination of any Executory Contract or Unexpired Lease after the entry of the Confirmation Order, but prior to the Effective Date, must be filed with the Bankruptcy Court and served on Garden Oaks HOA no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease for which proofs of Claim are not timely filed within that time period will be forever barred from asserting against Garden Oaks HOA, its assets, or properties unless otherwise ordered by the Bankruptcy Court. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in the Plan. Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all such Claims that are timely filed as provided in the Plan shall be treated as a General Unsecured Class Claim.

The Committee does not believe that there will be claims based on the rejection of GOMO's executory contracts or unexpired leases.

## IX.   INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.   Compromise and Settlement.

Pursuant to § 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan will constitute a good faith compromise of all Claims against GOMO. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of GOMO and holders of Claims.

**B.      Releases.**

(a)      *The Releasees.*   The Plan defines the "Releasees" as the Committee, and the Professionals of the Committee in this Chapter 11 Case.

(b)      *Releases by GOMO.*   Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, without limitation, the services of the Releasees in facilitating the expeditious implementation of the Plan, GOMO hereby provides a full release to the Releasees (and each such Releasee so released shall be deemed released and discharged by GOMO) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by GOMO, existing or taking place prior to or on the Effective Date arising from or related in any way to GOMO, including, without limitation, those that GOMO would have been legally entitled to assert or that any holder of a Claim or other Entity would have been legally entitled to assert for or on behalf of GOMO and further including those in any way related to GOMO's bankruptcy estate, the Chapter 11 Cases or the Plan; *provided, however*, that the foregoing provisions in the Plan shall not operate to waive or release the Releasees from any obligation under this Plan or the Confirmation Order, as applicable.

(c)      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article VIII.B of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of GOMO and all holders of Claims; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Releasees asserting any Claim or Cause of Action thereby released.

**C.      Exculpation.**

Notwithstanding anything contained in the Plan to the contrary, the Releasees shall neither have nor incur any liability to any Entity for any Claims or Causes of Action arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, or other agreement or document created or entered into in connection with the Plan or Disclosure Statement or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Plan; *provided, however*, that the provisions of this paragraph shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided, further*, that each Releasee shall be entitled to rely upon the advice of counsel concerning its duties.

**D.      Dismissal of Adversary Proceeding.**

For any Section that does not receive sufficient consents to adopt to the Proposed Amendments to the Deed Restrictions, Garden Oaks HOA shall consent to entry of a declaratory judgment in the Adversary Case prohibiting Garden Oaks HOA or GOMO from collecting the Transfer Fee for such section.

The Committee shall dismiss the Adversary Case after entry of such required declaratory judgment and, if no such declaratory judgment is required, within five (5) days of the Effective Date.

**E.      Injunction.**

**Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against Garden Oaks HOA and its assets and properties, as the case may be, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.**

**(a)      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against Garden Oaks HOA the Committee, their successors and assigns and their assets and properties, any other Claims based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.**

**(b)      The rights afforded in the Plan and the treatment of all Claims in the Plan shall be in exchange for and in complete satisfaction of Claims of any nature whatsoever, against GOMO, Garden Oaks HOA or any of their assets or properties.  On the Effective Date, all such Claims against GOMO or Garden Oaks HOA shall be satisfied and released in full.**

**(c)      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim satisfied and released hereby, from:**

**i.      commencing or continuing in any manner any action or other proceeding of any kind against GOMO, Garden Oaks HOA, their successors and assigns, or its assets and properties;**

**ii.      enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against GOMO, Garden Oaks HOA, their successors and assigns, or its assets and properties;**

**iii.      creating, perfecting or enforcing any encumbrance of any kind against GOMO, Garden Oaks HOA, their successors and assigns, or its assets and properties;**

**iv.      asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from GOMO or against GOMO's property, except to the extent**

**a right to setoff, recoupment or subrogation is asserted with respect to a timely filed proof of claim; or**

     v.     **commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Cause of Action released or settled hereunder.**

    **F.**    **Discharge.**

If the Plan is confirmed, it will discharge GOMO from all dischargeable pre-confirmation debts pursuant to section 1141(d) of the Bankruptcy Code.

**X.**    **SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  Further, a consent form is being provided to all owners in Garden Oaks seeking their vote on the Proposed Amendments to the Deed Restrictions. The procedures and instructions for voting and related deadlines are set forth in the Disclosure Statement Order [ECF [●]].

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND THE INSTRUCTIONS ACCOMPANYING THE BALLOT FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

    **A.**    **Holders of Claims Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all holders of Claims against a debtor are entitled to vote on a chapter 11 plan.  The Committee is soliciting votes to accept or reject the Plan only from holders of General Unsecured Class Claims.  The holders of General Unsecured Class Claims are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, holders of General Unsecured Class Claims have the right to vote to accept or reject the Plan.

The Committee is not soliciting votes from holders of any other class.  Additionally, the Disclosure Statement Order provides that certain holders of Claims in General Unsecured Class, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

    **B.**    **Voting Record Date.**

**The Voting Record Date is [●], 2019.**  The Voting Record Date is the date on which it will be determined which holders of Claims in General Unsecured Class are entitled to vote to accept or

reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

      **C.**     **Submitting Votes on the Plan.**

      **The Voting Deadline is [●], 2019, at [●].m. (prevailing Central Time).**  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered (either by email, U.S. mail, courier, or personal delivery) so that the ballots are **actually received** by Creditors' Committee Counsel on or before the Voting Deadline by one of the following methods:

| If by Email: | If by U.S. Mail/Courier/ Personal Delivery: |
|---|---|
| Send the completed ballots and/or consent forms to the following email address:<br><br>gardenoaks@diamondmccarthy.com | Send the completed ballots and/or consent form to the following address:<br><br>Diamond McCarthy LLP<br>Attention: GOMO Processing<br>909 Fannin, Suite 3700<br>Houston, Texas  77010 |

      The Voting Deadline and procedures for submitting Consent Forms is the same as that for ballots.

      **D.**     **Which Ballots Are Not Counted.**

      **No ballot will be counted toward confirmation if, among other things:**

      1.     it is illegible or contains insufficient information to permit the identification of the holder of the Claim;

      2.     it was transmitted by a method other than as specifically set forth in the ballots;

      3.     it was cast by a Person or Entity that is not entitled to vote on the Plan;

      4.     it was cast for a Claim listed in GOMO's Schedules as contingent, unliquidated, or disputed, for which the applicable Claims bar date has passed and no Proof of Claim was timely filed, or to which GOMO, the Committee, or another party-in-interest with standing has objected, and such objection remains unresolved;

      5.     it is unsigned; or

      6.     it is not clearly marked to either accept or reject the Plan, or it is marked both to accept and reject the Plan.

      **E.**     **Which Consent Forms Are Not Counted.**

**No consent form will be counted toward confirmation if, among other things:**

1.       it is illegible;

2.       it was transmitted by facsimile, email, or other electronic means other than as specifically set forth in the ballots;

3.       it is unsigned; or

4.       it is not clearly marked to either accept or reject the Proposed Amendments to the Deed Restrictions and Bylaws, or it is marked both to accept and reject the Proposed Amendments.

**Please refer to the Disclosure Statement Order, and the instructions accompanying the ballot and consent form provided to you for additional requirements with respect to voting to accept or reject the Plan or submitting the consent form.**

**ANY BALLOT OR CONSENT FORM RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, OR THE INSTRUCTIONS ACCOMPANYING THE BALLOT PROVIDED TO YOU WILL <u>NOT</u> BE COUNTED.**

## XI. CONFIRMATION OF THE PLAN

### A. Requirements for Confirmation of the Plan.

Among the requirements for confirmation of the Plan pursuant to § 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of § 1129 of the Bankruptcy Code. The Committee believes that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Committee has complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B. Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test,  § 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a Claim in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if GOMO were liquidated under chapter 7.

The Committee believes that confirmation of the Plan will provide a greater monetary return to holders of Claims as would a liquidation under chapter 7 of the Bankruptcy Code.   If the case is converted to a Chapter 7 case, then there would be substantial administrative costs incurred for a chapter 7 trustee and its professionals to administer the bankruptcy case.   Because the Plan uses all Available Cash to satisfy administrative claims and creditor claims and because the Plan avoids the

additional administrative costs inherent in a conversion to a chapter 7 bankruptcy case, the Plan satisfies the best interest of the creditors test and will provide more to the general unsecured creditors then liquidation under chapter 7.

A liquidation analysis showing examples of returns to holders of claims under the chapter 11 plan compared to a hypothetical chapter 7 liquidation is attached hereto as **Exhibit A**.

### C.      Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Committee proposes an orderly reorganization of GOMO that abandons the Transfer Fee. Garden Oaks HOA will be able to operate either from the mandatory annual fee, if the Proposed Amendment to the Deed Restrictions is adopted, or from voluntary donations, if the Proposed Amendment to the Deed Restrictions is not adopted.   Under either scenario, GOMO and Garden Oaks HAO will not likely be followed by liquidation or further reorganization.

The projected Garden Oaks HOA post-confirmation budget attached hereto as **Exhibit B** reflects that the $80 annual assessment is sufficient to satisfy Garden Oaks HOA's expenses.

### D.      Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of Claims impaired under a plan accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[6]   Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.      Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to § 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan Committee's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly"

---

[6]       A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles the holder of such claim.

and is "fair and equitable" with respect to each class of Claims that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Committee reserves the right to seek to confirm the Plan utilizing the "cramdown" provision of § 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Committee will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Committee reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

## 1. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.,* classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

## 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to a dissenting class, the test sets different standards depending upon the type of claims in the class.

### (a) Secured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims may be satisfied, among other things, if a debtor demonstrates that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

### (b) Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to

the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property.

### (c)     Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:  (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date of the plan, equal to the greater of:  (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (ii) if the class does not receive the amount as required under (i) no class of interests junior to the non-accepting class may receive a distribution under the plan.

## XII.   TAX CONSEQUENCES OF THE PLAN

ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## XIII.   CONCLUSION AND RECOMMENDATION

In the opinion of the Committee, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides equal to or greater value to GOMO's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. Further, the Committee believes that payments will be made to creditors more quickly under this Plan than in a Chapter 7.   In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to holders of Allowed Claims than that which is proposed under the Plan.

Accordingly, the Committee recommends that holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan and vote in favor of the Proposed Amendments to the Deed Restrictions by returning their Ballots and Consent Forms so that they will be received by the Committee no later than [●].m. (prevailing Central Time) on [●], 2019.

Dated: March 11, 2019                    Respectfully submitted,


                                         DIAMOND McCARTHY LLP

                                         By: */s/ Charles M. Rubio*
                                         Charles M. Rubio
                                         TBA No. 24083768
                                         crubio@diamondmccarthy.com
                                         (713) 333-5127 Telephone
                                         Michael D. Fritz
                                         TBA No. 24083029
                                         mfritz@diamondmccarthy.com
                                         (713) 333-5128 Telephone
                                         909 Fannin, Suite 3700
                                         Houston, TX 77010

                                         *Counsel to the Official Committee of Unsecured Creditors of
                                         Garden Oaks Maintenance Organization, Inc.*

Exhibit A

**Liquidation Analysis**

| Liquidation Analysis | | | | |
|---|---|---|---|---|
| **Low Recovery Scenario** | | | | |
| **Available Cash** | | **Chapter 7 Expenses** | **Chapter 7 Distribution** | **Chapter 11 Distribution** |
| $  200,000.00 | | Chapter 7 Trustee Fee | $13,250.00 | |
| | | Chapter 7 Counsel | $50,000.00 | |
| | | **Unseucred Creditor Recovery ($)** | $  136,750.00 | $  200,000.00 |
| | | **Unseucred Creditor Recovery ($)** | 27% | 40% |
| | | | | |
| **High Recovery Scenario** | | | | |
| **Available Cash** | | **Chapter 7 Expenses** | **Chapter 7 Distribution** | **Chapter 11 Distribution** |
| $  400,000.00 | | Chapter 7 Trustee Fee | $23,250.00 | |
| | | Chapter 7 Counsel | $50,000.00 | |
| | | **Unseucred Creditor Recovery ($)** | $  326,750.00 | $  400,000.00 |
| | | **Unseucred Creditor Recovery ($)** | 65% | 80% |
| **Notes/Assumptions** | | | | |

Analysis assumes there will be $200,000 available to creditors in Low Recovery Scenario and $400,000 available to creditors in a High Recovery Scenario.

For the recovery percentage calculation, analysis assumes that there will be $500,000 of allowed general unsecured claims.

Exhibit B

# Budget

**Garden Oaks HOA Indicative Annual Budget**
**Official Committee of the Unsecured Creditors**
**March 2019**

**Key Assumptions:**

| | | | |
|---|---|---|---|
| Number of Lot/Owners (Sections 1,2,3,5) | 1,153 | 100% | |
| Delinquencies | 231 | 20% | |
| Paid Assessments | 922 | 83% | |
| Required Budget Contingency | 20% | | |

| Annual Budget | Annual | Monthly | Annual Per Lot | Monthly Per Lot | Percent of Budget |
|---|---|---|---|---|---|
| **Contracts/Services** | | | | | |
| Management Services | $ 58,000 | $ 4,833 | $ 50.30 | $ 4.19 | 63.2% |
| CPA - Tax Preparation | $ 500 | $ 42 | $ 0.43 | $ 0.04 | 0.5% |
| Architectural Review/Inspection | $ 6,000 | $ 500 | $ 5.20 | $ 0.43 | 6.5% |
| Sub Total | **$ 64,500** | **$ 5,375** | **$ 55.94** | **$ 4.66** | **84.3%** |
| | | | | | |
| **General Administrative** | | | | | |
| Insurance | $ 2,000 | $ 167 | $ 1.73 | $ 0.14 | 2.2% |
| Postage/Copies/Mailings Adminstrative | $ 3,000 | $ 250 | $ 2.60 | $ 0.22 | 3.3% |
| Audits | $ 1,500 | $ 125 | $ 1.30 | $ 0.11 | 1.6% |
| Legal Fees | $ 5,000 | $ 417 | $ 4.34 | $ 0.36 | 5.4% |
| Website | $ 500 | $ 42 | $ 0.43 | $ 0.04 | 0.5% |
| Sub-Total | **$ 12,000** | **$ 1,000** | **$ 10.41** | **$ 0.87** | **15.7%** |
| | | | | | |
| Nominal Budget Total | $ 76,500 | $ 6,375 | $ 66.35 | $ 5.53 | 100.0% |
| Contingency | $ 15,300 | $ 1,275 | $ 13.27 | $ 1.11 | 16.7% |
| **Total Budget** | **$ 91,800** | **$ 7,650** | **$ 79.62** | **$ 6.63** | 100.0% |

| Notes/Assumptions | |
|---|---|
| No office - all meetings assumed to be held at GOMM | |
| An additional one time initial set up fee of $2500 is required by Management Company, (~$2.25 per lot) | |
| Includes additional mail outs & engagement of the neighborhood in first year ~$2,000 | |
| Assumes minimal consultation with engineer or architect for architectural review | |
| Assumes minimal legal counsel required 1-2 hours per month | |
| **Key Management Company Services** | |
| Initial Set up and transition to services | |
| Administration of regular and Annual and Quarterly Board / Member Meetings | |
| Faciliation of Architectual Reviews | |
| Board & Member Online Portal with general and specific account information available | |
| All Collections of Assessments and Delinquencies | |
| Deed Restriction Monthly Monitoring & Enforcement | |
| New Owner welcome information and process | |
| All Financial Management and Reporting | |
| Insurance Policy Management | |
| Record keeping and storage | |
| Transfer & Resale management with Title Co. | |